No. 22-15870

# 𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘 𝖋𝖔𝖗 𝖙𝖍𝖊 𝕹𝖎𝖓𝖙𝖍 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

―――――――――――――

MICHAEL ZELENY,
*Plaintiff-Appellant*,

v.

ROB BONTA, California Attorney General, in his official capacity,
*Defendant-Appellee*,

and

CITY OF MENLO PARK, a municipal corporation; DAVE BERTINI, an individual,
in his official capacity; NEW ENTERPRISE ASSOCIATES, INC.,
a Delaware corporation,
*Defendants*.

―――――――――――――

On Appeal from the United States District Court for Northern California,
San Francisco, No. 3:17-cv-07357-RS
The Honorable Richard G. Seeborg

―――――――――――

**EXCERPTS OF RECORD FOR APPELLANT MICHAEL ZELENY
VOLUME 2 of 3 (ER-21-ER-314)**

―――――――――――

ALAN ALEXANDER BECK
Attorney at Law
2692 Harcourt Drive
San Diego, California 92123
(619) 905-9105
Alan.alexander.beck@gmail.com

1  David W. Affeld, State Bar No. 123922
   Brian R. England, State Bar. No. 211335
2  Damion Robinson, State Bar No. 262573
   Affeld Grivakes LLP
3  2049 Century Park East, Ste. 2460
   Los Angeles, CA 90067
4  Telephone:    (310) 979-8700

5  Attorneys for Plaintiff Michael Zeleny

6

7

8                  **UNITED STATES DISTRICT COURT**

9                **NORTHERN DISTRICT OF CALIFORNIA**

10

11 MICHAEL ZELENY,                    Case No. CV 17-7357 RS

12        Plaintiff,                  Assigned to:
                                      The Honorable Richard G. Seeborg
13            vs.
                                      Discovery Matters:
14 GAVIN NEWSOM, *et al.*,            The Honorable Thomas S. Hixson

15        Defendants.
                                      **DECLARATION OF DAMION**
16                                    **ROBINSON IN SUPPORT OF**
                                      **PLAINTIFF MICHAEL ZELENY'S**
17                                    **MOTION FOR PARTIAL SUMMARY**
                                      **JUDGMENT AGAINST CALIFORNIA**
18                                    **ATTORNEY GENERAL XAVIER**
                                      **BECERRA**
19
                                      Date:        February 25, 2021
20                                    Time:        1:30 p.m.
                                      Courtroom: 3, 17th Floor
21

22                                    Action Filed:  December 28, 2017
23                                    Trial Date:    TBD

24

25

26

27

28

---

- 1 -

ROBINSON DECL. ISO MOTION FOR PARTIAL SUMMARY JUDGMENT

**ER-22**

I, Damion Robinson, declare:

1.     My law firm and I are counsel of record to plaintiff Michael Zeleny ("Zeleny") in this matter.  I have personal knowledge of the facts below or knowledge based on the records and files regularly maintained by my firm in the ordinary course of business.  I could testify competently to these facts if called upon to do so.

2.     On or about January 25, 2019, I served Plaintiff Michael Zeleny's First Set of Interrogatories to Xavier Becerra ("Becerra").  Becerra responded on or about April 3, 2019.  He declined to take a clear position on what the phrase "authorized participant" means under California Penal Code § 26375 and 26405(r).

3.     On or about February 12, 2020, I caused to be served Plaintiff Michael Zeleny's Interrogatories to Xavier Becerra, Set Two.  Becerra responded on March 13, 2020.  Again, he failed to take a clear position on the "authorized participant" exception.

4.     On or about August 26, 2020, we filed a letter brief requesting further responses to the interrogatories addressing the "authorized participant" provision.  *See* Dkt. No. 135.  After a hearing, Magistrate Judge Hixson issued an order on September 4, 2020, directing Becerra to respond further to the interrogatories.  Dkt. No. 140.

5.     Becerra moved for relief from the September 4, 2020 order.  The Court denied his motion on October 5, 2020.  Dkt. No. 148.

6.     Becerra provided amended responses to the interrogatories on October 6, 2020.  The responses still appeared to be deficient.  I, thus, met and conferred with counsel for Becerra.

7.     Becerra provided Second Amended Responses to the interrogatories on October 23, 2020.  The Second Amended Responses contain the original responses (April 3, 2019 and March 13, 2020), the Amended Responses (October 6), and the updated, Second Amended Responses (October 23, 2020).  For ease of reference, only the Second Amended Responses are attached.

8.     Attached as **Exhibit 1** is a true copy of Becerra's Second Amended Responses to Plaintiff Michael Zeleny's First Set of Interrogatories.

9.     Attached as **Exhibit 2** is a true copy of Becerra's Second Amended Responses to Plaintiff Michael Zeleny's Interrogatories, Set Two.

- 2 -

10. Attached as **Exhibit 3** is a true copy of the Expert Declaration of Michael Tristano.

11. Attached as **Exhibit 4** is a true copy of the Expert Declaration of Robert Latham Brown.

12. Attached as **Exhibit 5** is a true copy of excerpts of Volume II of the transcript of the deposition of Dave Bertini in this matter, testifying individually and as the Rule 30(b)(6) designee of the City of Menlo Park.

13. Attached as **Exhibit 6** is a true copy of excerpts of the deposition of Blake Graham taken in this matter, testifying as the Rule 30(b)(6) designee of the State of California.

14. Exhibits 1 through 7 to the accompanying Request for Judicial Notice are documents that I located through online research. I obtained the legislative history materials attached as Exhibits 1 through 6 from the Westlaw online research platform. I obtained the State Auditor's report, attached as Exhibit 7, from the State Auditor's website, www.auditor.ca.gov.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed January 21, 2021 at Los Angeles, California

s/ Damion Robinson
Damion Robinson

ROBINSON DECL. ISO MOTION FOR PARTIAL SUMMARY JUDGMENT

Exhibit 1

1　XAVIER BECERRA
　　Attorney General of California
2　ANTHONY R. HAKL
　　Supervising Deputy Attorney General
3　NOREEN P. SKELLY
　　Deputy Attorney General
4　State Bar No. 186135
　　　1300 I Street, Suite 125
5　　P.O. Box 944255
　　　Sacramento, CA 94244-2550
6　　Telephone: (916) 210-6057
　　　Fax: (916) 324-8835
7　　E-mail: Noreen.Skelly@doj.ca.gov
　　*Attorneys for Defendant Attorney General Xavier*
8　*Becerra*

9

10

　　IN THE UNITED STATES DISTRICT COURT

　　FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

　　SAN FRANCISCO DIVISION

12

13

| | |
|---|---|
| **MICHAEL ZELENY, an individual,** | 3:17-cv-07357 RS (NC) |
| Plaintiff, | **DEFENDANT ATTORNEY GENERAL XAVIER BECERRA'S SECOND AMENDED RESPONSES TO PLAINTIFF MICHAEL ZELENY'S FIRST SET OF INTERROGATORIES** |
| **v.** | |
| **GAVIN NEWSOM, an individual, in his official capacity; XAVIER BECERRA, an individual, in his official capacity; CITY OF MENLO PARK, a municipal corporation; and DAVE BERTINI, in his official capacity,** | |
| Defendants. | |

23　　　PROPOUNDING PARTY:　　Plaintiff Michael Zeleny

24　　　ANSWERING PARTY:　　Defendant Attorney General Xavier Becerra

25　　　SET NUMBER:　　One

26　/ / /

27　/ / /

28　/ / /

1

**ER-26**

**PRELIMINARY STATEMENT**

For purposes of these interrogatories, Plaintiff Zeleny has used the terms "YOU" and "YOUR" to, "refer to Xavier Becerra as the Attorney General of the State of California. These interrogatories seek the official position of the State of California." (Plaintiff Zeleny's Interrogatories, p. 2, lines 22-24.) Defendant Becerra objects to Plaintiff Zeleny's definition of "YOU" and "YOUR" as encompassing the official position of the State of California. The phrase "the official position of the State of California" is vague and overbroad. The State of California is made up of the Executive, Legislative, and Judicial branches of government, which are separate and co-equal. California's Executive branch includes a number of elected officials including, but not limited to the Attorney General of California. Moreover, the State of California is not a defendant in this action—nor would it be an appropriate defendant in this action. As a general matter, the proper respondent or defendant in a challenge to a state law or policy is the officer or agency charged with implementing it. See *Serrano v. Priest*, 18 Cal.3d 728, 752 (1976); *State v. Superior Court, 12 Cal.3d 237, 255* (1974).

Defendant Becerra objects to each interrogatory to the extent that it purports to impose any obligation or requirement greater than or different to the obligations or requirements set forth in the Federal Rules of Civil Procedure and/or the applicable rules and orders of this Court.

Defendant Becerra objects to each interrogatory to the extent that it calls for the disclosure of information protected from disclosure by the attorney work-product doctrine, the attorney-client privilege, the deliberative process privilege and/or any other applicable privilege or protection. Should Defendant Becerra disclose any privileged or otherwise protected information in these responses, the disclosure is inadvertent and does not constitute a waiver of the privilege or protection.

Defendant Becerra has not completed the investigation of the facts and issues relating to Plaintiff Zeleny's claims and has not completed discovery in this action. All of the answers contained herein are based solely upon information and documents which are presently available to, and specifically known by, Defendant Becerra, and the answers disclose only those contentions which presently occur to Defendant Becerra. Further discovery, independent

2

investigation, legal research and analysis may supply additional facts and may lead to additions, changes, and variations from the answers herein.

The following answers are given without prejudice to the right to produce evidence and/or witnesses or rely on facts which Defendant Becerra may later discover. Defendant Becerra accordingly reserves the right to change any and all answers herein as additional facts are ascertained, witnesses identified and legal research is completed. The answers contained herein are made in good faith in an attempt to supply as much factual information and as much specification of legal contention as is presently known, and in no way prejudices Defendant Becerra in relation to further discovery and proceedings.

Defendant Becerra incorporates by reference every general objection set forth above into each specific answer set forth below. A specific response may repeat a general objection for emphasis or some other reason. The failure to include a general objection in any specific answer does not waive any general objection to that interrogatory.

**INTERROGATORY NO. 1**: State all facts on which You base Your contention, if any, that California Penal Code § 26350 is constitutional under the Second Amendment, including any legitimate goals or public interests intended to be served by that statute.

[As used in these interrogatories,

(a) "You" and "Your" refer to Xavier Becerra as the Attorney General of the State of California. These interrogatories seek the official position of the State of California;

(b) "Second Amendment" means the Second Amendment to the United States Constitution].

**RESPONSE TO INTERROGATORY NO. 1**:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it is vague and overbroad, and unduly burdensome. Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's claims. Defendant Becerra also objects to this interrogatory on the grounds that it seeks Defendant Becerra's contentions regarding the constitutionality of California

3

1   Penal Code § 26350, and thus poses a question of pure law.  Defendant Becerra is not required to

2   respond to interrogatories raising questions of pure law.  See *AngioScore, Inc. v. TriReme Med.,*

3   *Inc.*, No. 12-cv-03393-YGR (JSC), 2014 WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014)

4   ("[I]nterrogatories directed to issues of 'pure law'—i.e., abstract legal issues not dependent on the

5   facts of the case are not permitted") (citation and some internal punctuation omitted).  A party

6   responding to interrogatories "is not required to write his[, her, or its] brief on a motion for

7   summary judgment in his[, her, or its] responses to interrogatories."  *Larson v. Trans Union, LLC*,

8   No. 3:12-CV-05726-WHO, 2017 WL 1540710, at *1 (N.D. Cal. April 28, 2017) (citation and

9   some internal punctuation omitted).

10      Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

11  follows:  California Penal Code § 26350 is constitutional under the Second Amendment.

12      In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the United States Supreme Court

13  recognized that the Second Amendment protects an individual right to keep and bear arms.  554

14  U.S. at 636.  The *Heller* Court did not, however, "undertake an exhaustive historical analysis . . .

15  of the full scope of the Second Amendment" or attempt to "clarify the entire field."  *Id.* at 626,

16  635.

17      First, *Heller* explains that "the most natural reading of 'keep Arms'" is "to 'have

18  weapons,'" 554 U.S. at 582, and that "bear arms" is most naturally read to mean "'wear, bear, or

19  carry upon the person or in clothing or in a pocket, for the purpose of being armed and ready for

20  offensive or defensive action in a case of conflict with another person,'" *id*. at 584 (ellipses

21  omitted).

22      Second, the right to bear arms must be construed and applied with careful attention to its

23  "historical background."  *Heller*, 554 U.S. at 592; see *id*. At 576-626.  This is critical "because it

24  has always been widely understood that the Second Amendment, like the First and Fourth

25  Amendments, codified a *pre-existing* right," and "declares only that is 'shall not be infringed.'"

26  *Id*., at 592.  Thus, while the Second Amendment's inclusion in the Bill of Rights indicates that the

27  right to bear arms ranks as fundamental, nothing about its enumeration in the Constitution

28

Defendant Xavier Becerra's Second Amended Responses to Plaintiff's First Set of Interrogatories  (3:17-cv-07357
RS)

1    changed the right into anything more comprehensive or absolute than would have been

2    understood and expected by "ordinary citizens in the founding generation." *Id*. at 577.

3        Third, that commonly understood right was and is "not unlimited." *Heller*, 554 U.S. at 595,

4    626. It is not a right "to keep and carry any weapon whatsoever in any manner whatsoever and

5    for whatever purpose," *id*. at 626, or "to carry arms for any sort of confrontation," *id*. at 595. The

6    core individual right recognized by *Heller* is the right to keep and bear arms "in defense of hearth

7    and home." 554 U.S. at 635; see also *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)

8    (plurality op.) (*Heller's* "central holding" was that "the Second Amendment protects a personal

9    right to keep and bear arms for lawful purposes, most notably for self-defense within the home.").

10   That does not mean that the right to "bear" has no scope or application beyond the home or its

11   immediate environs. But nothing in *Heller* suggests that it applies in exactly the same in all

12   places, so that a restriction on bearing arms in public must be treated just like a restriction on

13   bearing in or around the home. In particular, nothing in *Heller* dictates that, as Plaintiff Zeleny

14   seems to contend, that the Second Amendment embodies an individual right to openly carry a gun

15   in almost any public place.

16       On the contrary, *Heller* makes clear that Second Amendment rights are subject to many

17   reasonable regulations. *See* 554 U.S. at 636. Indeed, the Second Amendment "by no means

18   eliminates" States' "ability to devise solutions to social problems that suit local needs and

19   values." *McDonald,* 561 U.S. at 785.

20       *Heller* does not recognize any unfettered right to carry firearms in the crowded urban areas,

21   based solely on an individual's stated desire to be "'armed and ready for offensive or defensive

22   action in case of conflict with another person,'" 554 U.S. at 584. Rather, under *Heller*, Plaintiff

23   Zeleny's challenge to Penal Code § 26350 must be evaluated, in the first instance, by examining

24   "the historical understanding of the scope of that right." *Id*. at 625. The challenge cannot succeed

25   if the State's restrictions are a type of reasonable public regulation that has long been considered

26   consistent with a private right to bear arms. *Cf. id*. at 626-627.

27       "No fundamental right—not even the First Amendment—is absolute." *McDonald*, 561

28   U.S. at 802 (Scalia, J., concurring). Just as the First Amendment does not confer a right to speak

1   in any time, place or manner, history and precedent teach that the Second Amendment does not

2   confer the right to carry guns anywhere or at any time.  See *Heller*, 554 U.S. at 595.  California's

3   laws regulating the public carrying of firearms strike a permissible balance between preserving

4   order and public safety and accommodating the desire of some residents to carry guns.  There are

5   consistent with traditional restrictions on public carry, and are presumptively lawful on that basis.

6       Where text, history, and tradition show that a challenged law is consistent with the Second

7   Amendment, the restriction "'passes constitutional muster'" and the court's inquiry "'is

8   complete.'"  *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (en banc); see Heller,

9   554 U.S. at 626, 627 n.26.

10      California broadly allows the carrying of firearms in places and circumstances where it has

11  traditionally been common: in or immediately around an individual's home or place of business

12  and on much other private property with permission; in less-populated areas and during activities

13  such as hunting; and in circumstances of immediate and grave danger to person or property when

14  law enforcement is not available.  It also allows qualified individuals to obtain licenses to carry

15  more generally, if they can establish "good cause" under standards set by local officials who are

16  most familiar with the needs and desires of their own communities.

17      However, there is an "historical prevalence" of public carry restrictions similar to Penal

18  Code § 26350.  *Kachalsky v. Cty of Westchester*, 701 F.3d 81, 96 (2nd Cir. 2012).  Because

19  "[f]irearms have always been more heavily regulated in the public sphere," the right to bear arms

20  "most certainly operates in a different manner" in that context than when evaluating restrictions

21  that impinge directly on the core right to keep and carry guns in the home.  *Drake v. Filko*, 724

22  F.3d 426, 430 n.5. (3rd Cir. 2013).

23      This makes good functional sense.  When individuals move outside their homes—and

24  particularly when they move about in populated areas —their interest in carrying a firearm is

25  much more likely to come into conflict with the public interest in order and safety.  *See*, *e.g.*,

26  *Gould v. Morgan*, 907 F.3d 659, 672, (1st Cir. 2018).  The "inherent" risk that firearms present

27  when carried in public "distinguishes the Second Amendment right from other fundamental rights

28  . . . such as the right to marry and the right to be free from viewpoint discrimination, which can be

6

**ER-31**

1   exercised without creating a direct risk to others. *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121,

2   1126 (10th Cir. 2015). And as the Fourth Circuit observed, it "is not far-fetched to think" that

3   Heller's focus on the "core" right to protect the home was born out of a recognition that the

4   danger of "tragic act[s]" of violence "would rise exponentially as one moved the right from the

5   home to the public square." *United States v. Masciandaro*, 638 F.3d 458, 475-476 (4th Cir. 2011)

6   (Wilkinson, J.).

7       There is a legitimate role for public regulation touching on even our most fundamental

8   rights—especially when there is or can be genuine tension between the exercise of individual

9   rights and the safety of members of the public and law enforcement officers.

10      When, as here, a court will review a challenged statute under intermediate scrutiny, courts

11  ask whether the law promotes a "significant, substantial, or important government objective," and

12  whether there is a "'reasonable fit' between the challenged law and the asserted objective." *Peña*

13  *v. Lindley*, 898 F.3d 969, 979 (9th Cir. 2018). While the State must show that the law "promotes

14  a substantial government interest that would be achieved less effectively absent the regulation," it

15  need not demonstrate that the regulation is the "least restrictive means of achieving the

16  government interest." *Id*. (citations and quotation marks omitted). A court's only obligation is to

17  "assure that, in formulating its judgments, [the State] has drawn reasonable inferences based on

18  substantial evidence,'" an inquiry that must accord "'substantial deference to the predictive

19  judgments'" of the legislature. *Id*. at 979-980 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S.

20  180, 195 (1997)).

21      The need for appropriate deference to legislative predications is especially clear in the

22  Second Amendment context. "Providing for the safety of citizens within their borders has long

23  been state government's most basic task." *Kolbe v. Hogan*, 849 F.3d 114, 150 (4th Cir. 2017)

24  (Wilkinson, J., concurring). State legislatures are "'far better equipped than the judiciary' to

25  make sensitive public policy judgments (within constitutional limits) concerning the dangers in

26  carrying firearms and the manner to combat those risks." *Kachalsky*, 701 F.3d at 97. And, while

27  a legislature's judgments can be based on empirical evidence, they need not be; "history,

28  consensus, and 'simple common sense'" will suffice. *Florida Bar v. Went for It, Inc.*, 515 U.S.

1   618, 628 (1995).  Indeed, when it comes to dealing with a complex societal problem like gun

2   violence, there will almost always be room for reasonable minds to differ about the optimal

3   solution; demanding undue certainly would be foolhardy.

4       Here, California has a compelling interest in protecting public safety and reducing gun

5   violence.  *Jackson v. City & County of San Francisco*, 746 F.3d 953, 965 (9th Cir. 2014).  An

6   increase in guns carried by private persons in public places increases the risk that "'basic

7   confrontations between individuals [will] turn deadly.'"  *Wollard v. Gallagher*, 712 F.3d 865, 879

8   (4th Cir. 2013).  Similarly, misfired shots or accidental discharges are "more likely to hit a

9   bystander where there are more bystanders to hit."  Blocher, *Firearm Localism*, 123 Yale L.J. 82,

10  122-123 (2013).  The Legislature could also conclude that widespread public carry increases the

11  "availability of handguns to criminals via theft," *Woollard*, 712 F.3d at 879, and that such guns

12  would then be used to "commit violent crimes" or be transferred to "others who commit crimes,"

13  U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *2012 Summary:*

14  *Firearms Reported Lost and Stolen* 2 (2013).

15      According to the legislative history of California Penal Code § 26350, the absence of a

16  prohibition on openly carrying unloaded firearms has created a surge in individuals openly

17  carrying unloaded firearms in public.  These incidents adversely affect public safety in several

18  ways.  Members of the public who encounter individuals openly carrying firearms are alarmed

19  and fearful for their safety and the safety of others.  When members of the public report such

20  incidents to local law enforcement, they are only able to provide law enforcement personnel with

21  incomplete information.  As a result, law enforcement agencies respond to such incidents with

22  limited information regarding whether the individual openly carrying the firearm is a danger to

23  himself or herself; a danger to the public; or a danger to the responding law enforcement

24  personnel.

25      In such situations, a wrong move by the individual carrying the firearm could be construed

26  as threatening by the responding law enforcement officer.  The officer may feel compelled to

27  respond in a manner that could result in injury or death.  Thus, the practice of openly carrying

28  unloaded firearms can create an unsafe environment for everyone involved: the individual

Defendant Xavier Becerra's Second Amended Responses to Plaintiff's First Set of Interrogatories  (3:17-cv-07357
RS)

1  carrying the firearm, the responding law enforcement personnel, and all other individuals who

2  may be nearby.

3       In addition, responding to incidents involving individuals openly carrying unloaded

4  firearms taxes the resources of law enforcement agencies already stretched by under-staffing and

5  budget cutbacks.  Such a diversion of resources adversely affects law enforcement agencies'

6  ability to provide other public safety services to their communities.  See e.g., *Woollard*, 712 F.3d

7  at 879-880 (recounting similar policing benefits).

8       In light of the public safety risks the Legislature could reasonably deem to be associated

9  with public carrying of firearms, there is a "'reasonable fit'" between California's calibrated

10  regime governing public carry and the important interests that it serves.  *Peña*, 898 F.3d at. 979.

11      **INTERROGATORY NO. 2**:  Identify all documents bearing upon, supporting, or

12  reflecting the facts set forth in Your response to the preceding interrogatory.

13      **RESPONSE TO INTERROGATORY NO. 2**:

14       Defendant Becerra incorporates by reference the above-stated general objections as though

15  fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

16  vague, overbroad, and/or unduly burdensome.  Moreover, it seeks information irrelevant to

17  Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

18  that is relevant to Plaintiff's claims.

19       Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

20  follows:  See DOJ 000127-DOJ000411; DOJ 000001-DOJ 000126; DOJ 001227-DOJ 001281.

21      **INTERROGATORY NO. 3**:  State all facts on which You base Your contention, if any,

22  that California Penal Code § 26400 is constitutional under the Second Amendment, including any

23  legitimate goals or public interests intended to be served by the statute.

24      **RESPONSE TO INTERROGATORY NO. 3**:

25       Defendant Becerra incorporates by reference the above-stated general objections as though

26  fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

27  vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

28  Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

1  that is relevant to Plaintiff's claims.  Defendant Becerra also objects to this interrogatory on the

2  grounds that it seeks Defendant Becerra's contentions regarding the constitutionality of California

3  Penal Code § 26400, and thus poses a question of pure law.  Defendant Becerra is not required to

4  respond to interrogatories raising questions of pure law.  See *AngioScore, Inc. v. TriReme Med.,*

5  *Inc.*, No. 12-cv-03393-YGR (JSC), 2014 WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014)

6  ("[I]nterrogatories directed to issues of 'pure law'—i.e., abstract legal issues not dependent on the

7  facts of the case are not permitted") (citation and some internal punctuation omitted).  A party

8  responding to interrogatories "is not required to write his[, her, or its] brief on a motion for

9  summary judgment in his[, her, or its] responses to interrogatories." *Larson v. Trans Union, LLC*,

10  No. 3:12-CV-05726-WHO, 2017 WL 1540710, at *1 (N.D. Cal. April 28, 2017) (citation and

11  some internal punctuation omitted).

12      Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

13  follows:  California Penal Code § 26400 is constitutional under the Second Amendment.

14      In *Heller*, the Supreme Court recognized that the Second Amendment protects an individual

15  right to keep and bear arms.  554 U.S. at 636.  The *Heller* Court did not, however, "undertake an

16  exhaustive historical analysis . . . of the full scope of the Second Amendment" or attempt to

17  "clarify the entire field." *Id.* at 626, 635.

18      First, *Heller* explains that "the most natural reading of 'keep Arms'" is "to 'have

19  weapons,'" 554 U.S. at 582, and that "bear arms" is most naturally read to mean "'wear, bear, or

20  carry upon the person or in clothing or in a pocket, for the purpose of being armed and ready for

21  offensive or defensive action in a case of conflict with another person,'" *id*. at 584 (ellipses

22  omitted).

23      Second, the right to bear arms must be construed and applied with careful attention to its

24  "historical background." *Heller*, 554 U.S. at 592; see *id*. At 576-626.  This is critical "because it

25  has always been widely understood that the Second Amendment, like the First and Fourth

26  Amendments, codified a *pre-existing* right," and "declares only that is 'shall not be infringed.'"

27  *Id*., at 592.  Thus, while the Second Amendment's inclusion in the Bill of Rights indicates that the

28  right to bear arms ranks as fundamental, nothing about its enumeration in the Constitution

10

1  changed the right into anything more comprehensive or absolute than would have been

2  understood and expected by "ordinary citizens in the founding generation." *Id*. at 577.

3       Third, that commonly understood right was and is "not unlimited." *Heller*, 554 U.S. at 595,

4  626. It is not a right "to keep and carry any weapon whatsoever in any manner whatsoever and

5  for whatever purpose," *id*. at 626, or "to carry arms for any sort of confrontation," *id*. at 595. The

6  core individual right recognized by *Heller* is the right to keep and bear arms "in defense of hearth

7  and home." 554 U.S. at 635; see also *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)

8  (plurality op.) (*Heller's* "central holding" was that "the Second Amendment protects a personal

9  right to keep and bear arms for lawful purposes, most notably for self-defense within the home.").

10  That does not mean that the right to "bear" has no scope or application beyond the home or its

11  immediate environs. But nothing in *Heller* suggests that it applies in exactly the same in all

12  places, so that a restriction on bearing arms in public must be treated just like a restriction on

13  bearing in or around the home. In particular, nothing in *Heller* dictates that, as Plaintiff Zeleny

14  seems to contend, that the Second Amendment embodies an individual right to openly carry a gun

15  in almost any public place.

16       On the contrary, *Heller* makes clear that Second Amendment rights are subject to many

17  reasonable regulations. *See* 554 U.S. at 636. Indeed, the Second Amendment "by no means

18  eliminates" States' "ability to devise solutions to social problems that suit local needs and

19  values." *McDonald,* 561 U.S. at 785.

20       *Heller* does not recognize any unfettered right to carry firearms in the crowded urban areas,

21  based solely on an individual's stated desire to be "'armed and ready for offensive or defensive

22  action in case of conflict with another person,'" 554 U.S. at 584. Rather, under *Heller*, Plaintiff

23  Zeleny's challenge to Penal Code § 26350 must be evaluated, in the first instance, by examining

24  "the historical understanding of the scope of that right." *Id*. at 625. The challenge cannot succeed

25  if the State's restrictions are a type of reasonable public regulation that has long been considered

26  consistent with a private right to bear arms. *Cf. id*. at 626-627.

27       "No fundamental right—not even the First Amendment—is absolute." *McDonald*, 561

28  U.S. at 802 (Scalia, J., concurring). Just as the First Amendment does not confer a right to speak

1   in any time, place or manner, history and precedent teach that the Second Amendment does not

2   confer the right to carry guns anywhere or at any time.  See *Heller*, 554 U.S. at 595.  California's

3   laws regulating the public carrying of firearms strike a permissible balance between preserving

4   order and public safety and accommodating the desire of some residents to carry guns.  There are

5   consistent with traditional restrictions on public carry, and are presumptively lawful on that basis.

6         Where text, history, and tradition show that a challenged law is consistent with the Second

7   Amendment, the restriction "'passes constitutional muster'" and the court's inquiry "'is

8   complete.'"  *Teixeira*, 873 F.3d at 682; see *Heller*, 554 U.S. at 626, 627 n.26.

9         California broadly allows the carrying of firearms in places and circumstances where it has

10   traditionally been common: in or immediately around an individual's home or place of business

11   and on much other private property with permission; in less-populated areas and during activities

12   such as hunting; and in circumstances of immediate and grave danger to person or property when

13   law enforcement is not available.  It also allows qualified individuals to obtain licenses to carry

14   more generally, if they can establish "good cause" under standards set by local officials who are

15   most familiar with the needs and desires of their own communities.

16         However, there is an "historical prevalence" of public carry restrictions similar to Penal

17   Code § 26400.  *Kachalsky*, 701 F.3d at 96.  Because "[f]irearms have always been more heavily

18   regulated in the public sphere," the right to bear arms "most certainly operates in a different

19   manner" in that context than when evaluating restrictions that impinge directly on the core right

20   to keep and carry guns in the home.  *Drake*, 724 F.3d at 430 n.5.

21         This makes good functional sense.  When individuals move outside their homes—and

22   particularly when they move about in populated areas —their interest in carrying a firearm is

23   much more likely to come into conflict with the public interest in order and safety.  *See*, *e.g.*,

24   *Gould v. Morgan*, 907 F.3d 659, 672, (1st Cir. 2018).  The "inherent" risk that firearms present

25   when carried in public "distinguishes the Second Amendment right from other fundamental rights

26   . . . such as the right to marry and the right to be free from viewpoint discrimination, which can be

27   exercised without creating a direct risk to others.  *Bonidy*, 790 F.3d at 1126.  And as the Fourth

28   Circuit observed, it "is not far-fetched to think" that Heller's focus on the "core" right to protect

1    the home was born out of a recognition that the danger of "tragic act[s]" of violence "would rise

2    exponentially as one moved the right from the home to the public square." *Masciandaro*, 638

3    F.3d at 475-476.

4        There is a legitimate role for public regulation touching on even our most fundamental

5    rights—especially when there is or can be genuine tension between the exercise of individual

6    rights and the safety of members of the public and law enforcement officers.

7        When, as here, a court will review a challenged statute under intermediate scrutiny, courts

8    ask whether the law promotes a "significant, substantial, or important government objective," and

9    whether there is a "'reasonable fit' between the challenged law and the asserted objective." *Peña*,

10   898 F.3d at 979.  While the State must show that the law "promotes a substantial government

11   interest that would be achieved less effectively absent the regulation," it need not demonstrate

12   that the regulation is the "least restrictive means of achieving the government interest." *Id.*

13   (citations and quotation marks omitted).  A court's only obligation is to "assure that, in

14   formulating its judgments, [the State] has drawn reasonable inferences based on substantial

15   evidence,'" an inquiry that must accord "'substantial deference to the predictive judgments'" of

16   the legislature.  *Id.* at 979-980 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195

17   (1997)).

18       The need for appropriate deference to legislative predications is especially clear in the

19   Second Amendment context.  "Providing for the safety of citizens within their borders has long

20   been state government's most basic task." *Kolbe*, 849 F.3d at 150.  State legislatures are "'far

21   better equipped than the judiciary' to make sensitive public policy judgments (within

22   constitutional limits) concerning the dangers in carrying firearms and the manner to combat those

23   risks." *Kachalsky*, 701 F.3d at 97.  And, while a legislature's judgments can be based on

24   empirical evidence, they need not be; "history, consensus, and 'simple common sense'" will

25   suffice.  *Went for It, Inc.*, 515 U.S. at 628.  Indeed, when it comes to dealing with a complex

26   societal problem like gun violence, there will almost always be room for reasonable minds to

27   differ about the optimal solution; demanding undue certainly would be foolhardy.

28   / / /

1      California has a compelling interest in protecting public safety and reducing gun violence.

2  *Jackson*, 746 F.3d at 965.  An increase in guns carried by private persons in public places

3  increases the risk that "'basic confrontations between individuals [will] turn deadly.'"  *Wollard*,

4  712 F.3d at 879.  Similarly, misfired shots or accidental discharges are "more likely to hit a

5  bystander where there are more bystanders to hit."  Blocher, *Firearm Localism*, 123 Yale L.J. 82,

6  122-123 (2013).  The Legislature could also conclude that widespread public carry increases the

7  "availability of handguns to criminals via theft," *Woollard*, 712 F.3d at 879, and that such guns

8  would then be used to "commit violent crimes" or be transferred to "others who commit crimes,"

9  U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *2012 Summary:*

10  *Firearms Reported Lost and Stolen* 2 (2013).

11      The absence of a prohibition on openly carrying unloaded firearms has created a surge in

12  individuals openly carrying unloaded firearms in public.  These incidents adversely affect public

13  safety in several ways.  Members of the public who encounter individuals openly carrying

14  firearms are alarmed and fearful for their safety and the safety of others.  When members of the

15  public report such incidents to local law enforcement, they are only able to provide law

16  enforcement personnel with incomplete information.  As a result, law enforcement agencies

17  respond to such incidents with limited information regarding whether the individual openly

18  carrying the firearm is a danger to himself or herself; a danger to the public; or a danger to the

19  responding law enforcement personnel.

20      In such situations, a wrong move by the individual carrying the firearm could be construed

21  as threatening by the responding law enforcement officer.  The officer may feel compelled to

22  respond in a manner that could result in injury or death.  Thus, the practice of openly carrying

23  unloaded firearms can create an unsafe environment for everyone involved: the individual

24  carrying the firearm, the responding law enforcement personnel, and all other individuals who

25  may be nearby.

26      In addition, responding to incidents involving individuals openly carrying unloaded

27  firearms taxes the resources of law enforcement agencies already stretched by under-staffing and

28  budget cutbacks.  Such a diversion of resources adversely affects law enforcement agencies'

1    ability to provide other public safety services to their communities.  See e.g., *Woollard*, 712 F.3d

2    at 879-880 (recounting similar policing benefits).

3        According to the legislative history of California Penal Code§ 26400, one of the purposes

4    of the bill (A.B. 1527) was to follow up A.B. 144 (Statutes of 2011), which made public open

5    carry of handguns a misdemeanor, by expanding the prohibition to long-guns in incorporated

6    cities.  "The absence of a prohibition on 'open carry' of long guns has created an increase in

7    problematic instances of these guns carried in public, alarming unsuspecting individuals causing

8    issues for law enforcement.  Open carry creates a potentially dangerous situation.  In most cases

9    when a person is openly carrying a firearm, law enforcement is called to the scene with few

10   details other than one or more people are present at a location and are armed." (See DOJ 001050)

11   "In these tense situations, the slightest wrong move by the gun-carrier could be construed as

12   threatening by the responding officer, who may feel compelled to respond in a manner that could

13   be lethal.  In this situation the practice of 'open carry' creates an unsafe environment for all

14   parties involved; the officer, the gun-carrying individual, and for any other individuals nearby as

15   well."  (See DOJ 001050)

16       "Additionally, the increase in 'open-carry' calls placed to law enforcement has taxed

17   departments dealing with under-staffing and cutbacks due to the current fiscal climate in

18   California, preventing them from protecting the public in other ways."  (See DOJ 001051)

19       In light of the public safety risks the Legislature could reasonably deem to be associated

20   with public carrying of firearms, there is a "'reasonable fit'" between California's calibrated

21   regime governing public carry and the important interests that it serves.  *Peña*, 898 F.3d at. 979.

22       **INTERROGATORY NO. 4**:  Identify all documents bearing upon, supporting, or

23   reflecting the facts set forth in Your response to the preceding interrogatory.

24       **RESPONSE TO INTERROGATORY NO. 4**:

25       Defendant Becerra incorporates by reference the above-stated general objections as though

26   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

27   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

28

Defendant Xavier Becerra's Second Amended Responses to Plaintiff's First Set of Interrogatories  (3:17-cv-07357-RS)

1   Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

2   that is relevant to Plaintiff's claims.

3       Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

4   follows:  See DOJ 000127-DOJ 000411; DOJ 000412-DOJ 000529; DOJ 000927-DOJ 001226;

5   DOJ 001227-DOJ 001281.

6       **INTERROGATORY NO. 5**:  State all reasons for the adoption of California Penal Code

7   §§ 26375 and 26405(r), including, but not limited to any legitimate goals or public interests

8   intended to be served by the exemptions contained therein.

9       **RESPONSE TO INTERROGATORY NO. 5**:

10      Defendant Becerra incorporates by reference the above-stated general objections as though

11  fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

12  vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

13  Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

14  that is relevant to Plaintiff's claims.  Defendant Becerra also objects to this interrogatory on the

15  grounds that it seeks Defendant Becerra's contentions regarding the constitutionality of California

16  Penal Code §§ 26375 and 26405(r), and thus poses questions of pure law.  Defendant Becerra is

17  not required to respond to interrogatories raising questions of pure law.  See *AngioScore, Inc. v.*

18  *TriReme Med., Inc.*, No. 12-cv-03393-YGR (JSC), 2014 WL 7188779, at *5 (N.D. Cal. Dec. 16,

19  2014) ("[I]nterrogatories directed to issues of 'pure law'—i.e., abstract legal issues not dependent

20  on the facts of the case are not permitted") (citation and some internal punctuation omitted).  A

21  party responding to interrogatories "is not required to write his[, her, or its] brief on a motion for

22  summary judgment in his[, her, or its] responses to interrogatories."  *Larson v. Trans Union, LLC*,

23  No. 3:12-CV-05726-WHO, 2017 WL 1540710, at *1 (N.D. Cal. April 28, 2017) (citation and

24  some internal punctuation omitted).

25      Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

26  follows:  The *Heller* Court recognized that the Second Amendment protects an individual right to

27  keep and bear arms.  554 U.S. at 636.  The Court did not, however, "undertake an exhaustive

28

16

1  historical analysis . . . of the full scope of the Second Amendment" or attempt to "clarify the

2  entire field." *Id*. at 626, 635.

3      First, *Heller* explains that "the most natural reading of 'keep Arms'" is "to 'have

4  weapons,'" 554 U.S. at 582, and that "bear arms" is most naturally read to mean "'wear, bear, or

5  carry upon the person or in clothing or in a pocket, for the purpose of being armed and ready for

6  offensive or defensive action in a case of conflict with another person,'" *id*. at 584 (ellipses

7  omitted).

8      Second, the right to bear arms must be construed and applied with careful attention to its

9  "historical background." *Heller*, 554 U.S. at 592; see *id*. At 576-626. This is critical "because it

10  has always been widely understood that the Second Amendment, like the First and Fourth

11  Amendments, codified a *pre-existing* right," and "declares only that is 'shall not be infringed.'"

12  *Id*., at 592. Thus, while the Second Amendment's inclusion in the Bill of Rights indicates that the

13  right to bear arms ranks as fundamental, nothing about its enumeration in the Constitution

14  changed the right into anything more comprehensive or absolute than would have been

15  understood and expected by "ordinary citizens in the founding generation." *Id*. at 577.

16      Third, that commonly understood right was and is "not unlimited." *Heller*, 554 U.S. at 595,

17  626. It is not a right "to keep and carry any weapon whatsoever in any manner whatsoever and

18  for whatever purpose," *id*. at 626, or "to carry arms for any sort of confrontation," *id*. at 595. The

19  core individual right recognized by *Heller* is the right to keep and bear arms "in defense of hearth

20  and home." 554 U.S. at 635; see also *McDonald*, 561 U.S. at 780 (*Heller's* "central holding" was

21  that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes,

22  most notably for self-defense within the home."). That does not mean that the right to "bear" has

23  no scope or application beyond the home or its immediate environs. But nothing in *Heller*

24  suggests that it applies in exactly the same in all places, so that a restriction on bearing arms in

25  public must be treated just like a restriction on bearing in or around the home.

26      On the contrary, *Heller* makes clear that Second Amendment rights are subject to many

27  reasonable regulations. *See* 554 U.S. at 636. Indeed, the Second Amendment "by no means

28

17

**ER-42**

eliminates" States' "ability to devise solutions to social problems that suit local needs and values." *McDonald,* 561 U.S. at 785.

*Heller* does not recognize any unfettered right to carry firearms in the crowded urban areas, based solely on an individual's stated desire to be "'armed and ready for offensive or defensive action in case of conflict with another person,'" 554 U.S. at 584. Rather, under *Heller*, a challenge to Penal Code § 26350 must be evaluated, in the first instance, by examining "the historical understanding of the scope of that right." *Id*. at 625. The challenge cannot succeed if the State's restrictions are a type of reasonable public regulation that has long been considered consistent with a private right to bear arms. *Cf. id.* at 626-627.

"No fundamental right—not even the First Amendment—is absolute." *McDonald*, 561 U.S. at 802 (Scalia, J., concurring). Just as the First Amendment does not confer a right to speak in any time, place or manner, history and precedent teach that the Second Amendment does not confer the right to carry guns anywhere or at any time. See *Heller*, 554 U.S. at 595. California's laws regulating the public carrying of firearms strike a permissible balance between preserving order and public safety and accommodating the desire of some residents to carry guns. There are consistent with traditional restrictions on public carry, and are presumptively lawful on that basis.

Where text, history, and tradition show that a challenged law is consistent with the Second Amendment, the restriction "'passes constitutional muster'" and the court's inquiry "'is complete.'" *Teixeira*, 873 F.3d at 682; see *Heller*, 554 U.S. at 626, 627 n.26.

California broadly allows the carrying of firearms in places and circumstances where it has traditionally been common: in or immediately around an individual's home or place of business and on much other private property with permission; in less-populated areas and during activities such as hunting; and in circumstances of immediate and grave danger to person or property when law enforcement is not available. It also allows qualified individuals to obtain licenses to carry more generally, if they can establish "good cause" under standards set by local officials who are most familiar with the needs and desires of their own communities.

However, there is an "historical prevalence" of public carry restrictions similar to those in California. *Kachalsky*, 701 F.3d at 96. Because "[f]irearms have always been more heavily

18

1    regulated in the public sphere," the right to bear arms "most certainly operates in a different

2    manner" in that context than when evaluating restrictions that impinge directly on the core right

3    to keep and carry guns in the home. *Drake*, 724 F.3d at 430 n.5.

4         This makes good functional sense. When individuals move outside their homes—and

5    particularly when they move about in populated areas —their interest in carrying a firearm is

6    much more likely to come into conflict with the public interest in order and safety. *See*, *e.g.*,

7    *Gould*, 907 F.3d at 672. The "inherent" risk that firearms present when carried in public

8    "distinguishes the Second Amendment right from other fundamental rights . . . such as the right to

9    marry and the right to be free from viewpoint discrimination, which can be exercised without

10   creating a direct risk to others. *Bonidy*, 790 F.3d at 1126. And as the Fourth Circuit observed, it

11   "is not far-fetched to think" that Heller's focus on the "core" right to protect the home was born

12   out of a recognition that the danger of "tragic act[s]" of violence "would rise exponentially as one

13   moved the right from the home to the public square." *Masciandaro*, 638 F.3d at 475-476.

14        There is a legitimate role for public regulation touching on even our most fundamental

15   rights—especially when there is or can be genuine tension between the exercise of individual

16   rights and the safety of members of the public and law enforcement officers.

17        When, as here, a court will review a challenged statute under intermediate scrutiny, courts

18   ask whether the law promotes a "significant, substantial, or important government objective," and

19   whether there is a "'reasonable fit' between the challenged law and the asserted objective." *Peña*,

20   898 F.3d at 979. While the State must show that the law "promotes a substantial government

21   interest that would be achieved less effectively absent the regulation," it need not demonstrate

22   that the regulation is the "least restrictive means of achieving the government interest." *Id*.

23   (citations and quotation marks omitted). A court's only obligation is to "assure that, in

24   formulating its judgments, [the State] has drawn reasonable inferences based on substantial

25   evidence,'" an inquiry that must accord "'substantial deference to the predictive judgments'" of

26   the legislature. *Id*. at 979-980 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195

27   (1997)).

28

19

**ER-44**

1    The need for appropriate deference to legislative predications is especially clear in the

2    Second Amendment context. "Providing for the safety of citizens within their borders has long

3    been state government's most basic task." *Kolbe*, 849 F.3d at 150. State legislatures are "'far

4    better equipped than the judiciary' to make sensitive public policy judgments (within

5    constitutional limits) concerning the dangers in carrying firearms and the manner to combat those

6    risks." *Kachalsky*, 701 F.3d at 97. And, while a legislature's judgments can be based on

7    empirical evidence, they need not be; "history, consensus, and 'simple common sense'" will

8    suffice. *Went for It, Inc.*, 515 U.S. at 628.

9    California has a compelling interest in protecting public safety and reducing gun violence.

10   *Jackson*, 746 F.3d at 965. An increase in guns carried by private persons in public places

11   increases the risk that "'basic confrontations between individuals [will] turn deadly.'" *Wollard*,

12   712 F.3d at 879. Similarly, misfired shots or accidental discharges are "more likely to hit a

13   bystander where there are more bystanders to hit." Blocher, *Firearm Localism*, 123 Yale L.J. 82,

14   122-123 (2013). The Legislature could also conclude that widespread public carry increases the

15   "availability of handguns to criminals via theft," *Woollard*, 712 F.3d at 879, and that such guns

16   would then be used to "commit violent crimes" or be transferred to "others who commit crimes,"

17   U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *2012 Summary:*

18   *Firearms Reported Lost and Stolen* 2 (2013).

19   The absence of a prohibition on openly carrying unloaded firearms has created a surge in

20   individuals openly carrying unloaded firearms in public. These incidents adversely affect public

21   safety in several ways. Members of the public who encounter individuals openly carrying

22   firearms are alarmed and fearful for their safety and the safety of others. When members of the

23   public report such incidents to local law enforcement, they are only able to provide law

24   enforcement personnel with incomplete information. As a result, law enforcement agencies

25   respond to such incidents with limited information regarding whether the individual openly

26   carrying the firearm is a danger to himself or herself; a danger to the public; or a danger to the

27   responding law enforcement personnel.

28

20

1    In such situations, a wrong move by the individual carrying the firearm could be construed

2    as threatening by the responding law enforcement officer.  The officer may feel compelled to

3    respond in a manner that could result in injury or death.  Thus, the practice of openly carrying

4    unloaded firearms can create an unsafe environment for everyone involved: the individual

5    carrying the firearm, the responding law enforcement personnel, and all other individuals who

6    may be nearby.

7    In addition, responding to incidents involving individuals openly carrying unloaded

8    firearms taxes the resources of law enforcement agencies already stretched by under-staffing and

9    budget cutbacks.  Such a diversion of resources adversely affects law enforcement agencies'

10   ability to provide other public safety services to their communities.  *See e.g.*, *Woollard*, 712 F.3d

11   at 879-880 (recounting similar policing benefits).

12   According to the legislative history of California Penal Code § 26400, one of the purposes

13   of the bill (A.B. 1527) was to follow up A.B. 144 (Statutes of 2011), which made public open

14   carry of handguns a misdemeanor, by expanding the prohibition to long-guns in incorporated

15   cities.  "The absence of a prohibition on 'open carry' of long guns has created an increase in

16   problematic instances of these guns carried in public, alarming unsuspecting individuals causing

17   issues for law enforcement.  Open carry creates a potentially dangerous situation.  In most cases

18   when a person is openly carrying a firearm, law enforcement is called to the scene with few

19   details other than one or more people are present at a location and are armed." (See DOJ 001050)

20   "In these tense situations, the slightest wrong move by the gun-carrier could be construed as

21   threatening by the responding officer, who may feel compelled to respond in a manner that could

22   be lethal.  In this situation the practice of 'open carry' creates an unsafe environment for all

23   parties involved; the officer, the gun-carrying individual, and for any other individuals nearby as

24   well." (See DOJ 001050)

25   "Additionally, the increase in 'open-carry' calls placed to law enforcement has taxed

26   departments dealing with under-staffing and cutbacks due to the current fiscal climate in

27   California, preventing them from protecting the public in other ways."  (See DOJ 001051)

28

Defendant Xavier Becerra's Second Amended Responses to Plaintiff's First Set of Interrogatories  (3:17-cv-07357-RS)

1        Here, the Legislature enacted certain exceptions to the general prohibitions on openly

2  carrying firearms.

3        Penal Code § 26375 provides that section 26350 does not apply to, or affect, the open

4  carrying of an unloaded handgun by an authorized participant in, or an authorized employee or

5  agent of a supplier of firearms for, a motion picture, television or video production, or

6  entertainment event, when the participant lawfully uses the handgun as part of that production or

7  event, as part of rehearsing or practicing for participation in that production or event, or while the

8  participant or authorized employee or agent is at that production or event, or rehearsal or practice

9  for that production or event. (Pen. Code, § 26375.)  According to the Legislative history, Penal

10  Code § 26375 permits the use of unloaded handguns as an "entertainment props."  (See DOJ

11  000219)

12        Likewise, Penal Code § 26405, subdivision (r) provides that Penal Code § 26400 does not

13  apply to, or affect, the carrying of an unloaded firearm that is not a handgun by an authorized

14  participant in, or an authorized employee or agent of a supplier of firearms for, a motion picture,

15  television, or video production or entertainment event, when the participant lawfully uses that

16  firearm as part of that production or event, as part of rehearsing or practicing for participation in

17  that production or event, or while the participant or authorized employee or agent is at that

18  production or event, or rehearsal or practice for that production or event.

19        And, Penal Code § 29500 provides that, "Any person who is at least 21 years of age may

20  apply for an entertainment firearms permit from the Department of Justice.  An entertainment

21  firearms permit authorizes the permit holder to possess firearms loaned to the permitholder for

22  use solely as a prop in a motion picture, television, video, theatrical, or other entertainment

23  production or event."  (Added by Stats.2010, c. 711 (S.B. 1080).)

24      **INTERROGATORY NO. 6**:  Identify all documents bearing upon, supporting, or

25  reflecting the reasons set forth in Your response to the preceding interrogatory.

26      **RESPONSE TO INTERROGATORY NO. 6**:

27        Defendant Becerra incorporates by reference the above-stated general objections as though

28  fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

22

**ER-47**

1  vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

2  Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

3  that is relevant to Plaintiff's claims.

4      Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

5  follows:  See DOJ 000127-DOJ 000411; DOJ 000749-DOJ 000926; DOJ 0001282-DOJ 001312.

6      **INTERROGATORY NO. 7**:  State all factors that You contend were considered by the

7  Legislature of the State of California in determining whether or not to exempt the use of firearms

8  in other forms of expressive activity from the statutes prohibiting the carrying of firearms in

9  public.

10      **RESPONSE TO INTERROGATORY NO. 7**:

11      Defendant Becerra incorporates by reference the above-stated general objections as though

12  fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

13  vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

14  Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

15  that is relevant to Plaintiff's claims.

16      Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

17  follows:  Defendant Becerra has not made the contention described in this interrogatory.

18      **INTERROGATORY NO. 8**:  State all reasons for distinguishing between "motion picture,

19  television or video production, or entertainment event[s ]" and other forms of speech or

20  expressive conduct in California Penal Code §§ 26375 and 26405(r).

21      **RESPONSE TO INTERROGATORY NO. 8**:

22      Defendant Becerra incorporates by reference the above-stated general objections as though

23  fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

24  vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

25  Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

26  that is relevant to Plaintiff's claims.

27      Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

28  follows:  The interrogatory call for Defendant Becerra to speculate regarding whether the

1    Legislature considered including other forms of "speech or expressive conduct" in enacting Penal

2    Code §§ 26375 and 26405, subdivision (r).  Thus, Defendant Becerra is unable to respond to this

3    interrogatory.

4        **INTERROGATORY NO. 9**:  Identify all documents bearing upon, supporting, or

5    reflecting the reasons set forth in Your response to the preceding interrogatory.

6        **RESPONSE TO INTERROGATORY NO. 9**:

7        Defendant Becerra incorporates by reference the above-stated general objections as though

8    fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

9    vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

10   Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

11   that is relevant to Plaintiff's claims.

12       Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

13   follows: N/A.

14       **INTERROGATORY NO. 10**:  Does the phrase "authorized participant" as used in

15   California Penal Code §§ 26375 and 26405(r) refer to a participant authorized by a governmental

16   body or agency?

17       **INITIAL RESPONSE TO INTERROGATORY NO. 10**:

18        Defendant Becerra incorporates by reference the above-stated general objections as though

19   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

20   vague and overbroad.  Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and

21   not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's

22   claims.

23       Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

24   follows: Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

25   "authorized participant."

26       However, according to the Legislative history of Penal Code § 26375, that section permits

27   the use of unloaded handguns as an "entertainment props."  (See DOJ 000219)  Additionally, the

28   Entertainment Firearms Permit only authorizes the permit holder "to possess firearms loaned to

24

1    the permitholder for use solely as a prop in a motion picture, television, video, theatrical, or other

2    entertainment production or event."  (Penal Code § 29500.)  Thus, the exceptions set forth in

3    Penal Code §§ 26375 and 26405, subdivision (r) are available only to those using unloaded

4    firearms loaned to them for use as "entertainment props" in a motion picture, television, video,

5    theatrical, or other entertainment production or event.

6              **AMENDED** **RESPONSE TO INTERROGATORY NO. 10:**

7              Defendant Becerra incorporates by reference the above-stated general objections as though

8    fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

9    vague and overbroad.  Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and

10   not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's

11   claims.

12             Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

13   follows: Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

14   "authorized participant."  Defendant Becerra has never issued a formal opinion under California

15   law regarding the meaning of the phrase "authorized participant," and this response is not such an

16   opinion and cannot be relied upon as such an opinion.  Nor is this response a generally applicable

17   rule or regulation that is intended to be applied outside of the context of this case.  Moreover,

18   Defendant Becerra played no material role in the events described in the complaint, and was not

19   involved in the denial of Plaintiff Michael Zeleny's permit application(s).

20             Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific

21   context of this case, Defendant Becerra believes that most plausible reading of the term

22   "authorized participant" as used in California Penal Code §§ 26375 and 26405(r) refers to a

23   participant authorized by a governmental body or agency.

24             **INTERROGATORY NO. 11**:  If Your answer to Interrogatory No. 10 is in the

25   affirmative, identify the governmental bodies or agencies from which authorization is required?

26             **INITIAL RESPONSE TO INTERROGATORY NO. 11**:

27             Defendant Becerra incorporates by reference the above-stated general objections as though

28   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

1   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

2   Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

3   that is relevant to Plaintiff's claims.

4       Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

5   follows: N/A.

6       **<u>AMENDED</u> RESPONSE TO INTERROGATORY NO. 11:**

7       Defendant Becerra incorporates by reference the above-stated general objections as though

8   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

9   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

10  Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

11  that is relevant to Plaintiff's claims.

12      Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

13  follows: Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

14  "authorized participant."  Defendant Becerra has never issued a formal opinion under California

15  law regarding the meaning of the phrase "authorized participant," and this response is not such an

16  opinion and cannot be relied upon as such an opinion.  Nor is this response a generally applicable

17  rule or regulation that is intended to be applied outside of the context of this case.  Moreover,

18  Defendant Becerra played no material role in the events described in the complaint, and was not

19  involved in the denial of Plaintiff Michael Zeleny's permit application(s).

20      Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific

21  context of this case, the Department of Justice's Entertainment Firearms Permit only authorizes

22  the permit holder "to possess firearms loaned to the permitholder for use solely as a prop in a

23  motion picture, television, video, theatrical, or other entertainment production or event."  (Penal

24  Code § 29500.)  Anyone who is not otherwise authorized to carry a weapon openly, but who

25  desires to carry a weapon openly "as a prop in a motion picture, television, video, theatrical, or

26  other entertainment production or event" would need to do so under the auspices of an

27  Entertainment Firearms Permit.

28

1    The Attorney General understands this exception to have been carried forward into the open

2    carry laws, as the legislative history of Penal Code § 26375 refers to the use of unloaded

3    handguns as an "entertainment props." (See DOJ 000219.) Thus, the exceptions set forth in

4    Penal Code §§ 26375 and 26405, subdivision (r) are available only to those using unloaded

5    firearms loaned to them for use as "entertainment props" in a motion picture, television, video,

6    theatrical, or other entertainment production or event.

7    While the Department of Justice "authorizes" the use of firearms in this narrow context

8    through the issuance of Firearms Entertainment Permits, such authorization is in the nature of a

9    defense to an open carry prosecution within the very narrow context of an entertainment prop, not

10   a preclusion of any other regulation by other agencies. Other law enforcement agencies would

11   not be precluded from ensuring that an individual carrying a weapon openly had a permit, or

12   ensuring that an identified individual is not violating any other federal, state, or local laws or

13   ordinances. Notably, when issuing the Firearms Entertainment Permit, the Department does not

14   verify the nature of the entertainment event or impose any restrictions on how a weapon might be

15   carried or used, but only looks to see if a person is prohibited from owning firearms. In this

16   sense, the Firearms Entertainment Permit is a floor rather than a ceiling, with possible room for

17   other law enforcement agencies to determine, for example, that the open carry of weapons

18   endangered public safety, or was a nuisance, or that someone's conduct was not a "production or

19   event" covered by the relevant exception, or that someone was not violating other laws.

20   Also, within the structure of the open carry laws, the exception for an authorized participant

21   appears to be analogous to similar exceptions for gun shows (Pen. Code § 26369) or target ranges

22   (Pen. Code § 26365)—defined spaces in which the weapon being carried is not easily visible or

23   accessible to the public. The Attorney General understands the Firearms Entertainment Permit,

24   and the corresponding exceptions to the open carry laws, to apply to confined, non-public spaces

25   for a limited period of time, i.e., in a movie studio or clearly defined production area. To the

26   extent that an individual like Mr. Zeleny seeks to demonstrate on a public street with an unloaded

27   firearm in an unconfined area and/or for an indefinite period of time, the Attorney General views

28   the open carrying of unloaded weapons on a public street, in an unconfined area fully visible to

27

**ER-52**

1   and accessible by anyone else, and not within what would reasonably be considered a defined,

2   enclosed production area, to potentially be conduct outside the scope of the Firearms

3   Entertainment Permit and the corresponding exception to the open carry laws, and potentially

4   subject to enforcement by the law enforcement agency primarily responsible for enforcing the

5   open carry laws in that area.

6   <u>**SECOND AMENDED** RESPONSE TO INTERROGATORY NO. 11:</u>

7   Defendant Becerra incorporates by reference the above-stated general objections as though

8   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

9   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

10  Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

11  that is relevant to Plaintiff's claims.

12  Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

13  follows: Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

14  "authorized participant."  Defendant Becerra has never issued a formal opinion under California

15  law regarding the meaning of the phrase "authorized participant," and this response is not such an

16  opinion and cannot be relied upon as such an opinion.  Nor is this response a generally applicable

17  rule or regulation that is intended to be applied outside of the context of this case.  Moreover,

18  Defendant Becerra played no material role in the events described in the complaint, and was not

19  involved in the denial of Plaintiff Michael Zeleny's permit application(s).

20  Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific

21  context of this case, Defendant Becerra believes that an "authorized participant" must be

22  operating under the auspices of a Department of Justice Entertainment Firearms Permit, which

23  authorizes the permit holder "to possess firearms loaned to the permitholder for use solely as a

24  prop in a motion picture, television, video, theatrical, or other entertainment production or event."

25  (Penal Code § 29500.)  For entertainment productions this generally has meant that a propmaster

26  or similarly qualified person is supervising the use of firearms in the production, and others

27  involved in the production may transfer or possess firearms under the auspices of the supervising

28  permit-holder.

28

**ER-53**

1    **INTERROGATORY NO. 12**: If Your answer to Interrogatory No. 10 is in the

2    affirmative, state all bases for your contention that the phrase "authorized participant," as used in

3    California Penal Code §§ 26375 and 26405(r), refers to a participant authorized by a

4    governmental body or agency?

5         **INITIAL RESPONSE TO INTERROGATORY NO. 12**:

6         Defendant Becerra incorporates by reference the above-stated general objections as though

7    fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

8    vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

9    Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

10   that is relevant to Plaintiff's claims.

11        Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

12   follows: N/A.

13        **AMENDED RESPONSE TO INTERROGATORY NO. 12:**

14        Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

15   "authorized participant."  Defendant Becerra has never issued a formal opinion under California

16   law regarding the meaning of the phrase "authorized participant," and this response is not such an

17   opinion and cannot be relied upon as such an opinion.  Nor is this response a generally applicable

18   rule or regulation that is intended to be applied outside of the context of this case.  Moreover,

19   Defendant Becerra played no material role in the events described in the complaint, and was not

20   involved in the denial of Plaintiff Michael Zeleny's permit application(s).

21        Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific

22   context of this case, Defendant Becerra believes that most plausible reading of the term

23   "authorized participant" as used in California Penal Code §§ 26375 and 26405(r) refers to a

24   participant authorized by a governmental body or agency.  The opposite reading is less plausible.

25   In the broader context of California law, and especially in the context of the Penal Code, it would

26   be anomalous for an individual to be able to exempt themselves from the reach of a penal statute

27   by "authorizing" an exception for themselves.

28

29

**ER-54**

**<u>SECOND AMENDED</u> RESPONSE TO INTERROGATORY NO. 12:**

Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase "authorized participant." Defendant Becerra has never issued a formal opinion under California law regarding the meaning of the phrase "authorized participant," and this response is not such an opinion and cannot be relied upon as such an opinion. Nor is this response a generally applicable rule or regulation that is intended to be applied outside of the context of this case. Moreover, Defendant Becerra played no material role in the events described in the complaint, and was not involved in the denial of Plaintiff Michael Zeleny's permit application(s).

Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific context of this case, Defendant Becerra believes that most plausible reading of the term "authorized participant" as used in California Penal Code §§ 26375 and 26405(r) refers to a participant authorized by a governmental body or agency. This reading is based on Defendant Becerra's historical understanding of the Department of Justice's Firearms Entertainment Permit, which authorizes the permit holder "to possess firearms loaned to the permitholder for use solely as a prop in a motion picture, television, video, theatrical, or other entertainment production or event." (Penal Code § 29500.) The Attorney General understands this exception to have been carried forward into the open carry laws, as the legislative history of Penal Code § 26375 refers to the use of unloaded handguns as an "entertainment props." (See DOJ 000219.) Thus, the exceptions set forth in Penal Code §§ 26375 and 26405, subdivision (r) are available only to those using unloaded firearms loaned to them for use as "entertainment props" in a motion picture, television, video, theatrical, or other entertainment production or event, and when operating under the auspices of a Firearms Entertainment Permit.

The opposite reading is less plausible. In the broader context of California law, and especially in the context of the Penal Code, it would be anomalous for an individual to be able to exempt themselves from the reach of a penal statute by "authorizing" an exception for themselves.

**INTERROGATORY NO. 13**: If your answer to Interrogatory No. 10 is in the negative, state the persons or entities whose authorization is required in order for California Penal Code §§

26375 and 26405(r) to exempt the carrying of firearms from California Penal Code §§ 26350 and 26405.

**INITIAL RESPONSE TO INTERROGATORY NO. 13**:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it is vague and overbroad. Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's claims.

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: The Legislature enacted certain exceptions to the general prohibitions on openly carrying firearms.

Penal Code § 26375 provides that section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by an authorized participant in, or an authorized employee or agent of a supplier of firearms for, a motion picture, television or video production, or entertainment event, when the participant lawfully uses the handgun as part of that production or event, as part of rehearsing or practicing for participation in that production or event, or while the participant or authorized employee or agent is at that production or event, or rehearsal or practice for that production or event. (Pen. Code, § 26375.) According to the Legislative history, Penal Code § 26375 permits the use of unloaded handguns as an "entertainment props." (See DOJ 000219)

Likewise, Penal Code § 26405, subdivision (r) provides that Penal Code § 26400 does not apply to, or affect, the carrying of an unloaded firearm that is not a handgun by an authorized participant in, or an authorized employee or agent of a supplier of firearms for, a motion picture, television, or video production or entertainment event, when the participant lawfully uses that firearm as part of that production or event, as part of rehearsing or practicing for participation in that production or event, or while the participant or authorized employee or agent is at that production or event, or rehearsal or practice for that production or event.

31

1   And, Penal Code § 29500 provides that, "Any person who is at least 21 years of age may

2   apply for an entertainment firearms permit from the Department of Justice. An entertainment

3   firearms permit authorizes the permit holder to possess firearms loaned to the permitholder for

4   use solely as a prop in a motion picture, television, video, theatrical, or other entertainment

5   production or event." (Added by Stats.2010, c. 711 (S.B. 1080).)

6   **AMENDED** RESPONSE TO INTERROGATORY NO. 13:

7   No amendment is needed because Defendant Becerra's answer to interrogatory 10 was not

8   in the negative.

9   **INTERROGATORY NO. 14**: Do California Penal Codes §§ 26375 and 26405(r) require

10  that the "motion picture, television or video production" or "entertainment event" itself be

11  authorized in order to exempt participants from California Penal Code §§ 26350 and 26405?

12  **INITIAL RESPONSE TO INTERROGATORY NO. 14:**

13  Defendant Becerra incorporates by reference the above-stated general objections as though

14  fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it is

15  vague and overbroad, and unduly burdensome. Moreover, it seeks information irrelevant to

16  Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

17  that is relevant to Plaintiff's claims.

18  Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

19  follows: Penal Code §§ 26375 and 26405(r) do not address whether the "motion picture,

20  television or video production" or "entertainment event" itself be authorized in order to exempt

21  participants from California Penal Code §§ 26350 and 26405. Accordingly, Defendant Becerra is

22  unable to respond to this interrogatory.

23  **AMENDED** RESPONSE TO INTERROGATORY NO. 14:

24  Defendant Becerra incorporates by reference the above-stated general objections as though

25  fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it is

26  vague and overbroad, and unduly burdensome. Moreover, it seeks information irrelevant to

27  Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

28  that is relevant to Plaintiff's claims.

32

1    Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

2    follows: Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

3    "authorized participant." Defendant Becerra has never issued a formal opinion under California

4    law regarding the meaning of the phrase "authorized participant," and this response is not such an

5    opinion and cannot be relied upon as such an opinion. Nor is this response a generally applicable

6    rule or regulation that is intended to be applied outside of the context of this case. Moreover,

7    Defendant Becerra played no material role in the events described in the complaint, and was not

8    involved in the denial of Plaintiff Michael Zeleny's permit application(s).

9    Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific

10   context of this case, Penal Code §§ 26375 and 26405(r) do not address whether the "motion

11   picture, television or video production" or "entertainment event" itself be "authorized" in order to

12   exempt participants from California Penal Code §§ 26350 and 26405. The term "authorized"

13   only clearly modifies the terms "participant," "employee" or "agent." And since Mr. Zeleny

14   himself appears to be the "participant" possessing the weapon(s), it appears to be irrelevant if his

15   "production" or "event" is separately authorized. As Defendant Becerra understands the facts, the

16   question might be different if Mr. Zeleny were not the person openly carrying weapons, but were

17   only the person responsible for a "production" or "event."

18   Whether or not the "motion picture, television or video production" or "entertainment

19   event" itself must be "authorized" also appears to be a separate question from whether there exists

20   a bona fide "production" or "event" to begin with. Again specifically in the context of this case,

21   within the structure of the open carry laws, the relevant exception appears to be analogous to

22   similar exceptions for gun shows (Pen. Code § 26369) or target ranges (Pen. Code § 26365)—

23   defined spaces in which the weapon being carried is not easily visible or accessible to the public.

24   The Attorney General understands the Firearms Entertainment Permit, and the corresponding

25   exceptions to the open carry laws, to apply to confined, non-public spaces for a limited period of

26   time, i.e., in a movie studio or clearly defined production area. To the extent that an individual

27   like Mr. Zeleny seeks to demonstrate on a public street with an unloaded firearm in an unconfined

28   area and/or for an indefinite period of time, the Attorney General views the open carrying of

33

1    unloaded weapons on a public street, in an unconfined area fully visible to and accessible by

2    anyone else, and not within what would reasonably be considered a defined, enclosed production

3    area (i.e., a production or event), to potentially be conduct outside the scope of the Firearms

4    Entertainment Permit and the corresponding exception to the open carry laws, and potentially

5    subject to enforcement by the law enforcement agency primarily responsible for enforcing the

6    open carry laws in that area.

7            While the Department of Justice "authorizes" the use of firearms in this narrow context

8    through the issuance of Firearms Entertainment Permits, such authorization is in the nature of a

9    defense to an open carry prosecution within the very narrow context of an entertainment prop, not

10   a preclusion of any other regulation by other agencies.  Other law enforcement agencies would

11   not be precluded from ensuring that an individual carrying a weapon openly had a permit, or

12   ensuring that an identified individual is not violating any other federal, state, or local laws or

13   ordinances.  Notably, when issuing the Firearms Entertainment Permit, the Department does not

14   verify the nature of the entertainment event or impose any restrictions on how a weapon might be

15   carried or used, but only looks to see if a person is prohibited from owning firearms.  In this

16   sense, the Firearms Entertainment Permit is a floor rather than a ceiling, with possible room for

17   other law enforcement agencies to determine, for example, that the open carry of weapons

18   endangered public safety, or was a nuisance, or that someone's conduct was not a "production or

19   event" covered by the relevant exception, or that someone was not violating other laws.

20           **INTERROGATORY NO. 15**:  If your response to Interrogatory No. 14 is in the

21   affirmative, identify all persons or entities whose authorization of the "motion picture, television

22   or video production" or "entertainment event" is required in order to exempt participants from

23   California Penal Code §§ 26350 and 26405.

24           **INITIAL RESPONSE TO INTERROGATORY NO. 15**:

25           Defendant Becerra incorporates by reference the above-stated general objections as though

26   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

27   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

28

34

**ER-59**

1    Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

2    that is relevant to Plaintiff's claims.

3        Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

4    follows: N/A.

5        **<u>AMENDED</u> RESPONSE TO INTERROGATORY NO. 15:**

6        Defendant Becerra's answer to interrogatory 14 was not in the affirmative.

7        **INTERROGATORY NO. 16**:  State all of the bases for Your response to Interrogatory

8    No. 14.

9        **INITIAL RESPONSE TO INTERROGATORY NO. 16**:

10       Defendant Becerra incorporates by reference the above-stated general objections as though

11   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is

12   vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to

13   Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

14   that is relevant to Plaintiff's claims.

15       Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

16   follows: N/A.

17       **<u>AMENDED</u> RESPONSE TO INTERROGATORY NO. 16:**

18       Defendant Becerra has never issued a formal opinion under California law regarding the

19   meaning of the phrase "authorized participant," and this response is not such an opinion and

20   cannot be relied upon as such an opinion.  Nor is this response a generally applicable rule or

21   regulation that is intended to be applied outside of the context of this case.  Moreover, Defendant

22   Becerra played no material role in the events described in the complaint, and was not involved in

23   the denial of Plaintiff Michael Zeleny's permit application(s).

24       Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific

25   context of this case, Penal Code §§ 26375 and 26405(r) do not address whether the "motion

26   picture, television or video production" or "entertainment event" itself be "authorized" in order to

27   exempt participants from California Penal Code §§ 26350 and 26405.  The term "authorized"

28   only clearly modifies the terms "participant," "employee" or "agent."  And since Mr. Zeleny

35

1    himself appears to be the "participant" possessing the weapon(s), it appears to be irrelevant if his

2    "production" or "event" is separately authorized. As Defendant Becerra understands the facts, the

3    question might be different if Mr. Zeleny were not the person openly carrying weapons, but were

4    only the person responsible for a "production" or "event."

5         Whether or not the "motion picture, television or video production" or "entertainment

6    event" itself must be "authorized" also appears to be a separate question from whether there exists

7    a bona fide "production" or "event" to begin with. Again specifically in the context of this case,

8    within the structure of the open carry laws, the relevant exception appears to be analogous to

9    similar exceptions for gun shows (Pen. Code § 26369) or target ranges (Pen. Code § 26365)—

10   defined spaces in which the weapon being carried is not easily visible or accessible to the public.

11   The Attorney General understands the Firearms Entertainment Permit, and the corresponding

12   exceptions to the open carry laws, to apply to confined, non-public spaces for a limited period of

13   time, i.e., in a movie studio or clearly defined production area. To the extent that an individual

14   like Mr. Zeleny seeks to demonstrate on a public street with an unloaded firearm in an unconfined

15   area and/or for an indefinite period of time, the Attorney General views the open carrying of

16   unloaded weapons on a public street, in an unconfined area fully visible to and accessible by

17   anyone else, and not within what would reasonably be considered a defined, enclosed production

18   area (i.e., a production or event), to potentially be conduct outside the scope of the Firearms

19   Entertainment Permit and the corresponding exception to the open carry laws, and potentially

20   subject to enforcement by the law enforcement agency primarily responsible for enforcing the

21   open carry laws in that area.

22        This conclusion is consistent with the legislative history of the open carry statutes. The

23   absence of a prohibition on openly carrying unloaded firearms has created a surge in individuals

24   openly carrying unloaded firearms in public. These incidents adversely affect public safety in

25   several ways. Members of the public who encounter individuals openly carrying firearms are

26   alarmed and fearful for their safety and the safety of others. When members of the public report

27   such incidents to local law enforcement, they are only able to provide law enforcement personnel

28   with incomplete information. As a result, law enforcement agencies respond to such incidents

Defendant Xavier Becerra's Second Amended Responses to Plaintiff's First Set of Interrogatories  (3:17-cv-07357
RS)

1  with limited information regarding whether the individual openly carrying the firearm is a danger

2  to himself or herself; a danger to the public; or a danger to the responding law enforcement

3  personnel.

4       In such situations, a wrong move by the individual carrying the firearm could be construed

5  as threatening by the responding law enforcement officer.  The officer may feel compelled to

6  respond in a manner that could result in injury or death.  Thus, the practice of openly carrying

7  unloaded firearms can create an unsafe environment for everyone involved: the individual

8  carrying the firearm, the responding law enforcement personnel, and all other individuals who

9  may be nearby.

10      In addition, responding to incidents involving individuals openly carrying unloaded

11 firearms taxes the resources of law enforcement agencies already stretched by under-staffing and

12 budget cutbacks.  Such a diversion of resources adversely affects law enforcement agencies'

13 ability to provide other public safety services to their communities.  *See e.g.*, *Woollard*, 712 F.3d

14 at 879-880 (recounting similar policing benefits).

15      According to the legislative history of California Penal Code § 26400, one of the purposes

16 of the bill (A.B. 1527) was to follow up A.B. 144 (Statutes of 2011), which made public open

17 carry of handguns a misdemeanor, by expanding the prohibition to long-guns in incorporated

18 cities.  "The absence of a prohibition on 'open carry' of long guns has created an increase in

19 problematic instances of these guns carried in public, alarming unsuspecting individuals causing

20 issues for law enforcement.  Open carry creates a potentially dangerous situation.  In most cases

21 when a person is openly carrying a firearm, law enforcement is called to the scene with few

22 details other than one or more people are present at a location and are armed." (See DOJ 001050)

23 "In these tense situations, the slightest wrong move by the gun-carrier could be construed as

24 threatening by the responding officer, who may feel compelled to respond in a manner that could

25 be lethal.  In this situation the practice of 'open carry' creates an unsafe environment for all

26 parties involved; the officer, the gun-carrying individual, and for any other individuals nearby as

27 well." (See DOJ 001050)

28

37

**ER-62**

1    "Additionally, the increase in 'open-carry' calls placed to law enforcement has taxed

2    departments dealing with under-staffing and cutbacks due to the current fiscal climate in

3    California, preventing them from protecting the public in other ways." (See DOJ 001051)

4        The opposite legal interpretation is less plausible. If anyone could create a "motion picture,

5    television or video production" or "entertainment event" merely by filming themselves in a public

6    place (using an object as small as a cell phone), with no meaningful limitation on the visibility or

7    timing of the firearms display, such an exception would swallow the general prohibition on open

8    carrying of weapons and be inconsistent with the California Legislature's intent to minimize

9    potentially dangerous interactions in public.

10       **INTERROGATORY NO. 17**: State all facts supporting your interpretation of California

11   Penal Code §§ 26375 and 26405(r).

12       **RESPONSE TO INTERROGATORY NO. 17**:

13       Defendant Becerra incorporates by reference the above-stated general objections as though

14   fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it is

15   vague and overbroad, and unduly burdensome. Moreover, it seeks information irrelevant to

16   Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

17   that is relevant to Plaintiff's claims.

18       Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

19   follows: Defendant Becerra has not issued an interpretation of California Penal Code §§ 26375

20   and 26405, subdivision (r). However, the California Department of Justice does possess

21   documents that are related to firearms generally. See and DOJ 0001282-DOJ 001312.

22       **INTERROGATORY NO. 18**: Describe in detail all means through which your

23   interpretation of California Penal Code §§ 26375 and 26405(r) has been relayed to municipalities

24   and local governments.

25       **RESPONSE TO INTERROGATORY NO. 18**:

26       Defendant Becerra incorporates by reference the above-stated general objections as though

27   fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it is

28   vague and overbroad, and unduly burdensome. Moreover, it seeks information irrelevant to

Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's claims.

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: Defendant Becerra has not issued an interpretation of California Penal Code §§ 26375 and 26405(r). However, the California Department of Justice does possess documents that are related to firearms generally. See and DOJ 0001282-DOJ 001312.

**INTERROGATORY NO. 19**: Identify all documents reflecting your interpretation of California Penal Code §§ 26375 and 26405(r).

**RESPONSE TO INTERROGATORY NO. 19**:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it is vague and overbroad, and unduly burdensome. Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's claims.

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: Defendant Becerra has not issued an interpretation of California Penal Code §§ 26375 and 26405(r). Thus, Defendant Becerra is not aware of any documents that would be responsive to this request. However, the California Department of Justice does possess documents that are related to firearms generally. See and DOJ 0001282-DOJ 001312.

**INTERROGATORY NO. 20**: Identify all documents reflecting that you have conveyed your interpretation of California Penal Code §§ 26375 and 26405(r).

**RESPONSE TO INTERROGATORY NO. 20**:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it is vague and overbroad, and unduly burdensome. Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's claims.

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows:  Defendant Becerra has not issued an interpretation of California Penal Code §§ 26375 and 26405(r).  Thus, Defendant Becerra is not aware of any documents that would be responsive to this request.  However, the California Department of Justice does possess documents that are related to firearms generally.  See and DOJ 0001282-DOJ 001312.

**INTERROGATORY NO. 21**:  Identify the types of events that qualify as "entertainment events" under California Penal Code §§ 26375, 26405(r), and 25510.

**RESPONSE TO INTERROGATORY NO. 21**:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it is vague and overbroad, and unduly burdensome.  Moreover, it seeks information irrelevant to Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information that is relevant to Plaintiff's claims.

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows:  Defendant Becerra has not issued an interpretation of the types of events that would qualify as "entertainment events" under California Penal Code §§ 26375, 26405, subdivision (r), and 25510.  Thus, Defendant Becerra is not aware of any documents that would be responsive to this request.  However, the California Department of Justice does possess documents that are related to firearms generally.  See and DOJ 0001282-DOJ 001312.

/ / /

/ / /

/ / /

/ / /

40

1    Dated:  October 23, 2020                          Respectfully submitted,

2                                                      XAVIER BECERRA
                                                       Attorney General of California
3                                                      ANTHONY R. HAKL
                                                       Supervising Deputy Attorney General
4

5                                                      /s/ John W. Killeen
                                                       JOHN W. KILLEEN
6                                                      Deputy Attorney General
                                                       *Attorneys for Defendant Attorney General*
7                                                      *Xavier Becerra*

8

9

10

11

12

13

14

15

16

17

18

19

20   SA2018100198
     34524433.docx
21

22

23

24

25

26

27

28

Defendant Xavier Becerra's Second Amended Responses to Plaintiff's First Set of Interrogatories  (3:17-cv-07357 RS)

**ER-66**

Exhibit 2

1  XAVIER BECERRA
   Attorney General of California
2  ANTHONY R. HAKL
   Supervising Deputy Attorney General
3  NOREEN P. SKELLY
   Deputy Attorney General
4  JOHN W. KILLEEN
   Deputy Attorney General
5  State Bar No. 258395
     1300 I Street, Suite 125
6    P.O. Box 944255
     Sacramento, CA 94244-2550
7    Telephone: (916) 210-6045
     Fax: (916) 324-8835
8    E-mail: John.Killeen@doj.ca.gov
   *Attorneys for Defendant Attorney General Xavier*
9  *Becerra*

10                IN THE UNITED STATES DISTRICT COURT

11             FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                    SAN FRANCISCO DIVISION

13

14

15  **MICHAEL ZELENY, an individual,**              3:17-cv-07357 RS

16                                  Plaintiff,      **DEFENDANT ATTORNEY GENERAL
                                                    XAVIER BECERRA'S SECOND**
17       v.                                         **AMENDED RESPONSES TO
                                                    PLAINTIFF MICHAEL ZELENY'S**
18                                                  **INTERROGATORIES, SET TWO**
    **GAVIN NEWSOM, an individual, in his**
19  **official capacity; XAVIER BECERRA, an**
    **individual, in his official capacity; CITY OF**
20  **MENLO PARK, a municipal corporation;**
    **and DAVE BERTINI, in his official**
21  **capacity,**

22                                  Defendants.

23

24       PROPOUNDING PARTY:        Plaintiff Michael Zeleny

25       ANSWERING PARTY:          Defendant Attorney General Xavier Becerra

26       SET NUMBER:               Two

27

28

                                        1

**PRELIMINARY STATEMENT**

Defendant Becerra objects to each interrogatory to the extent that it purports to impose any obligation or requirement greater than or different to the obligations or requirements set forth in the Federal Rules of Civil Procedure and/or the applicable rules and orders of this Court.

Defendant Becerra objects to each interrogatory to the extent that it calls for the disclosure of information protected from disclosure by the attorney work-product doctrine, the attorney-client privilege, the deliberative process privilege and/or any other applicable privilege or protection. Should Defendant Becerra disclose any privileged or otherwise protected information in these responses, the disclosure is inadvertent and does not constitute a waiver of the privilege or protection.

Defendant Becerra objects to each interrogatory to the extent that it calls for him to interpret what the Legislature intended when it drafted any of the statutory provisions at issue in this case.

Defendant Becerra has not completed the investigation of the facts and issues relating to Plaintiff Zeleny's claims and has not completed discovery in this action. All of the answers contained herein are based solely upon information and documents which are presently available to, and specifically known by, Defendant Becerra, and the answers disclose only those contentions which presently occur to Defendant Becerra. Further discovery, independent investigation, legal research and analysis may supply additional facts and may lead to additions, changes, and variations from the answers herein.

The following answers are given without prejudice to the right to produce evidence and/or witnesses or rely on facts which Defendant Becerra may later discover. Defendant Becerra accordingly reserves the right to change any and all answers herein as additional facts are ascertained, witnesses identified and legal research is completed. The answers contained herein are made in good faith in an attempt to supply as much factual information and as much specification of legal contention as is presently known, and in no way prejudices Defendant Becerra in relation to further discovery and proceedings.

2

Defendant Becerra incorporates by reference every general objection set forth above into each specific answer set forth below. A specific response may repeat a general objection for emphasis or some other reason. The failure to include a general objection in any specific answer does not waive any general objection to that interrogatory.

**INTERROGATORY NO. 22**: Is an individual who has a valid "entertainment firearms permit" issued pursuant to Penal Code § 29500 an "authorized participant" within the meaning of Penal Code §§ 26375 and 26405(r)?

**INITIAL RESPONSE TO INTERROGATORY NO. 22**:

Defendant Becerra incorporates by reference the above-stated general objections as though fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it poses a question of pure law. Defendant Becerra is not required to respond to interrogatories raising questions of pure law. See *AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-cv-03393-YGR (JSC), 2014 WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014) ("[I]nterrogatories directed to issues of 'pure law'—i.e., abstract legal issues not dependent on the facts of the case are not permitted") (citation and some internal punctuation omitted). Defendant Becerra also objects to this interrogatory because it calls for him to interpret what the Legislature intended when it drafted any of the statutory provisions at issue in this case.

Subject to, and without waiving the foregoing objections, Defendant Becerra responds as follows: Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase "authorized participant." Thus, what the Legislature intended by that phrase is a question of statutory interpretation.

However, according to the Legislative history of Penal Code § 26375, that section permits the use of unloaded handguns as an "entertainment props." (See DOJ 000219) Additionally, the Entertainment Firearms Permit authorizes the permit holder "to possess firearms loaned to the permitholder for use solely as a prop in a motion picture, television, video, theatrical, or other entertainment production or event." (Penal Code § 29500.) Thus, it is possible to infer that the Legislature intended the exceptions set forth in Penal Code §§ 26375 and 26405, subdivision (r) to be available only to those using unloaded firearms loaned to them for use as "entertainment

3

1 props" in a motion picture, television, video, theatrical, or other entertainment production or
2 event.

3        **AMENDED RESPONSE TO INTERROGATORY 22:**

4        Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase
5 "authorized participant."  Defendant Becerra has never issued a formal opinion under California
6 law regarding the meaning of the phrase "authorized participant," and this response is not such an
7 opinion and cannot be relied upon as such an opinion.  Nor is this response a generally applicable
8 rule or regulation that is intended to be applied outside of the context of this case.  Moreover,
9 Defendant Becerra played no material role in the events described in the complaint, and was not
10 involved in the denial of Plaintiff Michael Zeleny's permit application(s).

11        Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific
12 context of this case, an individual who has a valid "entertainment firearms permit" issued
13 pursuant to Penal Code § 29500 could be an "authorized participant" within the meaning of Penal
14 Code §§ 26375 and 26405(r) for the very narrow purpose of having a defense against a
15 prosecution of open carry laws, if that individual were using the weapon as a prop in a motion
16 picture, television, video, theatrical, or other entertainment production or event.  However, that
17 individual would not be immune from other regulation of their activities.

18        **SECOND AMENDED RESPONSE TO INTERROGATORY NO. 22:**

19        Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase
20 "authorized participant."  Defendant Becerra has never issued a formal opinion under California
21 law regarding the meaning of the phrase "authorized participant," and this response is not such an
22 opinion and cannot be relied upon as such an opinion.  Nor is this response a generally applicable
23 rule or regulation that is intended to be applied outside of the context of this case.  Moreover,
24 Defendant Becerra played no material role in the events described in the complaint, and was not
25 involved in the denial of Plaintiff Michael Zeleny's permit application(s).

26        Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific
27 context of this case, an individual who has a valid "entertainment firearms permit" issued
28 pursuant to Penal Code § 29500 would be an "authorized participant" within the meaning of

1   Penal Code §§ 26375 and 26405(r) for the narrow purpose of having a defense against a

2   prosecution of open carry laws, if that individual were using the weapon as a prop in a motion

3   picture, television, video, theatrical, or other entertainment production or event.  However, that

4   individual would not be immune from other regulation of their activities.

5       **INTERROGATORY NO. 23**:  State all facts supporting your response to the preceding

6   interrogatory.

7       **INITIAL RESPONSE TO INTERROGATORY NO. 23**:

8       Defendant Becerra incorporates by reference the above-stated general objections as though

9   fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it poses

10  a question of pure law.  Defendant Becerra is not required to respond to interrogatories raising

11  questions of pure law.  See *AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-cv-03393-YGR (JSC),

12  2014 WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014) ("[I]nterrogatories directed to issues of 'pure

13  law'—i.e., abstract legal issues not dependent on the facts of the case are not permitted") (citation

14  and some internal punctuation omitted).  Defendant Becerra also objects to this interrogatory

15  because it calls for him to interpret what the Legislature intended when it drafted any of the

16  statutory provisions at issue in this case.

17      Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

18  follows: Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

19  "authorized participant."  Thus, what the Legislature intended by that phrase is a question of

20  statutory interpretation.

21      However, according to the Legislative history of Penal Code § 26375, that section permits

22  the use of unloaded handguns as an "entertainment props."  (See DOJ 000219)  Additionally, the

23  Entertainment Firearms Permit authorizes the permit holder "to possess firearms loaned to the

24  permitholder for use solely as a prop in a motion picture, television, video, theatrical, or other

25  entertainment production or event."  (Penal Code § 29500.)  Thus, it is possible to infer that the

26  Legislature intended the exceptions set forth in Penal Code §§ 26375 and 26405, subdivision (r)

27  to be available only to those using unloaded firearms loaned to them for use as "entertainment

28

1   props" in a motion picture, television, video, theatrical, or other entertainment production or

2   event.

3       <u>AMENDED</u> RESPONSE TO INTERROGATORY 23:

4       Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

5   "authorized participant."  Defendant Becerra has never issued a formal opinion under California

6   law regarding the meaning of the phrase "authorized participant," and this response is not such an

7   opinion and cannot be relied upon as such an opinion.  Nor is this response a generally applicable

8   rule or regulation that is intended to be applied outside of the context of this case.  Moreover,

9   Defendant Becerra played no material role in the events described in the complaint, and was not

10  involved in the denial of Plaintiff Michael Zeleny's permit application(s).

11      Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific

12  context of this case, the Department of Justice's Entertainment Firearms Permit only authorizes

13  the permit holder "to possess firearms loaned to the permitholder for use solely as a prop in a

14  motion picture, television, video, theatrical, or other entertainment production or event." (Penal

15  Code § 29500.)  Anyone who is not otherwise authorized to carry a weapon openly, but who

16  desires to carry a weapon openly "as a prop in a motion picture, television, video, theatrical, or

17  other entertainment production or event" would need to do so under the auspices of an

18  Entertainment Firearms Permit.

19      The Attorney General understands this exception to have been carried forward into the open

20  carry laws, as the legislative history of Penal Code § 26375 refers to the use of unloaded

21  handguns as an "entertainment props."  (See DOJ 000219.)  Thus, the exceptions set forth in

22  Penal Code §§ 26375 and 26405, subdivision (r) are available only to those using unloaded

23  firearms loaned to them for use as "entertainment props" in a motion picture, television, video,

24  theatrical, or other entertainment production or event.

25      While the Department of Justice "authorizes" the use of firearms in this narrow context

26  through the issuance of Firearms Entertainment Permits, such authorization is in the nature of a

27  defense to an open carry prosecution within the very narrow context of an entertainment prop, not

28  a preclusion of any other regulation by other agencies.  Other law enforcement agencies would

1    not be precluded from ensuring that an individual carrying a weapon openly had a permit, or

2    ensuring that an identified individual is not violating any other federal, state, or local laws or

3    ordinances.  Notably, when issuing the Firearms Entertainment Permit, the Department does not

4    verify the nature of the entertainment event or impose any restrictions on how a weapon might be

5    carried or used, but only looks to see if a person is prohibited from owning firearms.  In this

6    sense, the Firearms Entertainment Permit is a floor rather than a ceiling, with possible room for

7    other law enforcement agencies to determine, for example, that the open carry of weapons

8    endangered public safety, or was a nuisance, or that someone's conduct was not a "production or

9    event" covered by the relevant exception, or that someone was not violating other laws.

10          Also, within the structure of the open carry laws, the exception for an authorized participant

11    appears to be analogous to similar exceptions for gun shows (Pen. Code § 26369) or target ranges

12    (Pen. Code § 26365)—defined spaces in which the weapon being carried is not easily visible or

13    accessible to the public.  The Attorney General understands the Firearms Entertainment Permit,

14    and the corresponding exceptions to the open carry laws, to apply to confined, non-public spaces

15    for a limited period of time, i.e., in a movie studio or clearly defined production area.  To the

16    extent that an individual like Mr. Zeleny seeks to demonstrate on a public street with an unloaded

17    firearm in an unconfined area and/or for an indefinite period of time, the Attorney General views

18    the open carrying of unloaded weapons on a public street, in an unconfined area fully visible to

19    and accessible by anyone else, and not within what would reasonably be considered a defined,

20    enclosed production area, to potentially be conduct outside the scope of the Firearms

21    Entertainment Permit and the corresponding exception to the open carry laws, and potentially

22    subject to enforcement by the law enforcement agency primarily responsible for enforcing the

23    open carry laws in that area.

24    **SECOND AMENDED RESPONSE TO INTERROGATORY NO. 23:**

25          Penal Code §§ 26375 and 26405, subdivision (r) do not include definitions of the phrase

26    "authorized participant."  Defendant Becerra has never issued a formal opinion under California

27    law regarding the meaning of the phrase "authorized participant," and this response is not such an

28    opinion and cannot be relied upon as such an opinion.  Nor is this response a generally applicable

1   rule or regulation that is intended to be applied outside of the context of this case.  Moreover,

2   Defendant Becerra played no material role in the events described in the complaint, and was not

3   involved in the denial of Plaintiff Michael Zeleny's permit application(s).

4          Based on Defendant Becerra's understanding of Plaintiff Zeleny's situation, in the specific

5   context of this case, the Department of Justice's Entertainment Firearms Permit only authorizes

6   the permit holder "to possess firearms loaned to the permitholder for use solely as a prop in a

7   motion picture, television, video, theatrical, or other entertainment production or event." (Penal

8   Code § 29500.)  Anyone who is not otherwise authorized to carry a weapon openly, but who

9   desires to carry a weapon openly "as a prop in a motion picture, television, video, theatrical, or

10  other entertainment production or event" would need to do so under the auspices of an

11  Entertainment Firearms Permit.  For entertainment productions this generally has meant that a

12  propmaster or similarly qualified person is supervising the use of firearms in the production, and

13  others involved in the production may transfer or possess firearms under the auspices of the

14  supervising permit-holder.

15         The Attorney General understands this exception to have been carried forward into the open

16  carry laws, as the legislative history of Penal Code § 26375 refers to the use of unloaded

17  handguns as an "entertainment props."  (See DOJ 000219.)  Thus, the exceptions set forth in

18  Penal Code §§ 26375 and 26405, subdivision (r) are available only to those using unloaded

19  firearms loaned to them for use as "entertainment props" in a motion picture, television, video,

20  theatrical, or other entertainment production or event, and when operating under the auspices of a

21  Firearms Entertainment Permit.

22  **INTERROGATORY NO. 24**:  State all facts supporting your contention that the definition of

23  "authorized participant" under Penal Code §§ 26375 and 26405(r) refers to a person with an

24  "entertainment firearms permit" issued pursuant to Penal Code § 29500.

25         **INITIAL RESPONSE TO INTERROGATORY NO. 24**:

26         Defendant Becerra incorporates by reference the above-stated general objections as though

27  fully set forth herein.  Defendant Becerra objects to this interrogatory on the grounds that it poses

28  a question of pure law.  Defendant Becerra is not required to respond to interrogatories raising

8

1    questions of pure law. See *AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-cv-03393-YGR (JSC),

2    2014 WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014) ("[I]nterrogatories directed to issues of 'pure

3    law'—i.e., abstract legal issues not dependent on the facts of the case are not permitted") (citation

4    and some internal punctuation omitted).

5         Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

6    follows: Defendant Becerra has not made this contention. What the Legislature intended when it

7    used the phrase "authorized participant" is a question of statutory interpretation.

8         **AMENDED RESPONSE TO INTERROGATORY 24:**

9         Becerra has not made this contention. However, to the extent that he had, in response to

10   interrogatory 23, Becerra has explained his understanding of the statute in the context of this

11   particular case.

12        **SECOND AMENDED RESPONSE TO INTERROGATORY NO. 24:**

13        To the extent that Defendant Becerra has made the contention "that the definition of

14   'authorized participant' under Penal Code §§ 26375 and 26405(r) refers to a person with an

15   'entertainment firearms permit' issued pursuant to Penal Code § 29500, in response to

16   interrogatory 23, Becerra has explained his understanding of the statute in the context of this

17   particular case.

18        **INTERROGATORY NO. 25**: Identify all documents bearing upon, supporting, or

19   reflecting the facts set forth in Your response to the preceding interrogatory.

20        **RESPONSE TO INTERROGATORY NO. 25**:

21        Defendant Becerra incorporates by reference the above-stated general objections as though

22   fully set forth herein. Defendant Becerra objects to this interrogatory on the grounds that it is

23   vague and overbroad, and unduly burdensome. Moreover, it seeks information irrelevant to

24   Plaintiff Zeleny's claims, and not reasonably calculated to lead to the discovery of information

25   that is relevant to Plaintiff's claims.

26        Subject to, and without waiving the foregoing objections, Defendant Becerra responds as

27   follows: N/A.

28        **AMENDED RESPONSE TO INTERROGATORY 25:**

9

1    Becerra has not made this contention. However, to the extent that he had, in response to

2    interrogatory 23, Becerra has explained his understanding of the statute in the context of this

3    particular case.

4    **<u>SECOND AMENDED</u> RESPONSE TO INTERROGATORY NO. 25:**

5    To the extent that Defendant Becerra has made the contention "that the definition of

6    'authorized participant' under Penal Code §§ 26375 and 26405(r) refers to a person with an

7    'entertainment firearms permit' issued pursuant to Penal Code § 29500, in response to

8    interrogatory 23, Becerra has explained his understanding of the statute in the context of this

9    particular case.

10

11   Dated: October 23, 2020                          Respectfully submitted,

12                                                    XAVIER BECERRA
                                                      Attorney General of California
13                                                    ANTHONY R. HAKL
                                                      Supervising Deputy Attorney General
14

15

16                                                    */s/ John W. Killeen*
                                                      NOREEN P. SKELLY
17                                                    Deputy Attorney General
                                                      JOHN W. KILLEEN
18                                                    Deputy Attorney General
                                                      *Attorneys for Defendant Attorney General*
19                                                    *Xavier Becerra*

20

21

22

23

24

25   SA2018100198
26   34524444.docx

27

28

Defendant Xavier Becerra's Second Amended Responses to Plaintiff's Interrogatories, Set Two  (3:17-cv-07357 RS)

# Exhibit 3

David W. Affeld, State Bar No. 123922
Brian R. England, State Bar No. 211355
Damion Robinson, State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone:     (310) 979-8700

Attorneys for Plaintiff
Michael Zeleny

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| MICHAEL ZELENY, | Case No. CV 17-7357 RS |
|---|---|
| Plaintiff, | Assigned to: The Honorable Richard G. Seeborg |
| vs. | **EXPERT DECLARATION OF MICHAEL TRISTANO** |
| GAVIN NEWSOM, *et al.*, | |
| Defendants. | Action Filed:  December 28, 2017 Trial Date:     None Set |

- 1 -

EXPERT DECLARATION

**ER-79**

I, Michael Tristano, declare as follows:

1.     I have been retained by Affeld Grivakes LLP on behalf of Michael Zeleny, as an expert in the above-referenced litigation.

2.     As an independent expert, I have been asked to give my opinion on the issue of permitting for film, television, and other video projects, and, specifically, the permitting and use of firearms on such projects.

3.     For my work on this case, I am being compensated at a rate of $500 per hour, plus expenses.  I have not received and will not receive any other compensation related to this case.  No part of my compensation depends on the outcome of this case.

**PROFESSIONAL BACKGROUND AND EXPERIENCE**

4.     I have been a professional Armorer and Special Effects Technician for more than 30 years.  I have worked on more than 500 feature films, television shows and video projects, most of which are listed on the Internet Movie Database (imdb.com).  These projects include: 3:10 to Yuma, The Purge, Medal of Honor, I Am Still Here, and Enron: The Smartest Guys in the Room.

5.     Most of my work is done in the State of California, and my licenses and permits to do this work include:

        1)     A California DOJ Entertainment Firearms Permit;

        2)     A Federal Firearms License (FFL);

        3)     The four California Dangerous Weapon Permits, which include permits for assault weapons and .50 caliber weapons, machine guns, short-barrel rifles and shotguns, and destructive devices; and

        4)     The California Certificate of Eligibility.

6.     Besides providing on-set armorer services and training of actors, actresses, extras, and stunt people (collectively "Authorized Persons") for proper and safe use of blank-firing firearms on set, my company also rents and provides non-firing replica and rubber guns.

7.     I have also been an on-camera weapons expert on shows for The History Channel, The Discovery Channel and A&E.

- 2 -

EXPERT DECLARATION

**ER-80**

8.    When I am involved in any project using firearms on the set of a motion picture, TV show or video project, I advise the production on what firearms I think they should use in their show and what permitting we will require regarding the use of firearms during the project.

9.    Based on my extensive career as a professional, licensed motion picture and television Armorer, I believe that I am qualified to address the questions presented to me.

**INFORMATION CONSIDERED**

10.    In preparing this expert report, I have reviewed the relevant applications and standards regarding permitting for film, television and video projects in the State of California, and the use of firearms on set.

11.    My analysis of the information relevant to this case is ongoing, and I expect to continue receiving information and questions as they are presented to me, and it is possible that new information may affect certain conclusions in this report. I therefore reserve the right to supplement it.

**OPINIONS**

12.    If called upon to testify, I would explain the following facts and opinions regarding permitting for film, television and video productions, and the inclusion of proper permitting for the use of firearms on these productions.

13.    When I am contacted by a production to provide their show with Armorer services and the rental of blank-firing guns, non-firing replicas and rubber guns, I am involved with the production company in the process of obtaining the necessary permits.  I always insist that productions get the proper permitting and cover all of the requirements in the specific area and jurisdiction they are filming in.

14.    In the State of California, although rules and regulations may vary somewhat from county to county and city to city, the general state policies are the same:

1)    The production must apply for a permit for all of the days and at each location where the filming will be taking place through the offices in

charge of filming in the respective jurisdictions. In Los Angeles, for example, permits are applied for and obtained from FilmLA.

2) If there is going to be blank-firing weapons used and blanks fired, both the permit application and the permit must include this information, with a description of the type of gunfire (such as single shot, semiautomatic, fully automatic, or black powder blanks) and the load size of the blanks (1/4 load, 1/2 load, or full load) so the proper notifications can be made to the surrounding area.

3) Is the blank gunfire to take place in the interior or exterior of the location? If there is gunfire in the exterior of the location, or in any area open to the public view, at least one Police Officer is usually required to be assigned to the location by the permitting office. A Fire Marshall or FSO (Fire Safety Officer) may also be assigned by the permitting office if the location is located in a fire zone, or if there are possible flammable elements at the location.

4) If there is no blank gunfire, but replica or rubber guns are brandished in an exterior part of the location, or an area open to view by the public, this must also be on the permit application and the permit and a Police Officer will still be assigned to the location to deal with civilians to make sure everyone knows this is not an active shooter situation.

5) Whenever any real or blank-firing firearms are present on a set, a licensed Armorer must be present to handle blank-firing weapons and a licensed Prop Master for non-firing replica guns and rubbers. This is so proper safety protocols are always followed.

6) Permitting offices do not inquire about the names or identities of the Authorized Participants using the weapons, as such information is neither necessary nor relevant for the permitting process. In fact, when the permit applications are being prepared, submitted, and considered, often times the

- 4 -

specific names and identities of the Authorized Participants are not known or finalized. In particular, the names and identities of extras serving as Authorized Participants may well not be known until the actual day of the shoot and can change throughout the day in the director's discretion. In my experience, during the permitting process, I have never been asked to provide, and have not provided, the names and identities of the anticipated Authorized Participants to any permitting office or agency.

7) In contrast to the permitting offices and agencies, licensed Armorers are required to ensure that none of the Authorized Participants using the real and/or blank-firing weapons is a felon or a person prohibited from possessing a firearm. Such "prohibited persons" may use replica or rubber weapons only.

8) While any blank-firing, replica or rubber weapons are on set, they remain in the charge of the Armorer and/or Prop Master, until they are needed to be placed in the hands of the Authorized Participants and/or on the set. After the shots are completed, the firearms are taken back and remain in the charge of the Armorer and/or Prop Master.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed October 9, 2020 at Los Angeles, California.

Michael Tristano
Declarant

- 5 -

EXPERT DECLARATION

# Exhibit 4

David W. Affeld, State Bar No. 123922
Brian R. England, State Bar No. 211355
Damion Robinson, State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone:     (310) 979-8700

Attorneys for Plaintiff
Michael Zeleny

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ZELENY,<br><br>    Plaintiff,<br><br>    vs.<br><br>GAVIN NEWSOM, *et al.*,<br><br>    Defendants. | Case No. CV 17-7357 RS<br><br>Assigned to:<br>The Honorable Richard G. Seeborg<br><br>**EXPERT DECLARATION OF ROBERT LATHAM BROWN**<br><br>Action Filed:  December 28, 2017<br>Trial Date:     None set. |

EXPERT DECLARATION
**ER-85**

I, Robert Latham Brown, declare as follows:

1. I have been asked to provide my expert opinion and experience regarding the permitting process involved in filming a motion picture or television production that includes the use of firearms in the State of California.

2. For my work on this case, I am being compensated at the hourly rate of $200/hour for the preparation of this report, and $300/hour for deposition or court testimony. I received no other form of compensation related to this case. No part of my compensation depends upon the outcome of this case.

3. **Information Considered:** In preparing this expert report, I have reviewed and considered the following material:

    a. The American Entertainment Armorers Association Amicus Brief in support of Plaintiffs and Petitioners (Proposed); Superior Court Case No. CPF-05-505960, (https://michellawyers.com/wp-content/uploads/2013/01/Fiscal_American-Entertainment-Armorers-Association-Amicus-Brief-In-Support-of-Plaintiffs-and-Petitioners-Proposed.pdf);

    b. California Penal Code Sections 26350, 26375, and 25510;

    c. FilmLA Permit website (https://www.filmla.com/for-filmmakers/permits/);

    d. California Film Commission website (https://film.ca.gov/);

    e. The Producers Guild Code of Credits (https://www.producersguild.org/page/code_of_credits); and

    f. The Directors Guild of America Basic Agreement (https://www.dga.org/Contracts/~/link.aspx?_id=CC4363E3-BC29-443C-9E34-88F7A534F982&_z=z).

4. **Education:**

    a. Bachelor of Arts degree from Tulane University awarded in September 1969.

    b. Two years of study for an MFA degree from The University of California, Los Angeles (1972 – 1974). Left before completion to enter the AMPTP/DGA Training Program.

- 2 -

EXPERT DECLARATION
**ER-86**

c. Association of Motion Picture and Television Producers / Directors Guild of America (AMPTP/DGA) Training Program (1974-1976).

5. **Teaching:** I have been an adjunct professor at the USC School of Cinematic Arts since the fall of 1996. The main course I teach is Production Planning, which covers the methods a Producer uses from when he receives a script through to the point of when the film is delivered. This includes, but is not limited to, scheduling the shoot, budgeting the picture, selecting the locations, procuring required permits, hiring the crew, casting the picture, and all logistical arrangements.

6. **Author:** I wrote *Planning the Low-Budget Film* as the textbook for my USC class. The book covers all the basic steps to mounting a film production. It is now used as a text in film schools beyond USC and is currently ranked by Amazon.com at 1,152 in Film & Television.

7. **Film Production Experience:** I have worked as a Producer, Co-Producer, Production Manager, Unit Production Manager, First Assistant Director, and Second Assistant Director on over 40 motion picture and television productions, and generally all but the Assistant Director positions involved obtaining location filming permits. At times I did this on my own and other times were with the aid of a Location Manager. With or without a Location Manager, I was the person ultimately responsible for obtaining the filming permits. This occurred in many different cities and towns in California, numerous other states, and in other countries. The following paragraphs will give a brief description of my involvement with those productions and whether or not firearms were used in them. The dates in parentheses were when the pictures were released.

8. Position or Credit Definitions: **The** duties **of the positions mentioned in the above paragraph are briefly described below. For a more comprehensive list of duties, see the sources listed.**

a. **Producer:** "Subject to the control of the Owner, the individual receiving Produced By credit shall have final responsibility for all business and creative aspects of the production of the motion picture, with direct participation in making decisions concerning a major portion of the producing functions (see Producers Code of Credits Section 1 for comprehensive list)." Source: Producers Guild of America Code of Credits (https://www.producersguild.org/page/coc_tmp_2)

- 3 -

EXPERT DECLARATION
**ER-87**

b. **Co-Producer / Line Producer:** "The Co-Producer / Line Producer is the single individual who has the primary responsibility for the logistics of the production, from pre-production through completion of production; all Department Heads report to the Co-Producer / Line Producer." Source: Producers Guild of America Code of Credits (https://www.producersguild.org/page/coc_tmp_2)

c. **Production Manager / Unit Production Manager:** "The UPM, under the supervision of the Employer, is required to coordinate, facilitate and oversee the preparation of the production unit or units (to the extent herein provided) assigned to him or her, all off-set logistics, day-to-day production decisions, locations, budget, schedules and personnel." Source: The Directors Guild of America Basic Agreement, pp. 14-5, sec. 1-302, (https://www.dga.org/Contracts/~/link.aspx?_id=CC4363E3-BC29-443C-9E34-88F7A534F982&_z=z)

d. **Assistant Director:** "The First Assistant Director, alone or in conjunction with the UPM, organizes pre-production, including organizing the crew, securing equipment, breaking down the script, preparing the stripboard and a shooting schedule. During production, he assists the Director with respect to on-set production details, coordinates and supervises crew and cast activities and facilitates an organized flow of production activity." Source: The Directors Guild of America Basic Agreement, p. 16, sec. 1-303, (https://www.dga.org/Contracts/~/link.aspx?_id=CC4363E3-BC29-443C-9E34-88F7A534F982&_z=z)

9. **Multiple Television and Feature Film Productions (1976-1979):** Credits – First Assistant Director, Second Assistant Director. After completing the AMPTP/DGA Training Program, I worked on multiple television and feature film productions. My duties on these productions generally did not include obtaining film permits.

10. **The Big Fix (1978):** Credit - Second Assistant Director. When the production department at Universal Studios realized the Unit Production Manager (UPM) was having difficulty keeping up with the pace of the production, they offered me a raise in pay to stick close to the UPM

- 4 -

EXPERT DECLARATION
**ER-88**

1  and make sure nothing slipped through the cracks. At the time, Universal did not assign Location

2  Managers to feature productions, so it was left up to me to obtain all the film permits.

3      11.  **The Concorde: Airport 79 (1979):** Credit – Unit Production Manager. This was my

4  first job as a UPM. The film was shot in Paris, France; Washington, DC; Alta, UT; and Los Angeles.

5  As the 2nd UPM, I was responsible for the Washington, DC and Alta, UT locations. In Washington,

6  permits were obtained from the National Park Service for the scenes shot at the Lincoln Memorial

7  and the National Mall. In Utah, our filming was confined to the areas above the Alta ski runs,

8  simulating the Alps where the Concorde crash lands in the story.

9      12.  **The Nude Bomb (1980):** Credit – Unit Production Manager. This was my first

10  picture as the sole UPM. The film was shot entirely in Los Angeles on local locations and on stages

11  at Universal Studios. It simulated locations in and around Washington, DC. Some weapons were

12  used which mainly involved .38 caliber revolvers.

13      13.  **The Blues Brothers (1980):** Credit – Unit Production Manager. This picture was

14  shot mostly in Chicago, IL and surrounding suburbs, with some stage work done at Universal

15  Studios in Los Angeles. Although I did have the assistance of a Location Manager, I handled most of

16  the interaction with Mayor Jane Byrne. There were scenes with a lot of weapons firing, mostly

17  police .38 caliber revolvers. The weapons were all handled by the Prop Master, Michael Milgrom.

18      14.  **All Night Long (1981):** Credit – Unit Production Manager. This picture was shot in

19  and around the Los Angeles area including locations in Pasadena and Valencia. No weapons were

20  involved. There was no Location Manager.

21      15.  **Bustin' Loose (1981):** Credit – Unit Production Manager. I was brought on to

22  oversee the shooting of additional scenes after Richard Pryor had recovered from an accident in

23  which his face was badly burned. These scenes were shot on stage at Universal and no permits were

24  required.

25      16.  **Ghost Story (1981):** Credit – Unit Production Manager. This picture was shot in

26  Saratoga, NY; Woodstock, VT; Philadelphia, PA; and New York, NY. No weapons were involved.

27      17.  **The Thing (1981):** Credit – Unit Production Manager. This picture was shot on stage

28  at Universal Studios with locations outside Juneau, AK and Stewart, BC. I acquired all the location

- 5 -

EXPERT DECLARATION
**ER-89**

permissions required. On an ice field outside of Juneau, we shot a scene involving an actor firing a rifle from a hovering helicopter. We also used pistols and rifles in Stewart, BC and on stage at Universal Studios in California. The Prop Master, John Zemansky, handled them.

18. **Star Wars: Episode VI – Return of the Jedi (1983):** Credit – Production Executive. I was unable to accept a UPM credit because Lucasfilm Ltd. was not a signatory to the Directors Guild of America (DGA) Basic Agreement, so I was not able to perform DGA covered work. I supervised two unit managers who were not members of the DGA. Although the majority of the film was largely shot in England and Tunisia, my responsibilities covered the shoots at the Kerner Facility in San Rafael, CA; the Jedediah Smith Redwoods State Park outside Crescent City, CA; and Buttercup Valley, outside Yuma, AZ. Buttercup Valley is actually in California, but Yuma is the nearest town with motels. All weapons were futuristic inventions of the prop department. No actual weapons were used.

19. **Iceman (1984):** Credit – Unit Production Manager. This picture was shot in Vancouver, BC and Stewart, BC. I don't recall any weapons being used. If they had been the Canadian UPM, Justis Greene, would have sought the appropriate permits if needed.

20. **Indiana Jones and the Temple of Doom ((1984):** Credit – Production Manager. My responsibilities on this picture were the shoots on the Tuolomne River east of Modesto, CA; Mammoth Mountain, CA; and Marin County, CA. No weapons were used.

21. **Best Defense (1984):** Credit – Unit Production Manager. This picture was shot in Los Angeles, CA and the area around Jericho, Israel. All weapons use took place in Israel.

22. **The Goonies (1985):** Credit – Unit Production Manager. I was brought in to manage additional scenes during postproduction, so I am not listed in the credit crawl. These were shot in Los Angeles, CA, both on stage and on local location. No weapons were used.

23. **Warning Sign (1985):** Credit – Associate Producer / Unit Production Manager. The film was shot on location in La Crescenta, CA and Payson, UT. Semi-automatic pistols and a revolver were used. These were handled by the Prop Master, Larry Byrd.

- 6 -

EXPERT DECLARATION
**ER-90**

24.     **Blue City (1986):** Credit – Unit Production Manager. This picture was shot in and around Los Angeles, CA. Revolvers and semi-automatic pistols were used in filming. All the weapons were controlled by the Prop Master, Jack Marino.

25.     **Howard the Duck (1986):** Credit – Co-Producer / Unit Production Manager. This picture was shot in Northern California consisting of locations in San Francisco, Petaluma, Napa, San Rafael, Black Point, Modesto, Nicasio, Oakland, Herald, Rio Vista, and Sacramento. No firearms were used.

26.     **One Crazy Summer (1986):** Credit – Unit Production Manager. This picture was shot in Cape Cod and Nantucket, MA. There were rifles present in a scene, but they were never fired. The Prop Master, Art Lipschultz handled the weapons.

27.     **Spaceballs (1987):** Credit – Production Manager. This picture did shoot on location in Buttercup Valley, CA but was mostly shot on stage at what is now Sony Studios in Culver City, CA. At that time, it was still MGM Studios. I was assisted by a Location Manager, Michael Meehan. All weapons were products of the prop department.

28.     **Clean and Sober (1988):** Credit – Unit Production Manager. This picture was shot in Pennsylvania, Delaware, and New Jersey, with stage work being done at Burbank, CA. No weapons were used.

29.     **Elvira: Mistress of the Dark (1988):** Credit – Production Manager. I was brought in to do additional scenes in post-production. Most of our filming took place on stage at the Burbank Studios except for a 2nd unit in Las Vegas, NV which I directed. No firearms were used.

30.     **Child's Play (1988):** Credit – Unit Production Manager. The portion of picture I was involved with was filmed in and around Los Angeles. I replaced the original UPM who had left the film. Handguns were used in some scenes. These were under the supervision of the Prop Master, Art Shippee. I was assisted in obtaining film permits by a Location Manager, Michael Malone.

31.     **The War of the Roses (1989):** Credit – Unit Production Manager. This picture was mostly shot on stage and local locations in Los Angeles, with a few scenes being shot at Whidbey Island, WA. No firearms were used.

- 7 -

EXPERT DECLARATION

**ER-91**

32. **Child's Play 2 (1990):** Credit – Executive Producer. This picture was shot mostly in Pasadena, Long Beach, and Los Angeles, CA. There were police officers portrayed who were wearing holstered side arms. These were probably rubber props.

33. **Child's Play 3 (1991):** Credit – Producer / 2nd Unit Director. This picture was shot mostly in Southern California with the military academy exteriors shot at Kemper Military School in Boonville, MO. Handguns and M1 rifles were used in both California and Missouri. The weapons were all under the custody and supervision of the Prop Master, Jack Marino. Location filming permits were obtained by a Location Manager, William Bowling. No special permits were required for the use of the weapons.

34. **Babylon 5: The Gathering (1993):** Credit – Producer / Unit Production Manager. This was the pilot episode for a television episodic series. It was shot on stage in Santa Clarita, CA at the Santa Clarita Studios. No actual firearms were used.

35. **Robin Hood: Men in Tights (1993):** Credit – Executive in Charge of Production / Production Manager. This picture was shot in and around Los Angeles, CA. All weapons were medieval. No firearms were involved. William Bowling was the Location Manager.

36. **Showgirls (1995):** Credit – Unit Production Manager. This picture was shot in Los Angeles, CA; Lake Tahoe, NV; and Las Vegas, NV. No firearms were used.

37. **Dracula: Dead and Loving It (1995):** Credit – Associate Producer / Production Manager. This picture was shot in and around Los Angeles, CA. No firearms were used.

38. **Starship Troopers (1997):** Credit – Production Manager. This picture was shot in Southern California; Hell's Half Acre outside of Casper, WY; and Kadoka, SD. William Bowling was the Location Manager. During the shoot in Hell's Half Acre, we used futuristic prop weapons built on real automatic rifles, plus real Browning .50 caliber machine guns, all of which were fired using blank cartridges. Since the Federal Firearms Act of 1938, automatic weapons have been strictly controlled. These prohibitions were renewed in the Gun Control Act of 1968. I hired Robert "Rock" Galotti as our Weapons Coordinator/Armorer. Mr. Galotti is a Federal Firearms Licensee (FFL) and he was legally authorized to be in possession of such weapons and to arrange their transportation. He maintained strict control over the weapons. At the end of each shooting day, Mr.

- 8 -

EXPERT DECLARATION
**ER-92**

1  Galotti caused the weapons to be secured at the Casper, WY Police Department. No permits were

2  required for our use of these weapons because Mr. Galotti had control of them.

3      39.    **The Parent Trap (1998):** Credit – Production Manager. My involvement with this

4  picture was for the shooting sequences in the western United States. This included locations in

5  California such as San Francisco, Camp Seely in Crestline, Lake Gregory, Long Beach Airport,

6  Napa Valley, RMS Queen Mary Long Beach, Santa Clarita, and Los Angeles. No weapons were

7  used.

8      40.    **Hollow Man (2000):** Credit – Production Manager. This picture was shot in

9  Washington, DC and Los Angeles, CA. There were handguns used but I believe they were non-

10  functional replicas.

11      41.    **Ali (2001):** Credit – Production Manager. I am not listed in the credit crawl since I

12  was only involved in prepping the picture to shoot after which I handed the picture over to another

13  UPM. My work included scheduling the shoot, budgeting the picture, hiring the crew, arranging to

14  transport the crew and equipment to Uganda, and tracking costs during the prep period.

15      42.    **Spider-Man (2002):** Credit – Production Manager. I am not listed in the credit crawl

16  since I was brought in to oversee the shooting of additional scenes and to manage the postproduction

17  period. No firearms were used for these additional scenes.

18      43.    **The Anarchist Cookbook (2002):** Credit – Producer. This was a low budget

19  production shot in and around Plano, TX with a day at the Fort Worth Stockyards. There was a

20  handgun used which was obtained by the Prop Master, Jason Hammond.

21      44.    **Vampires: Los Muertos (2002):** Credit – Line Producer / Unit Production Manager.

22  I am not listed in the credit crawl since I was brought in to manage a few added scenes. The picture

23  was filmed entirely in Mexico except for the added scenes which I supervised. These were shot in

24  Los Angeles. There were handguns and a shotgun used. These were obtained by the Prop Master,

25  Richard Blake Wester. No special permits were required.

26      45.    **The Santa Clause 2 (2002):** Credit – Production Manager. This picture was shot

27  entirely in Canada. I was on the film only for the prep period during which I scheduled and budgeted

28  the movie.

EXPERT DECLARATION

**ER-93**

46.    **Charlie's Angels: Full Throttle (2003):** Credit – Unit Production Manager. I was brought in to manage the additional scenes, so I am not listed in the credit crawl. No firearms were used.

47.    **S.W.A.T. (2003):** Credit – Unit Production Manager. This picture was shot in and around Los Angeles and at Mojave Airport. Many firearms were used including automatic weapons. There were large shoot-outs staged in Burbank and downtown Los Angeles. All weapons were under the control of our Armorer, Michael Papac who is an FFL. Our main concern was how the noise would affect residents and businesses in the surrounding areas.

48.    **A Lot Like Love (2005):** Credit – Unit Production Manager. This picture was shot in and around Los Angeles and in New York, NY. No firearms were used.

49.    **Lords of Dogtown (2005):** Credit – Unit Production Manager. I was brought in to manage the additional scenes, so I am not listed in the credit crawl. It was shot mostly in Venice, CA and other Los Angeles areas. No firearms were used.

50.    **Local Color (2006):** Credit – Co-Producer / Unit Production Manager. This was a low budget picture shot in New Orleans and Covington, LA. No firearms were used.

51.    **The Holiday (2006):** Credit – Unit Production Manager. I was brought in to supervise additional scenes, so I am not listed in the credit crawl. These were shot in and around Los Angeles.

52.    **Hard Breakers (2010):** Credit – Producer / Production Manager. This was a low budget independent feature shot in and around Los Angeles. No firearms were used.

53.    **1982 (2013):** Credit – Co-Producer. This was a low budget short film. It was shot in Los Angeles. No firearms were used.

54.    **Love is Not Love (2019):** Credit – Line Producer. This was a low budget independent feature shot in and around Los Angeles. No firearms were used.

55.    **Current Productions:** Credit – Producer. I am currently involved in the development of four films, two of which will involve firearms.

EXPERT DECLARATION
**ER-94**

56. **Planning for the use of firearms in a scene:** When I am employed as a Co-Producer, Line Producer, or Unit Production Manager, there are discrete steps that I follow when planning a film shoot in which firearms are used. These are outlined in the following paragraphs.

57. **Read the script.** The first step is to read the script and note any scenes in which firearms are used.

58. **Create the breakdown sheets.** A breakdown sheet is created for each scene in the script. In the top half of this sheet are listed the scene numbers, whether the scene is exterior, interior, or both, the set name, the time of day, how long the scene is in terms of pages and eighths of a page, a brief but unique synopsis of the scene, the page of the script the scene starts on, the story day of the scene, what filming unit will be shooting the scene, and the locations of the shoot.

    a. **Filling in the breakdown sheet:** The bottom half of the breakdown sheet is where all the specific elements that are needed to shoot the scene are listed. These would include cast members; background actors (extras); stunt players; picture cars or other vehicles appearing in front of camera; props; camera equipment; special effects that occur in the scene such as fire, rain, or explosions; costume notes; makeup and hair notes; animals; animal wranglers; music notes; sound notes; art department notes; set dressing; greenery; special equipment; security; additional labor; visual effects notes and personnel; and miscellaneous notes.

    b. **Props.** Props are any objects which are handled by the actors or extras. Jewelry, eyeglasses, and watches are also included in props, as are weapons of various sorts. These can be replicas of weapons, for example they may be an airsoft or plastic gun, or they can be real weapons such as knives, swords, or firearms.

    c. **Firearms.** Motion pictures and television productions usually use Title 1 firearms. These are firearms that are available to the general public, such as rifles from bolt action to semi-automatic, revolvers, and semi-automatic handguns. On occasion, we also use firearms that are prohibited to the general public in so far as they require a special federal permit and license to possess them. For more complex or higher

- 11 -

volume of firearms or other weapons, we employ an Armorer who has a federal firearms license.

    d. **Title 1 Firearms.** In California, absent a statutory exemption, if a Prop Master or Armorer wanted to rent a Title 1 firearm to use in a motion picture or television production, the Prop Master or Armorer would need to undergo a background check every time he or she rented a firearm. Then when the Prop Master or Armorer wanted to turn the firearm over to an actor to use in a scene, the actor would have to go through a background check as well. Legislated waiting periods would also apply in each of these transfers. This would be unworkable in the making of a motion picture or television production and would severely impact the filmmakers.

    e. **The California Entertainment Firearms Permit.** The California Legislature passed amendments to California's firearms restrictions creating the Entertainment Firearms Permit ("EFP"). This is a California specific permit that a Prop Master or any other nonprohibited person can register for and can be used in place of the repeated background checks. It also allows an EFP holder to give the firearm to an actor or other Authorized Participant and take it back after the scene is over, without doing background checks or requiring a waiting period. For purposes of California's ban on the open carry of weapons, the actor or participant to whom the firearm is loaned is an "Authorized Participant" as that term is used in California Penal Code Sections 26375 and 25510.

    f. **Federal Firearm License.** In order to possess, transport, rent, or transfer firearms that are prohibited by the Federal Firearms Act and succeeding laws, a Prop Master or Armorer must have a Federal Firearms License ("FFL").

59.     **Create the shooting schedule.** Once the breakdown sheets are completed, the database of breakdown sheets is viewed in the form of a strip board, where each scene is individually displayed on a strip. These strips can be rearranged and sorted on the board with day markers to create a shooting schedule. It's at this point that I would consult with a Prop Master or Armorer if the motion picture or television production requires operational firearms.

- 12 -

1      60.    **Prop Master or Armorer.** The decision whether to hire a Prop Master or an Armorer

2 rests on the type and the number of weapons needed. On a movie such as STARSHIP TROOPERS, I

3 had a complete department headed by an Armorer to handle all weapons. In that film, we were using

4 many prohibited weapons including two Browning .50 caliber machine guns. Once the Prop Master

5 or Armorer is hired, I would discuss with him or her the weapons we needed and solicit his/her

6 recommendations. At that time, we would not know the names of all the people who might be

7 handling the firearms in any given scene. This is because we would not necessarily have the motion

8 picture or television production completely cast and would not yet have hired the stunt players. Any

9 extras who would be given firearms in the scenes might not be hired until the day of shooting. In

10 addition, on any shooting day, the Director may change his or her mind as to who will be firing the

11 weapons. In my experience, neither a Prop Master nor an Armorer are concerned with or request the

12 names or identities of the specific actors and extras who will be Authorized Participants. With

13 respect to the Authorized Participants, the only concern a Prop Master or Armorer has is to make

14 sure that the Authorized Participants are not legally prohibited from possessing a firearm and are

15 capable of safely handling the firearm. The Prop Master or Armorer will then arrange for the

16 procurement of the prop weapons and are responsible for the transport, storage, and safe use of the

17 firearms.

18      61.    **Film permits.** One to two weeks prior to the filming of a scene, the production

19 company's designee will apply for the location filming permits. The application asks for information

20 related to the logistics of the shoot, including for example; what will take place in the scene, how

21 long we expect to be at the location, whether we will be firing weapons, the approximate size of the

22 crew, whether we will be using pyrotechnics, where we will be parking our equipment, and whether

23 we will need traffic control on public streets. It's not that different from applying for a permit to

24 perform street maintenance. At no time during the permitting process, have I ever been asked to

25 provide the names or identities of the actors, stunt players, and extras who will be using the firearms

26 in any specific scene, and I have never volunteered that information. In fact, often at this stage of the

27 process, that information is not yet known or finalized.

28

- 13 -

EXPERT DECLARATION
**ER-97**

62.     The film permit will be issued with certain restrictions such as how many policemen we must hire and whether we need a fire safety officer with us during the shoot. We will also be required to notify residents and businesses within a 500-foot radius of our location about the upcoming shoot. If it's a residential area, we will be restricted to certain hours of the day (e.g. we can't arrive before 7:00 am and must be gone by 10:00 pm). The film permit does not identify or reference the names or the identities of the Authorized Participants in the shoot. Obviously, any notification to residents or businesses likewise does not include the names or identities of the Authorized Participants.

63.     **On the day of filming.** The call sheet for that day will have a notice that there will be gunfire on the set. We do the same if there will be explosions or if there will be anything similar the crew should be aware of. During the set up of the shot, a mandatory safety meeting will be held by the First Assistant Director in conjunction with the Prop Master and/or Armorer attended by the Director, actors, stunt players, extras, and crew. Hearing protection is issued to the crew. Cast members, stunt players, and extras will be issued foam ear plugs that won't be visible to the camera.

64.     Before each take, the weapons are checked, loaded with blank cartridges, and handed to the Authorized Participants (the actors, stunt players, and extras) by the Prop Master/Armorer. After each take, the weapons are secured by the Prop Master/Armorer, cleared, and reloaded with blank cartridges if there is to be another take.

65.     The use of firearms in motion pictures and television productions is highly regulated, especially in California. It would be more so if not for the special exemptions from the state firearm laws that are granted to the motion picture and television industry. Without those exemptions, it would be impossible to make certain types of productions in California.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed October 9, 2020 at Westlake Village, California

Robert Latham Brown
Declarant

- 14 -

EXPERT DECLARATION
**ER-98**

# Exhibit 5

David W. Affeld. State Bar No. 123922
Brian R. England. State Bar No. 211355
Damion Robinson. State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East. Ste. 2460
Los Angeles. CA 90067
Telephone:    (310) 979-8700

Attorneys for Plaintiff
Michael Zeleny

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ZELENY, | Case No. CV 17-7357 RS |
| Plaintiff, | Assigned to:<br>The Honorable Richard G. Seeborg |
| vs. | **EXPERT DECLARATION OF GREG BLOCK** |
| GAVIN NEWSOM, *et al.*, | |
| Defendants. | Action Filed:  December 28, 2017<br>Trial Date:    None Set |

EXPERT DECLARATION

**ER-100**

I, Greg Block, declare as follows:

1.     I, Greg Block, have been retained by the law firm Affeld Grivakes LLP, on behalf of Michael Zeleny, as an expert in this litigation.

2.     For my work in this case, I am being compensated at the hourly expert rate of $250.00 per hour, plus expenses. I receive no other form of compensation related to this case. No part of my compensation depends upon the outcome of this case.

**Professional Background.**

3.     Since 1983, I have been a law enforcement instructor. I teach City, County, State and Federal Agencies, plus the Military in Use of Force and Firearms.

4.     I have over 100 instructor credentials, from the NRA Law Enforcement side, the NRA Civilian side, the Federal Department of Justice, California Department of Justice, the FBI, and ATF.

5.     Over 45 firearms manufacturers have certified me to teach their weapons systems to Law Enforcement.

6.     Several state agencies have also certified me: CA-POST which stands for Peace Officer Standards and Training, the other agency is STC, Standards and Training for Corrections. CA-POST oversees sworn law enforcement and STC oversees Probation, Corrections, Prisoner Transport and Bailiffs.

7.     I am both a certified instructor and certified presenter for both CA-POST and STC, and I am authorized to provide training for them. With STC I am the only non-government affiliated individual to have this distinction. With CA-POST who has over 700 presenters, all but three are the agencies themselves, Police Departments, Sheriff's Office, State Investigative Agencies and County Investigative Agencies. The other two entrepreneurs are law firms that teach officers how to testify in court. There are 58 counties in California. Since 1999, I have been CA-POST's Use Of Force instructor in 36 of those counties.

8.     With CA-POST, I am also a "SME", which stands for Subject Matter Expert. I deal with the Learning Domains ("LD") in the police academy. I am an SME for twelve of the forty-eight LDs taught in the Basic Police academy, including Use of Force, Firearms, Chemical

EXPERT DECLARATION

**ER-101**

Agents, Electronic Weapons, Impact Weapons, Impact Weapons, Defensive Tactics, Projectile Less Lethal Weapons, Force Option Simulator, Tactical Firearms, Dangerous Weapons Laws, Crowd Control, Vehicle Operations and Patrol Operations. As needed, as the California Penal Code is amended and additional court decisions are rendered, SME's will work together to update the LDs. The revised LDs are then sent to CA-POST in Sacramento and distributed to the 39 Police Academies throughout California. LD 40 is the Dangerous Weapons Law for Law Enforcement, which represents California's gun laws.

9. In January 1999, a new Carry Concealed Weapon ("CCW"), law went into effect in California. It was Assembly Bill (AB) 2022, also called the Wright CCW Bill. It took California from a 1-year CCW to a 2-year CCW, plus it changed the residency requirements needed to apply for a CCW. It also mandated training every two years; a minimum of 4 hours for renewal, and a maximum of 16 hours for first time applicants. I was asked by the Orange County Sheriff to be a part of a group, which included Captain Gage, the head of Professional Standards Division (PSD), which oversees the CCW Licensing Bureau, Lieutenant Hogbin, the head of the CCW Licensing Bureau, to create Orange Counties policies and procedures for the new California CCW law. Those policies and procedures were widely recognized and approved and I presented them to all 58 California County Sheriffs. In June of 1999, I attended the bi-annual meeting of the California State Sheriffs Association (CSSA) in Sacramento. I made a presentation on these policies and procedures, and they subsequently became the state standard.

**Information Considered**

10. In preparing this expert report, I have reviewed the following material:

a.     MPPD Reports_Redacted MP1843-1901

b.     CAD Reports MP 5084-5099

c.     100929 Police Report – Cooperation w Signage and Noise

d.     101004 Police Report – 'Cooperation'

e.     120210 Police Log – Zeleny Cooperative; No

f.     120210 Police Report Re Zeleny – Harassment of Supporters

g.     120410 Meeting Minutes re Zeleny Used at Legislative Committee

EXPERT DECLARATION

h.  120524 Critical Reach Info on MZ

i.  100525 Police Report

j.  120613 Log Of Contact with Mr. Zeleny

k.  120620 Log Documenting Mr. Zeleny Cooperation

l.  20628 Incident Report – Zeleny Cooperates

m.  Audio Recording of Police Interaction with Mr. Zeleny

n.  Photographs of Mr. Zeleny's Belt Holster

o.  Chief Dave Bertini's Deposition Transcripts

p.  Deputy Jeremy Foy Deposition Transcripts

q.  Photos MP5521-5529

r.  Mr. Zeleny's Deposition Transcript

s.  Meeting with Michael Zeleny, looking at his setup he was carrying/using at the time. Evaluating it to make sure he was in compliance with California Penal Code.

t.  Discussing California Penal Code covering owning, transporting and the carry of firearms with Mr. Zeleny.

**Mr. Zeleny Demonstrated Exceptional Gun Safety And Knowledge of Applicable Law.**

11.  Mr. Zeleny showed up at my office with two cases. One case contained a semi-automatic pistol and the other contained a semi automatic rifle. The handgun was unloaded in a locked container per California Penal Code 25610. The actual container was also in compliance with California Penal Code 16850. The rifle was transported in compliance with California Penal Code 25400. A long gun does not need to be locked up; it does need to be unloaded and enclosed in a case, which of course it was. Once he unlocked the handgun container, I inspected both guns to make sure they were both properly unloaded; they were.

12.  I spent quite a bit of time talking to Mr. Zeleny about his two firearms, as they are both considered rare. His knowledge about those firearms was exceptional. He demonstrated safe handling and was conscious of the muzzle at all times. His knowledge of firearms laws at the State level and the Federal level was well above average for a gun owner.

EXPERT DECLARATION

**Mr. Zeleny's Interactions With Law Enforcement Were Respectful.**

13.    In reviewing all police reports, I found Mr. Zeleny complied with all orders and requests given to him by law enforcement. His knowledge of the law far exceeded theirs. In my experience, Law Enforcement officers do not have extensive training in the proper interpretation and application of California's firearms laws. The training they receive is contained in Learning Domain 40 ("LD 40").   LD 40 is California's Dangerous Weapon and Control Laws teaching module. This is a 6-hour segment taught in the Basic Police Academy. There is no required or mandated training on these laws for the rest of a peace officer's career.  Law Enforcement officers do not make the decision to arraign or charge individuals with violations of the firearm laws; Deputy District Attorneys make those decisions.

**In Los Angeles County, A Concealed Weapons Permit Is Nearly Impossible To Obtain And Does Not Represent A Meaningful Avenue For A Resident To Lawfully Possess A Firearm Outside Of His Or Her Home.**

14.    Currently 41 states are shall issue, constitutional carry, or a combination of both. "Shall issue" means the permit must be issued to the applicant unless he or she is a convicted felon. "Constitutional Carry" means that it is the applicant's Second Amendment Constitutional right to carry without a permit. California is one of eight "may issue" states. In California, with very limited exceptions, "may issue" means that the issuance of a concealed carry permit is at the sole discretion of the local sheriff in the county where the applicant resides. The local county sheriff has broad discretion whether to issue a CCW or not. In effect, there are 58 counties in the State of California and an equal number of potential interpretations of what constitutes "good cause" for the issuance of a CCW permit. The interpretation of "good cause" is left to the broad discretion of the local county sheriff and is not an objective standard defined in the law.

15.    Although there are 58 different potential interpretations, they can be loosely grouped into two categories; (i) a strict interpretation employed in the 12 urban counties; and (ii) a far more broad interpretation employed in the 46 rural counties. Nineteen of the top twenty CCW issuing counties in California are rural counties, where a far more permissive interpretation is used in evaluating a CCW application. In California's twelve urban counties,

- 5 -

1 with the exception of Orange County, the standard for obtaining a CCW permit is exceedingly
2 strict, and in many cases, practically impossible to meet. For example, San Francisco County has
3 issued exactly zero CCW permits to the general public.

4     16.    As a resident of an urban county, specifically Los Angeles, in my professional
5 opinion, Mr. Zeleny has zero likelihood of successfully obtaining a CCW Permit. As of 2019,
6 there were approximately 10.04 million residents of Los Angeles County. As of March 2020,
7 when the Los Angeles County Sheriff's Department published the most recent report, there were
8 only 158 CCW permits issued in Los Angeles County. The overwhelming majority of people
9 interested in applying for a CCW permit in Los Angeles either are: (i) dissuaded from ever
10 submitting an application; or (ii) are turned away by the LA County Bureau of Licensing. As a
11 practical consequence, under current California law, a resident of Los Angeles County has no
12 reasonably available legal ability to carry a firearm outside of his or her residence.

13     I declare under penalty of perjury under the laws of the United States that the foregoing is
14 true and correct. Executed October 9, 2020 at Huntington Beach, California.

15

16                   Greg Block
                  Declarant

- 6 -

EXPERT DECLARATION

**ER-105**

Exhibit 6

1     UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3       ---OOO---

4 MICHAEL ZELENY,

5   Plaintiff,

6 vs.     Case No. CV 17-7357 JCS

7 GAVIN NEWSOM, et al.,

8   Defendants.

 _____/

9 Pages 278 - 286 ARE CONFIDENTIAL

10 AND BOUND SEPARATELY

11

12 Pages 310 - 324 ARE CONFIDENTIAL

13 AND BOUND SEPARATELY

14

15  CONTINUED VIDEOTAPED DEPOSITION OF CHIEF DAVE BERTINI

16     BY VIDEOCONFERENCE

17    (Volume II - Pages 229 to 534

18

19   Taken before DENISE M. LOMBARDO, CSR No. 5419

20     RPR, RMR, RDR, CRR

21     August 7, 2020

22

23

24

25

         Page 229

```
 1    The time now is 3:06.
 2            (Off the record.)
 3            THE VIDEOGRAPHER:  Back on the record.
 4    The time now is 3:13.
 5    BY MR. ROBINSON:                                    03:13
 6        Q.  Chief Bertini, how long have you been in
 7    the law enforcement profession?
 8        A.  Over 33 years.
 9        Q.  Throughout those 33 years, have you dealt
10    with district attorneys the entire time?            03:13
11        A.  Yes.
12        Q.  Have you consulted with district attorneys
13    for their input about legal matters from time to
14    time?
15        A.  I would say numerous times.                 03:14
16        Q.  In the numerous times that you've
17    communicated with district attorneys or assistant
18    district attorneys about legal matters, have they
19    given you opinions?
20        A.  Yes.                                        03:14
21        Q.  Based on that experience, looking --
22    considering the e-mail exchange with the district
23    attorney's office that we just looked at, did you
24    form an opinion about or did you form a belief
25    about the district attorney's view of whether the  03:14
```

Veritext Legal Solutions
866 299-5127

```
 1    basis for denying it, but it was a concern because
 2    the laws had changed, and you could no longer
 3    openly carry rifles and handguns in the state of
 4    California.
 5         Q.  How does the City determine whether          03:49
 6    there's a logical nexus to the event?
 7            MR. MASTER:  Objection.  Vague and
 8    ambiguous.  Overbroad.  Calls for a legal
 9    conclusion.
10            Go ahead.                                      03:49
11            THE WITNESS:  As I did not author this
12    letter, I don't know.
13    BY MR. ROBINSON:
14         Q.  Does the City have a written or unwritten
15    standard for determining whether there's a logical   03:49
16    nexus between carrying firearms and the event?
17         A.  No, except that it's illegal to do so.
18         Q.  I don't want to cover ground that we
19    covered last time, but if Mr. Zeleny were given the
20    permit that he was asking for, it would have been    03:50
21    legal to carry the firearms; correct?
22         A.  Well, that's the question we were trying
23    to get answered through the Department of Justice,
24    the district attorney's office, et cetera.  Because
25    that law is very vague, we were trying to determine  03:50
```

Page 428

```
 1    whether that's true or not.  And as it stands

 2    today, our reading of that exception is, yes, if he

 3    was permitted under the -- under the special events

 4    or film permit, then he could openly carry weapons.

 5        Q.  When did you come to that view, that he        03:50

 6    could openly carry with a permit?

 7        A.  After -- after having discussions, again,

 8    with the Department of Justice, with the DA's

 9    office and the city attorney's office.

10        Q.  Who at the City decides whether there's a      03:50

11    logical nexus between the carrying of firearms and

12    the event?

13        A.  Again, I did not author that.  I did not

14    say those words, so I don't know what he meant by

15    that.                                                  03:51

16        Q.  Okay.  Is it the city attorney's call

17    about whether there's a logical nexus?

18        A.  I don't know.

19        Q.  Who at the City determines whether there

20    was a legitimate purpose in carrying the firearm?     03:51

21        A.  Again, I did not authorize this letter.  I

22    did not say those words.  So I don't have an answer

23    for you.

24        Q.  As a matter of policy at the City of Menlo

25    Park, was Zeleny required to have a logical nexus      03:51
```

Page 429

```
 1              REPORTER'S CERTIFICATE

 2

 3

 4        I, DENISE M. LOMBARDO, do hereby certify:

 5        That DAVE BERTINI, in the foregoing deposition

 6   named, was present by videoconference and by me

 7   sworn as a witness in the above-entitled action at

 8   the time and place therein specified;

 9        That said deposition was taken before me at

10   said time and place, and was taken down in

11   shorthand by me, a Certified Shorthand Reporter of

12   the State of California, and was thereafter

13   transcribed into typewriting, and that the

14   foregoing transcript constitutes a full, true and

15   correct report of said deposition and of the

16   proceedings that took place;

17        And that the aforementioned 306-page

18   transcript meets the California minimum transcript

19   format standards.

20        IN WITNESS WHEREOF, I have hereunder

21   subscribed my hand this 3rd day of September, 2020.

22

23        Denise M. Lombardo

24        DENISE M. LOMBARDO, CSR No. 5419

25        State of California
```

Page 534

# Exhibit 7

1                UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4    MICHAEL ZELENY,              ) Case No.
                                  ) CV 17-7357 JCS
5              Plaintiff,         )
                                  )
6     vs.                         )
                                  )
7    EDMUND G. BROWN, Jr.         )
     et al.,                      )
8                                 )
               Defendants.        )
9    _____)

10

11

12

13              DEPOSITION OF BLAKE GRAHAM

14            Thursday, January 23rd, 2020

15                     ---oOo---

16

17

18

19

20

21

22   Reported by:
     David A. Disbrow
23   CSR No. 7768

24

25

1   Committees for each House basically, they may have a
2   person or they may suggest you know the Judicial
3   Counsel's office or something like that.  That's where
4   I would start.
5        Q    Understood.  Let's go on to topic number
6   four.
7        A    Okay.
8        Q    Are you prepared to testify today about topic
9   number four?
10       A    The Attorney General's office to my knowledge
11  does not provide a legal opinion in general about
12  concealed carry.  There is a I want to say at least one
13  lawsuit, the "Peruta" case, that may still be active.
14  I'm not a part of that, I was not deposed, so there may
15  be some existing legislation on the matter.  I'm not
16  sure if it's completely done as far as the appeals or
17  you know that type of thing and so I'm probably you
18  know I guess the best place to tell you that there
19  could be recent activity on that conceal carry matter.
20       Q    Let's backtrack for a second.  I didn't ask
21  you at the start of the deposition.  What do you do for
22  a living?
23       A    I'm a special agent in charge for the
24  Department of Justice and then within the Department of
25  Justice, I work within the Bureau of Firearms.  To

```
1    extend on that a little bit, I supervise teams of
2    special agents that disarm prohibitive people.  We
3    investigate firearms dealers if there's an allegation
4    of wrongdoing.  We will monitor gun shows to make sure
5    that only legal activity is occurring there.
6            THE REPORTER:  "To make sure that --"
7            THE WITNESS:  -- only legal activity is
8    occurring at the gun shows.
9            THE REPORTER:  Okay.
10           THE WITNESS:  And I also have a team of
11   analysts that prepare regulations that are firearms
12   related regulations for the Bureau of Firearms and I
13   have some analysts that help prepare investigative
14   packages for the agents that again go out and disarm
15   folks and whatnot.
16   BY MR. ROBINSON:
17       Q    Okay.
18       A    I have testified in front of the Legislature
19   multiple times on various technical matters, assault
20   weapons and whatnot, things like that.
21       Q    Okay.  As part of your role within the
22   Department of Justice do you enforce the concealed
23   carry statutes?
24       A    Personally, we have made arrests.  For
25   example, during a gun show investigation we may
```

```
 1    place you would see a gun.  It could be shoved down the

 2    floor, between their feet, some other scenario and I

 3    think that would be in discussion, too.

 4         Q    All right.

 5         A    Okay.

 6         Q    Let's go to the last page of Exhibit Six.

 7         A    (Witness reviewed document.)

 8         Q    Do you recognize the section that we're

 9    looking at there; Penal Code Section 26375?

10         A    Okay.  Let me review this real quick.

11         Q    Sure.

12         A    Okay, so I've reviewed that smaller language

13    on the top half of the page there.

14         Q    Okay.

15         A    Could you reask the question?

16         Q    Well, I just asked you to review it.

17         A    Okay, sorry.

18         Q    Is this one of the exceptions to the ban on

19    openly carrying handguns?

20         A    Yes.

21         Q    In the first clause, maybe it's the second

22    clause, but it refers to -- let me clarify that.  So

23    the section reads, Section 26350, "Does not provide the

24    or affect the open carrying of an unregistered handgun

25    by an unauthorized participant," and then it goes on,
```

1    okay?

2        **A**    Yeah, I see that.

3        **Q**    What does "Authorized" mean in that clause

4    that I just read?

5            MS. SKELLY:  Objection; the deponent is not

6    authorized to interpret the statute which was written

7    by the Legislature and so he can't answer that

8    question.

9            THE WITNESS:  I'm not aware of this

10   "Authorized participant" being defined by the

11   Legislature.  I don't know that it's defined in DOJ

12   regulations either.

13   BY MR. ROBINSON:

14       **Q**    Has the Attorney General's office issued an

15   opinion about what an "Authorized participant" means if

16   you know?

17       **A**    I don't know that they have issued -- as I

18   said, this entertainment firearms permit area of the

19   law is I guess an infinitesimal part of the overall

20   firearms' scheme in the State and I don't think until

21   now I've even been asked what that phrase meant.

22       **Q**    Do you have an understanding of what it means

23   now?

24           MS. SKELLY:  Objection; there's no relevance

25   to the deponent's understanding of what the statute

```
1    means.  The statute -- the document speaks for

2    itself.  To the extent that any interpretation is

3    needed it will be done by the Court.

4              MS. RAUCH:  Join.

5    BY MR. ROBINSON:

6         Q    You can answer.

7         A    I would have to do quite a bit of research

8    before I could come up with something on this.  This

9    kind of a definition when it's not defined by the

10   Legislature sometimes can be left to the agency but to

11   my knowledge we've not done regulations which would

12   somehow clarify that and it's not something I can come

13   up with at the spur of the moment today.

14        Q    Do you know if the DOJ has an official

15   position on what "Authorized participant" means?

16             MS. SKELLY:  Objection; asked and answered.

17             THE WITNESS:  Yeah, I think I've probably

18   said that just now in the last question

19   BY MR. ROBINSON:

20        Q    Why don't you just go ahead and answer it

21   again.

22        A    Okay.

23        Q    Does DOJ have an official position on what

24   "Authorized participant" means in the exemptions?

25        A    To my knowledge without -- lacking a
```

1    document.

2    BY MR. ROBINSON:

3        **Q**    All right.  The Legislative bill analysis

4    document you're referring to is about a different

5    statute, right?

6        **A**    Your question dealt with an exemption to

7    unloaded carry --

8        **Q**    Right.

9        **A**    -- right?  And it deals with entertainment

10   firearms permits so this document doesn't have the

11   actual Penal Codes listed out in this document.  I

12   assume there's -- this was an attachment or connected

13   to the actual Codes involved in the bill.  To me, these

14   are possible, they're possibly connected.  Back when

15   this document was created in 2004 the Penal Codes were

16   generally in the 12000 series.  In 2012, the

17   Legislature renumbered all the Penal Codes so as they

18   sit now, this 26375 that is in, I'm referencing now

19   from Exhibit Six, that might be what's referenced in

20   page two farther up in existing law where you see let's

21   say, 12078, 12072.  The Legislature renumbered

22   everything so it's possible that they are really the

23   same thing but I don't have the ability as I sit here

24   today to be a hundred percent sure but I want to at

25   least point you in the right direction that really they

```
1                CERTIFICATE OF DEPOSITION OFFICER

2

3           I, DAVID A. DISBROW, CSR, duly
       authorized to administer oaths pursuant to Section
4      2093(b) of the California Code of Civil Procedure,
       hereby certifying that the foregoing proceedings
5      were taken at the time and place therein stated;
       transcribed by means of computer-aided
6      transcription; that the foregoing is a full,
       complete and true record of said proceedings;
7           I further certify that I am not of
       Counsel or attorney for either or any of the
8      parties in the foregoing deposition and caption
       named, or in any way interested in the outcome of
9      this cause named in said caption.

10

11     _____          _____
        DATE                         DAVID A. DISBROW
12                                   C.S.R. NO. 7768

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

## **PROOF OF SERVICE**

2

      I hereby certify that on January 21, 2021, I electronically filed the foregoing document using the Court's CM/ECF system. I am informed and believe that the CM/ECF system will send a notice of electronic filing to the interested parties.

3

4

                                s/ Gabrielle Bruckner

5

                                Gabrielle Bruckner

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINSON DECL. ISO MOTION FOR PARTIAL SUMMARY JUDGMENT

**ER-121**

David W. Affeld, State Bar No. 123922
Brian R. England, State Bar No. 211335
Damion Robinson, State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone:     (310) 979-8700

Attorneys for Plaintiff
Michael Zeleny

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| MICHAEL ZELENY, | Case No. CV 17-7357 JCS |
|---|---|
| Plaintiff, | Assigned to: |
| vs. | The Honorable Richard G. Seeborg |
| GAVIN NEWSOM, Jr., *et al.*, | Discovery Matters: |
| Defendants. | The Honorable Thomas S. Hixson |

**DECLARATION OF MICHAEL ZELEN IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMAR  UDGMENT AGAINST ATTORNE  GENERAL XA  IER BECERRA**

Date:       February 25, 2021
Time:       1:30 p.m.
Courtroom: 3, 17th Floor

Action Filed:  December 28, 2017
Trial Date:    TBD

- 1 -

ZELENY DECLARATION IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Michael Zeleny, declare:

1.      I am the Plaintiff in this action.  I have personal knowledge of the facts below.  I could testify competently to these facts if called upon to do so.

2.      I am an independent scholar and a published author in various fields, including logic, history, literature, and technology, as well as an independent performance artist and filmmaker.  I am also an historian and author on the history and design of firearms.  I maintain a popular blog, larvatus.livejournal.com, which has over 85,000 visits from around the world, on which I discuss various topics.  I also use this platform to publish information about my efforts to expose moral corruption and hypocrisy in Silicon Valley.

3.      I am a holder of a California Certificate of Eligibility ("CoE"), which verifies that I have passed an appropriate background check, and am eligible to possess and acquire firearms.  I also hold a Type 08 Federal Firearms License.  I am a collector of rare, unique, and historically-significant firearms, and currently possess a number of firearms lawfully, some of which I use for ongoing study on firearms history and design.

4.      I plan to carry unloaded firearms in connection with a series of protests against venture capital firm New Enterprise Associates ("NEA") in Menlo Park.  I have done so in the past, up to and including 2012, when I protested outside of NEA's headquarters on Sand Hill Road in Menlo Park.  I stopped my protests when I was falsely prosecuted for lawfully carrying firearms.  I was ultimately acquitted.

5.      The subject matter of my protests is credible allegations of child rape made against Min Zhu, founder of WebEx Communications, and NEA's continued financial backing of Min Zhu and refusal to disclaim him or speak out against his conduct.  I find Min Zhu's conduct, and NEA's complicity in that conduct, morally and ethically abhorrent.  In addition, I have raised in my protests the issue that I have received a series of death threats made in the name and on behalf of Min Zhu.  I bring firearms to my protests to amplify and draw attention to my message about the heinous conduct of Min Zhu and NEA, and for self-protection, and to send a clear message that I will not be coerced or intimidated into silence through threats.

6.      Throughout my protests, I consistently carried unloaded firearms, and cooperated

1  at all times with police requests to inspect them.  I have significant training and experience in the

2  safe handling of firearms, and handle firearms during my protests consistent with best practices.

3  Among other things, I keep all of the firearms unloaded and pointed in a safe direction (usually

4  towards the ground).  When members of the public have expressed concern, I have explained my

5  situation to them, and why I am protesting, stressing that under no circumstances would I initiate

6  any kind of violence.

7        7.     I lawfully carried unloaded firearms in Menlo Park without significant incident

8  until 2012 when Menlo Park and NEA had me falsely prosecuted for allegedly carrying a

9  concealed handgun.  The gun was in an open and obvious belt holster on my hip, designed for this

10  purpose.  The court acquitted me in December 2014, finding that the gun was not concealed.

11        8.     Following my acquittal, I planned to resume my protests.  As part of these efforts,

12  I plan to present a live, multimedia performance using a large flat-screen monitor powered by a

13  generator to display animations and images relating to Min Zhu's child rape and NEA's financial

14  backing and continued support of Min Zhu.  As part of the presentation, I also intend to display

15  posters and placards, and a number of rare and unique firearms, which will be unloaded at all

16  times.  I plan to film my multimedia presentation and the reactions of passersby in order to live

17  stream the event as it is happening and to use the footage as part of my ongoing documentary film

18  project about Min Zhu, NEA, and my protests.

19        9.     Both the District Attorney during my prosecution, and Menlo Park following my

20  acquittal, have taken the position that in order to lawfully carry a firearm in connection with my

21  protests, I am required to have a city permit.  Menlo Park has informed me that I am required to

22  have either a "Special Events" permit or a film permit.

23       10.    I have applied for both types of permit.  My "Special Events" permit was denied,

24  and the denial was upheld at a final appeal to the Menlo Park City Council in 2017.  Menlo Park

25  has declined to move forward with my film permit application since 2017.

26       11.    I previously held an Entertainment Firearms Permit issued by the California

27  Department of Justice.  A true copy of my permit is attached as **Exhibit**   .  Based on my

28  experience and research, I do not believe that such a permit is required to qualify as an

- 3 -

ZELENY DECLARATION IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1  "authorized participant" within the meaning of California Penal Code §§ 26375 or 26405(r).

2       12.     I am an adult resident of Los Angeles County, California.  I have no history of

3  mental illness or insanity, and have never been convicted of a crime.  I am legally qualified to

4  possess firearms under both state and federal law.

5       13.     But for California's comprehensive ban on carrying firearms in public places, I

6  would carry firearms in non-sensitive public places, as part of my protests in Menlo Park, for self-

7  defense during those protests, and at other times and locations.  To the extent that California law

8  allowed me to do so, I would carry firearms either openly or concealed, as the law allowed.

9       14.     The only reason that I refrain from carrying firearms during my protests. and at

10 other times in non-sensitive public areas, is my fear that I will be prosecuted for violating

11 California's laws prohibiting the open and concealed carry of firearms.

12      I declare under penalty of perjury under the laws of the United States that the foregoing is

13 true and correct.  Executed this 20th day of January, 2021 at Los Angeles, California.

14

15

16 _____

17 Michael Zeleny

18

19

20

21

22

23

24

25

26

27

28

- 4 -

ZELENY DECLARATION IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Case 3:19-cv-07675-RS Document 135-2 Filed 11/21/21 Page 106 of 294

# Exhibit 1

Case 3:17-cv-02357-RS   Document 163-2   Filed 01/21/21   Page 6 of 8



STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
BUREAU OF FIREARMS

*Entertainment Firearms Permit*

Permit Number: 12-380

Issued to:

MICHAEL ZELENY

Date of Issue:       JULY 13, 2016
Expiration Date:    JULY 12, 2017

This is to certify that the Department of Justice, Bureau of Firearms has completed a firearms eligibility check. As of the date of issue, there is nothing that would prohibit the above named permit holder from the possession of firearms loaned to the permittee for use as props in motion picture, television, video, theatrical, or other entertainment productions pursuant to Penal Code sections 29500 through 29530.

Signature of Issuing Officer: _____

ZEL 0386

PAGE 122

ER-127

State of California
Department of Justice
Bureau of Firearms

Permit No.: 12-380

# Entertainment Firearms Permit

Issued to:

## MICHAEL ZELENY

Date of Issue: 7-13-16          Expiration Date: 7-12-17

This is to certify that the Department of Justice, Bureau of Firearms has completed a firearms eligibility check. As of the date of issue, there is nothing that would prohibit the above named permitholder from the possession of firearms loaned to the permittee for use as props in motion picture, television, video, theatrical, or other entertainment productions pursuant to Penal Code sections 29500 through 29530.

Signature of Issuing Officer: _____

ZEL 0387

1

**PROOF OF SERVICE**

2

     I hereby certify that on January 21, 2021, I electronically filed the foregoing document using the Court's CM/ECF system.  I am informed and believe that the CM/ECF system will send a notice of electronic filing to the interested parties.

3

4

                           s/ Gabrielle Bruckner
                           Gabrielle Bruckner

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 5 -

1   XAVIER BECERRA
    Attorney General of California
2   ANTHONY R. HAᴋᴋᴀL
    Supervising Deputy Attorney General
3   JOHN W. ᴋILLEEN
    Deputy General
4   State Bar No. 258395
     1300 I Street, Suite 125
5    P.O. Box 944255
     Sacramento, CA 94244-2550
6    Telephone: (916) 210-6045
     Fax: (916) 324-8835
7    E-mail: John.ᴋilleen doj.ca.gov
    *Attorneys for Defendant Xavier Becerra*
8

9              IN THE UNITED STATES DISTRICT COURT

10            FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

13

14   | | |
     |---|---|
     | **MICHAEL ZELENᴦ, an individual,** | 3:17-cv-07357 RS (NC) |
     | Plaintiff, | **DECLARATION OF ᴊOHN W. KILLEEN IN SUPPORT OF MOTION FOR SUMMARᴦ ᴊUDGMENT Bᴦ CALIFORNIA ATTORNEᴦ GENERAL XAᴠIER BECERRA** |
     | v. | Date: February 25, 2021 |
     | **GAᴠIN NEWSOM, an individual, in his official capacity ᴄ XAᴠIER BECERRA, an individual, in his official capacity ᴄ CITᴦ OF MENLO PARK, a municipal corporation and DAᴠE BERTINI, in his official capacity,** | Time: 1:30 p.m. |
     | | Dept: Courtroom 3, 17th Floor |
     | | Judge: The Honorable Richard G. Seeborg |
     | Defendants. | Trial Date: None set |
     | | Action Filed: 12/28/2017 |

22

23

24

25

26

27

28

1      I, John W. illeen, declare as follows:

2      1.     I am a Deputy Attorney General in the California Attorney General's Office. I

3  represent Defendant Xavier Becerra, in his official capacity as Attorney General of California

4  ("Defendant"), in the above-captioned matter. I have personal knowledge of each fact stated in

5  this declaration, and if called as a witness I could and would testify competently to them under

6  oath.

7      2.     Attached hereto as Exhibit 1 is a true and correct copy of a document produced by

8  Plaintiff Michael Zeleny in this litigation, bates-stamped ZEL0070 to ZEL0075.

9      3.     On March 18, 2019, counsel for Defendant City of Menlo Park deposed Plaintiff

10  Michael Zeleny. Attached hereto as Exhibit 2 is a true and correct copy of excerpts from the

11  transcript of Mr. Zeleny's deposition.

12     4.     Attached hereto as Exhibit 3 is a true and correct copy of a document produced by

13  Plaintiff Michael Zeleny in this litigation, bates-stamped ZEL0007.

14     5.     Attached hereto as Exhibit 4 is a true and correct copy of a document produced by

15  Plaintiff Michael Zeleny in this litigation, bates-stamped ZEL0001 to ZEL0003.

16     6.     Attached hereto as Exhibit 5 is a true and correct copy of a document produced by

17  Plaintiff Michael Zeleny in this litigation, bates-stamped ZEL0248 to ZEL0258.

18     7.     On March 19, 2019, and continuing on August 7, 2020, counsel for Plaintiffs deposed

19  Defendant Chief Dave Bertini. Attached hereto as Exhibit 6 is a true and correct copy of excerpts

20  from the transcript of Chief Bertini's deposition.

21     8.     Attached hereto as Exhibit 7 is a true and correct copy of a document produced by

22  Plaintiff Michael Zeleny in this litigation, bates-stamped ZEL0181 to ZEL0182.

23     9.     Attached hereto as Exhibit 8 is a true and correct copy of a document produced by

24  Defendant City of Menlo Park in this litigation, bates-stamped MP000234 to MP000240.

25     10.    Attached hereto as Exhibit 9 is a true and correct copy of a document produced by

26  Plaintiff Michael Zeleny in this litigation, bates-stamped ZEL0167.

27

28

Declaration of John W. illeen (3:17-cv-07357 RS (NC))

**ER-131**

11. On November 20, 2020, counsel for Defendants deposed Plaintiff Michael Zeleny's expert witness David Hardy. Attached hereto as Exhibit 10 is a true and correct copy of excerpts from the transcript of Mr. Hardy's deposition.

12. On October 9, 2020, Plaintiff provided Defendants with the expert report of Robert Latham Brown. Attached hereto as Exhibit 11 is a true and correct copy of Mr. Brown's expert report.

13. On October 9, 2020, Plaintiff provided Defendants with the expert report of Michael Tristano. Attached hereto as Exhibit 12 is a true and correct copy of Mr. Tristano's expert report.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 21, 2020, at Sacramento, California.


*/s/John W. Killeen*
John W. illeen


SA2018100198
34758185.docx

# Exhibit 1



**Michael Zeleny <larvatus@gmail.com>**

## Notice of Peaceful Protests in the San Francisco Bay Area

**Michael Zeleny** <michael@massmeans.com>                    Mon, Jun 25, 2012 at 2:41 PM
To: Jennifer Tejada <jtejada@ci.sausalito.ca.us>, Greg Munks <gmunks@co.sanmateo.ca.us>, btsmith@sbcglobal.net,
sheriff@sfgov.org, sfpdcommunityrelations@sfgov.org, policechief@menlopark.org, rdoyle@marinsheriff.org,
police@losgatosca.gov, pd@cityofpaloalto.org, bcole@santaclaraca.gov, knguyen@santaclaraca.gov
Cc: "David W. Affeld" <dwa@agzlaw.com>, "Michael D. Pinnisi" <mpinnisi@pinnisianderson.com>, "Hawk, Robert B."
<robert.hawk@hoganlovells.com>, Arno Penzias <apenzias@nea.com>, Brooke Seawell <bseawell@nea.com>, Subrah Iyar
<Subrah.Iyar@webex.com>, Forest Baskett <fbaskett@nea.com>, Scott Sandell <ssandell@nea.com>, Sigrid Van Bladel
<svanbladel@nea.com>, Peter Sonsini <psonsini@nea.com>, Dick Kramlich <dkramlich@nea.com>, Robert Garland
<rgarland@nea.com>, Louis Citron <lcitron@nea.com>, Jake Nunn <jnunn@nea.com>, Dan Primack
<danielprimack@gmail.com>

Dear Bay Area law enforcement personnel,

Over the following year, I shall reside and appear in your jurisdictions, exercising my fundamental rights under the First and
Second Amendments to the Constitution of the United States in the course of ongoing peaceful public protests, as
documented at http://www.subrah.com/ and http://larvatus.livejournal.com/tag/webex. The attached images and the
article "Man with semi-automatic weapon protests on Sand Hill", published in a local newspaper, should give you an
adequate idea concerning the parameters of my performances.

I conduct my protests in response to independently witnessed and officially documented death threats made against me and
my family in order to deter us from pursuing claims recorded in a lawsuit subsequently filed in California Superior Court,
County of Santa Clara as case No. 1-02-CV-809286, *Zeleny v. Zhu and WebEx.*, in the names and on the behalves of Min
Zhu and WebEx Communications, Inc. The evidence of these threats and their gravity sufficed for Judge Adajian of Los
Angeles Superior Court to acquit me on 11 April 2003 of weapons carry charges on the grounds of necessity, in a bench trial
of case No. 2CR11665. In accounting for his acquittal, he ruled:
> He wouldn't get a gun permit. He wouldn't get a gun permit. We just don't issue those in L.A. unless you're a movie star or
> somebody who shouldn't have one. But they manage to get one. Attorney's [sic.] should have one. I couldn't get one when
> I was an attorney. I know when I became a judge, a responsible person, I was able to get one. Not as an attorney.
> I think he had a good-faith belief in the threat. He did go to the police. He did do the right thing.
Ten months after this decision, my father Isaak Zelyony, plaintiff in a related lawsuit No. 1-02-CV-810705, styled *Zelyony v.
Zhu*, suffered fatal injuries in an apartment fire that appeared to start at two locations at once. My father was important to
me. I am seeking amends for unlawful threats of violence that were followed by his violent death under suspicious
circumstances. I am protesting the ongoing institutional and individual support of a violent sexual deviant, who represents a
grave personal threat to me and my family.

As law enforcement officers, you are well placed to assess my situation. For starters, you might consult the 1988 sealed
police report of childhood sexual abuse made by Min Zhu's then 14 year-old daughter Erin. On numerous occasions Erin
recounted Min's prior use of the terms that failed to dissuade me from pursuing my claim against him and his company, to
persuade her to yield to his sexual advances. Her subsequent complaints of her molestation by Min Zhu can be found on
newsgroup alt.sexual.abuse.recovery via Google Groups search for the terms "Erin Zhu sexual abuse". Additionally, they
can be found along with her draft complaint against Min Zhu for childhood sexual abuse, her email correspondence with
Blixa Bargeld to that effect, and various declarations by third parties attesting to the same facts, as matters of public record
in Santa Clara Superior Court case 1-02-CV-809286, *Zeleny v. Zhu & WebEx.* Erin Zhu has authenticated the accounts of
her rape by her father that she has authored and relayed or publicized, in sworn depositions in that case. Moreover, in a
sworn deposition taken by John Walton on 3 November 2003, in *Zelyony v. Zhu*, Santa Clara Superior Court Case Number
CV-810705, she confirmed under oath having settled her childhood sexual abuse claim against her father Min Zhu for
$300,000, paying her lawyer David Affeld a contingency fee of 2.5%. She admitted having participated in the preparation of
the draft complaint, which included a graphic description of her rape by Min Zhu. She acknowledged that after she settled
her claim against them, her parents made her the beneficiary of a trust; and although she denied linking it to the settlement,
she later settled a claim by her lawyer, who sued her for a contingency fee portion of the trust. While denying on that
occasion that her childhood sexual abuse by her father involved "penetration", Erin Zhu confirmed under oath having told her
lawyer when they prepared the draft complaint that it did involve penetration, and never having told him otherwise; and she
further confirmed under oath that this sexual abuse occurred between 1 and 20 times. I urge you to consult the relevant
parts of the transcript of Erin Zhu's referenced deposition, as entered in evidence and permanently consigned to the public
record in *NEA v. Zeleny*, San Mateo Superior Court Case No. CIV499465, in the context of California Penal Code Section

ZEL 0070

263 providing: "The essential guilt of rape consists in the outrage to the person and feelings of the victim of the rape. Any sexual penetration, however slight, is sufficient to complete the crime."

My revelations of these facts failed to diminish the support of Min Zhu by the Menlo Park venture capital firm New Enterprise Associates (NEA). By NEA's accounts, its business relationship with Min Zhu began in 1999 when it invested in the company that he founded, WebEx Communications, Inc. According to SEC filings, NEA's General Partner Scott Sandell was on the Board of Directors of WebEx until February 2002. In his sworn declaration Sandell testified that "Min Zhu was a consultant at NEA, with the title Venture Partner, from March 17 2004 through March 2008." NEA has acknowledged that in 2004 I emailed them about Erin Zhu's claims concerning her childhood sexual abuse by her father Min Zhu. In my communications I pointed out that Erin verified under oath having made these claims between 1991 and 2001 in conversation with her friends, associates, and employees; in public Usenet postings and letters to her husband Blixa Bargeld; and in statements to her lawyer David Affeld in connection with the claim for childhood sexual abuse that he presented to her parents and settled on her behalf. My notices went unanswered and had no effect on NEA's support of Min Zhu and his position at WebEx. Min Zhu resigned from WebEx and fled the United States to China only after I exposed him as a child rapist at the WebEx User Conference in San Francisco, on 2 May 2005. Yet in September of the same year, NEA funded Min Zhu's next venture in China, in full knowledge of the foregoing events. Witness this pointed observation published by China Venture News on 23 September 2005: "What's missing in the Private Equity Online article or any NEA release is any mention of the previous controversy surrounding NEA's venture partner, Min Zhu, who joined NEA in 2004, after his forced resignation as WebEx President and Director." Another side of Min Zhu's character is captured in the 2007 report of a joint investigation of WebEx by FBI and NSA, which found it illicitly transferring the records of its customers' confidential communications to China. To connect the dots, NEA's knowing sponsorship of a duplicitous child rapist has been an open secret in the venture capital community for over seven years. This is especially noteworthy in an industry, whose foundations can be shaken by a female partner's displeasure at receiving a copy of Leonard Cohen's *The Book of Longing* from her male colleague.

According to Min Zhu, as of 2008, NEA continued to invest money in his company Cybernaut. I have no reason to doubt that their business relationship has continued to this day. By all accounts, Min Zhu has established himself as an excellent profit earner, inspiring investments from numerous profit-seeking institutions and individuals undeterred by scruples about his character. In bringing to light its defects, I look forward to finding out, how far the turpitude of Silicon Valley capital is matched by its shamelessness.

Please be assured that I am sensitive to your concerns for public safety. Accordingly, in the course of my Constitutionally protected activities, I pledge to abstain from any unlawful actions, including, without limitation, the following:

- loading any firearms in the absence of a reasonable fear for life or limb;
- deploying or firing any deadly weapons or firearms in the absence of a clear and present danger to life or limb;
- making any threats of unlawful violence, including, but not limited to, drawing or exhibiting any deadly weapons or firearms in the presence of another person, in a rude, angry, or threatening manner;
- stalking, accosting, or harassing any individual, including, but not limited to, making harassing telephone calls to any individual or institution, or sending harassing correspondence to any individual or institution by any means;
- making any statement or engaging in a course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose;
- capturing visual images or audio recordings of any individual who has a reasonable expectation of privacy, or otherwise attempting to frustrate such an expectation.

I am pleased to point out that my prior events in San Diego, Milpitas, Menlo Park, and Santa Clara were unmarked by any disturbances. I hope that the same will be the case on this occasion of scaling up my activities within the bounds of legitimacy sanctioned by the authorities of the United States Court of Appeals for the Ninth Circuit and the United States Supreme Court. Owing to substantial gains in my quest for legitimate remedies, my protests shall include topical artistic performances by bagpipes, clowns, rappers, and a brass band. I shall employ portable generators, high-intensity floodlights, and night vision devices to discover the identities and whereabouts of other friends and supporters of Min Zhu. It is my position that the mounting of these performances and the use of these instruments are protected under the First Amendment, and therefore are not subject to local permit requirements. However, as an accommodation provided in the spirit of courtesy, I shall consider reasonable requests for placing time, place, and manner constraints on my performances on a case-by-case basis. Lastly, I continue to claim the right protected by the First Amendment, to hold press conferences at the sites of our protests and to film all passerby there being questioned as to their opinion of their subject matter. I hope to forestall dangerous misunderstandings and futile litigation bound to be costly and disappointing to your taxpayers by giving you this advance notice of our plan.

My protests will take place, without limitation, at the public grounds adjacent to the following institutions and residences:

1. New Enterprise Associates (NEA), 2855 Sand Hill Road, Menlo Park, CA 94025;
2. Cisco/WebEx, 3979 Freedom Circle, Santa Clara, CA 95054;
3. Silk Road Software & Services, Inc. (SRS2), One Market Street, San Francisco, CA 94105;
4. Subrah and Rupar Iyar, 15292 Kennedy Rd, Unit A, Los Gatos, CA 95032;

ZEL 0071

ER-135

5. Scott Sandell, 120 Deer Meadow Ln, Portola Valley, CA 94028;
6. Forest Baskett, 24 Alexander Ave, Sausalito, CA 94965;
7. Robert J. Garland, 636 Melville Ave, Palo Alto, CA 94301;
8. C. Richard Kramlich, 3699 Washington St, San Francisco, CA 94118;
9. Jake R. Nunn, 2120 Ashton Ave, Menlo Park, CA 94025;
10. Arno Allan Penzias, 19 Calle Del Mar, Stinson Beach, CA 94970;
11. Brooke A. Seawell, 1155 Trinity Dr, Menlo Park, CA 94025;
12. Peter Sonsini, 350 Olive St, Menlo Park, CA 94025; and
13. Sigrid Van Bladel, 1338 Masonic Ave, San Francisco, CA 94117.

This list will be extended and updated in future online postings and email communications. My protests will continue until I receive full satisfaction for Min Zhu's offenses against me and my family. All concerned parties may address their communications to my lawyers Michael D. Pinnisi <mpinnisi@pinnisianderson.com>, Pinnisi & Anderson, 410 East Upland Road, Ithaca, NY 14850, phone: (607) 257-8000, and David W. Affeld <dwa@agzlaw.com>, Affeld Grivakes Zucker LLP, 12400 Wilshire Boulevard, Suite 1180, Los Angeles CA 90025, phone: (310) 979-8700, fax: (310) 979-8701. I may be reached at the number listed below.

--
Michael@massmeans.com ---- http://larvatus.livejournal.com/ ---- http://www.subrah.com
Zeleny@post.harvard.edu | 7576 Willow Glen Rd, Los Angeles, CA 90046 | 213.290.4699
**Wronged by the high and mighty? Cut them down to size with legally safe and ethically sound degradation of unworthy moguls and scrofulous celebrities.**

---

**7 attachments**


protest.jpg
338K


child_rapist.jpg
853K


TOOL1.jpg
451K

TOOL2.jpg
495K

ZEL 0072





**NEA Banner.JPG**
27K



**NEA 1.jpg**
215K



**webex 1.jpg**
216K

ZEL 0073

# WANTED: MIN ZHU



# CHILD RAPIST, TERRORIST, THIEF

ZEL 0074

In the summer of 1988, Min Zhu threatened to kill his fourteen year old daughter Erin, unless she gave in to his sexual advances. Min continued to rape Erin every night until the school year began. He did not want his sexual needs to interfere with his daughter's studies. The thoughtful patriarch henceforth confined his child abuse to frequent beatings.

Erin Zhu has been telling this story since 1988 to friends and strangers, physicians and programmers, lawyers and policemen. Her serial rape accusations against her father are convincing. The evidence that supports them is compelling. In 1991, Erin publicized her story on the Usenet newsgroup alt.sexual.abuse.recovery. It remains accessible via Google search. A record of her subsequent complaints can be found in Santa Clara Superior Court case number CV809286, filed by Michael Zeleny in December of 2001 against the Zhus and WebEx for breach of contract.

Erin Zhu formed a business partnership with Michael Zeleny. Their partnership lasted from January of 1995 to January of 2000. It performed many jobs commissioned by Min Zhu and his company, WebEx Communications, Inc. In 1999, Erin and Michael entered into a joint venture with WebEx. In January of 2000, WebEx reneged on their agreement.

In January of 2000, Erin Zhu made a claim for childhood sexual abuse against Min Zhu. Shortly thereafter, Min paid his daughter $300,000 in blood money. According to Erin, Min also promised to give her 500,000 shares of WebEx stock in order to settle her claim. Min meant this transfer to be secret so as to cheat Erin's lawyer David Affeld out of his 2.5% contingency fee for representing her rape claim against him. Affeld had to sue the Zhus for his fees in Santa Clara Superior Court case number CV817300.

In January of 2001, while Min Zhu was completing his rape payoff, WebEx delivered 5,000 shares of its stock to Erin Zhu. At that time, WebEx owed 5,000 shares of its stock to Zeleny's company. Zeleny attempted to recover this asset from WebEx. In response, he received anonymous death threats in the names of WebEx and Min Zhu. These threats recapitulated Min Zhu's intimidation of his daughter into yielding to his sexual advances. Zeleny's father Isaak and Affeld and his wife overheard these threats on two occasions. Min's threats ceased as soon as Zeleny sued WebEx and the Zhus. Zeleny's father, who supported Erin Zhu financially in her claim against Min, filed a related lawsuit against her in Santa Clara Superior Court case number CV810705.

On 11 February 2004, Zeleny's father suffered massive burns in an apartment fire of unknown origin. He never recovered consciousness. Isaak died of his injuries on 1 March 2004. After his father's death, Michael Zeleny went public with this story.

On 25 October 2004, the Zhus settled Zeleny's business lawsuit. A month later, they settled Affeld's lawsuit by paying his fee. Meanwhile, WebEx sued Zeleny in connection with his publication of this story. In its rulings the courts ordered WebEx to pay Zeleny's attorney's fees twice in a row, imposing sanctions for frivolous claims. Nevertheless, WebEx persisted with its defamation lawsuit against Zeleny in Los Angeles Superior Court case number BC324927.

On 2 May 2005 Zeleny protested against the coverup of Min Zhu's rape of his daughter during the WebEx Experience in San Francisco. The next day WebEx cancelled its conference. It never held another user conference since. On 13 May 2005, after failing to get a restraining order against future protests by Zeleny, WebEx announced Min Zhu's sudden "retirement" and his relocation to China. On 23 December 2005, following further public protests by Zeleny, WebEx dropped its bad faith lawsuit against him.

Numerous colleagues of Min Zhu contacted Zeleny since he started telling this story. They spoke of the times Min terrorized and assaulted his family and employees. They spoke of Min's illegal exports of U.S. technology to China. They spoke of Min putting his mistress on WebEx's payroll. They spoke of Min's theft of his customers' confidential information. They never doubted Min Zhu's limitless capacity to break the law in the furtherance of his will.

Min Zhu tucked tail and fled the U.S. after being exposed as a child rapist. His reputation preceded him. Wikipedia and Chinese internet boards echo this account. Observe carefully how Min Zhu responds to these allegations. Think twice before entrusting your business to the fool who expects a grown man to cave in as if he were daddy's little girl. Think twice before working with the psychopath who responds to business disputes with death threats.

Child rape is a loathsome crime, all the more so when it violates the bond of trust between parent and child. In his proper setting, the prison lingo identifies a child molester as a *nonce*.

**Don't work for the nonce.**

**— Michael Zeleny@post.harvard.edu — 7576 Willow Glen Rd, L.A., CA 90046 —**
**323.363.1860 — http://larvatus.livejournal.com/tag/webex — 6 October 2007 —**
**I will gladly answer all your questions. See for yourself if Min Zhu does likewise.**

ZEL 0075

# Exhibit 2

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

MICHAEL ZELENY, an individual,

        Plaintiff,

        vs.                    No. 17-cv-07357-RS

EDMUND G. BROWN, JR., an
individual, in his official
capacity, et al.,

        Defendants.

_____/

DEPOSITION OF MICHAEL ZELENY

Monday, March 18, 2019

1100 Alma Street, Suite 210

Menlo Park, California

MADELEINE M. FREDA, INC.
Certified Shorthand Reporters

Reported by:             2000 Broadway
    Judy Brennan         P.O. Box 3119
    CSR No. 5138        Redwood City, CA 94064
Our File No. 48464      (650) 365-6152

```
                                                                    2
1                         I N D E X

2   Examinations                                           Page

3   MR. MASTER                                                7

4   AFTERNOON SESSION                                         95

5

6                          ---oOo---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

MADELEINE M. FREDA, INC.
CERTIFIED SHORTHAND REPORTERS

3

EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | 2-page 10-26-16 email from larvatus@gmail.com to Bruce Goitia (MP000002-000003) | 40 |
| 2 | 2-page 7-10-15 email from Michael Zeleny to William McClure, Scott Sandell, Matt Milde and Police Chief; 5-page attachment (MP000234-000240) | 95 |
| 3 | 1-page photograph of Browning M1919A4 | 95 |
| 4 | 4-page still depiction of animation taken off LiveJournal | 95 |
| 5 | 5-page email chain, the top one from Michael Zeleny to William McClure, dated 7-28-15 (MP000290-294); 1-page photograph | 125 |
| 6 | 2-page 9-21-15 letter to Michael Zeleny from William L. McClure; 2-page attachment (MP000352-000355) | 129 |
| 7 | 5-page email chain, the top one from Matt Milde to Cherise Brandell and Robert Jonsen dated 4-15-16; 12-page attachment (MP000435-000439, 000439A, 000440-000450) | 131 |
| 8 | 3-page 5-4-16 letter to Michael Zeleny from William L. McClure (MP000463-000465) | 140 |
| 9 | 2-page email chain, the top one from Michael Zeleny to Mr. McClure dated 5-27-16 (MP004890-004891) | 141 |
| 10 | 1-page email chain, the top one from Matt Milde to Michael Zeleny, William McClure, Robin Riggins and Cherise Brandell dated 6-16-16; 3-page attachment (MP000473-000476) | 144 |
| 11 | 2-page email chain, the top one from Cherise Brandell to Michael Zeleny dated 6-24-16 (MP000477-000478) | 147 |

4

```
 1              E X H I B I T S  (Cont'd)

 2      12    2-page 6-24-16 letter to Michael Zeleny        147
              from Cherise Brandell (MP000479-000480)
 3
        13    1-page email chain, the top one from           149
 4            Michael Zeleny to Cherise Brandell dated
              7-1-16 (MP000481)
 5
        14    1-page 7-12-16 letter to Michael Zeleny        149
 6            from Matt Milde on behalf of Cherise
              Brandell (MP000486)
 7
        15    1-page email chain, the top one from           151
 8            Michael Zeleny to Matt Milde dated 7-13-16;
              4-page attachment (MP004898-004902)
 9
        16    1-page photograph of Entertainment Firearms     155
10            Permit issued to Michael Zeleny 7-13-16;
              2-page attachment (MP000946-000948)
11
        17    1-page email from Nicole Casados to David       161
12            Bertini dated 8-22-17; 117-page attachment
              (MP000947-001064)
13
        18    1-page 9-5-17 email from Jelena Harada to       174
14            Michael Zeleny; 2-page attachment
              (MP001218-001220)
15
        19    2-page email chain, the top one from           175
16            Michael Zeleny to Jelena Harada dated
              9-7-17 (MP001221-001222)
17
        20    3-page email chain, the top one from Ivan      176
18            Toews to Michael Zeleny dated 9-28-17;
              5-page attachment (MP001231-001238)
19
        21    5-page email chain, the top one from           177
20            Michael Zeleny to Ivan Toews dated 10-6-17;
              3-page attachment (MP001242-001249)
21
        22    1-page email chain, the top one from           185
22            Michael Zeleny to Ivan Toews, Jelena
              Harada, William McClure, David Bertini,
23            Alex McIntyre, Nicolas Flegel, Subrah Iyar,
              Scott Sandell dated 11-3-17 (MP001268)
24

25
```

5

```
 1                    E X H I B I T S (Cont'd)

 2    23        5-page email chain, the top one from Ivan      190
                Toews to Michael Zeleny, Jelena Harada,
 3              William McClure, David Bertini, Alex
                McIntyre, Nicolas Flegel, Subrah Iyar,
 4              Scott Sandell dated 11-6-17
                (MP001279-001283)
 5
      24        9-page email chain, the top one from           190
 6              Michael Zeleny to Ivan Toews dated
                11-9-17; 2-page attachment
 7              (MP001290-001300)

 8    25        11-page email chain, the top one from          190
                Nicolas Flegel to Michael Zeleny and Ivan
 9              Toews dated 11-22-17 (MP001331-001341)

10    26        12-page email chain, the top one from          190
                Michael Zeleny to Nicolas Flegel dated
11              12-21-17 (MP001415-001426)

12    27        10-page Defendant City of Menlo Park's         190
                Special Interrogatories to Plaintiff (Set
13              One); 16-page Plaintiff Michael Zeleny's
                Responses to Defendant City of Menlo
14              Park's Special Interrogatories (Set One);
                2-page Proof of Service
15
      28        9-page Defendant Dave Bertini's Special        190
16              Interrogatories to Plaintiff (Set One);
                12-page Plaintiff Michael Zeleny's
17              Responses to Defendant Dave Bertini's
                Special Interrogatories (Set One); 2-page
18              Proof of Service

19

20                          ---oOo---

21

22

23

24

25
```

6

```
 1                  A P P E A R A N C E S

 2  For the Plaintiff:      AFFELD GRIVAKES LLP
                            BY:  DAMION ROBINSON, Esquire
 3                          2049 Century Park East, Suite 2460
                            Los Angeles, California 90067
 4                          (310) 979-8700
                            dr@agzlaw.com
 5
    For the Defendants City of Menlo Park and David Bertini:
 6
                            HOWARD ROME MARTIN & RIDLEY, LLP
 7                          BY:  TODD H. MASTER, Esquire
                            1900 O'Farrell Street, Suite 280
 8                          San Mateo, California 94403
                            (650) 365-7715
 9                          tmaster@hrmrlaw.com

10

11

12

13          BE IT REMEMBERED that pursuant to Notice of

14  Taking Deposition, and on Monday, March 18, 2019,

15  commencing at the hour of 10:11 a.m., at 1100 Alma

16  Street, Suite 210, Menlo Park, California, before me,

17  JUDY BRENNAN, a Certified Shorthand Reporter duly

18  licensed by the State of California, there personally

19  appeared

20

21                  MICHAEL ZELENY,

22

23  called as a witness by the Defendants herein, who, being

24  by me first duly sworn, was examined and interrogated as

25  is hereinafter set forth.
```

MADELEINE M. FREDA, INC.
CERTIFIED SHORTHAND REPORTERS

1      MICHAEL ZELENY,

2   being first duly sworn by the Certified Shorthand

3   Reporter to tell the truth, the whole truth and nothing

4   but the truth, testified as follows:

5

6              EXAMINATION BY MR. MASTER

7           MR. MASTER:  Q.  Good morning.

8   A.      Good morning.

9   Q.      Would you please state your full name for the

10  record.

11  A.      My name is Michael Zeleny.  That's Z-e-l-e-n-y.

12  Q.      And you pronounce it Zeleny?

13  A.      Yeah.  But you're free to modify.

14  Q.      What's your date of birth?

15  A.      February 26, 1958.

16  Q.      Have you ever been deposed before?

17  A.      Yes, several times.

18  Q.      When was the last time?

19  A.      I think 2012.  No, maybe 2010.  Sorry.

20  Q.      Okay.  And in 2010 what was the general

21  substance of that deposition?

22  A.      It was a lawsuit that NEA filed against me for

23  trespass.  NEA, New Enterprise Associates.

24  Q.      And you were being deposed in your capacity as

25  a party in that case?

8

1    A.    Yeah.

2    Q.    And how many other times have you been deposed

3 prior to that one?

4    A.    It would have been in 2002.  At least once.  I

5 think that's about it.

6    Q.    So you recall being deposed at least two

7 times --

8    A.    At least two times, yes.

9    Q.    -- prior to today?

10    A.    Yes.

11    Q.    And in 2002 what was the general nature of that

12 deposition?

13    A.    It was a business dispute with the Zhus and

14 WebEx.

15    Q.    Is that Min Zhu?

16    A.    Yeah.  Min and Erin.

17    Q.    Did you have some business relationship with

18 Mr. Zhu and WebEx?

19    A.    I had a business relationship with WebEx, not

20 with Min.

21    Q.    Generally what was your business relationship

22 with WebEx?

23    A.    We were supposed to be a partner with them

24 using their technology in a different market.

25    Q.    When you say "we," who do you mean?

9

| | | |
|---|---|---|
| 1 | A. | Erin and I had a company. |

1     A.     Erin and I had a company.

2     Q.     And that's Erin --

3     A.     Erin Zhu, Z-h-u.

4     Q.     What was the name of your company with Erin?

5     A.     Live Share.

6     Q.     I'm sorry?

7     A.     Live Share.

8     Q.     Life Share?

9     A.     Live, L-i-v-e, Share.

10    Q.     And what was the general nature of that

11    company?

12    A.     Well, we did a lot of things related to the

13    first wave of internet commercialization.  In this

14    particular instance we would have done consumer level

15    marketing for the WebEx product and service.

16    Q.     Let's back up since it has been --

17    A.     Twenty years.

18    Q.     Well, it's been almost 20 years since that

19    deposition and almost nine years since the other

20    deposition with NEA.

21            We've met prior to today --

22    A.     Yes.

23    Q.     -- but my name is Todd Master.  I'm an attorney

24    that's been retained by the City of Menlo Park and Chief

25    David Bertini to represent them in a lawsuit filed by

15

1    A.    Starting with my lawsuit against the Zhus and

2 WebEx, then proceeding with the WebEx lawsuit against me

3 for defamation that they dropped.  Then there was a

4 lawsuit by NEA against me for trespass.  I think that

5 about covers it.

6    Q.    Okay.  I'd like to kind of touch on each of

7 those separately, if I can.

8    A.    M-hm.

9    Q.    The first one is your lawsuit against Mr. Zhu

10 and WebEx.

11    A.    Yes.

12    Q.    When was that lawsuit filed?

13    A.    Around the end of 1999.

14    Q.    And I'm presuming you were a plaintiff in that

15 lawsuit?

16    A.    Yes.

17    Q.    Where was that lawsuit venued?

18    A.    We started in Los Angeles and the venue was

19 properly moved to the Bay Area.

20    Q.    Do you recall which court in the Bay Area?

21    A.    I am not sure.  You'd have to look it up.  I do

22 have records that I can supply to you.

23    Q.    Okay.  And what was the purpose of your lawsuit

24 against Mr. Zhu and WebEx?

25    A.    There was a breach of contract alleged and

16

1    various torts related to it.

2        Q.    And I'm assuming that lawsuit resolved,

3    correct?

4        A.    It resolved in part.  I reached a settlement

5    with my former partner, Erin Zhu.  I dropped the claims

6    against, or I didn't do anything about the claims

7    against the Zhus and WebEx, the rest of the Zhus and

8    WebEx.

9        Q.    So your lawsuit was against Mr. Zhu and Erin

10   Zhu?

11       A.    Correct.

12       Q.    And WebEx?

13       A.    And WebEx.

14       Q.    Okay.  Was the City of Menlo Park in any way

15   involved in that lawsuit?

16       A.    Not at all.

17       Q.    Now, let's talk about there was a -- you

18   mentioned a WebEx lawsuit against yourself for

19   defamation?

20       A.    That's right.

21       Q.    And where was that lawsuit -- let me ask you

22   this.  When was that lawsuit filed approximately?

23       A.    It would have been in the second half of 2004.

24   That's my best estimate.

25       Q.    Okay.  Where was that lawsuit venued, if you

44

1   or -- no, probably 2006.

2      Q.    Okay.  The first time you protested in the City

3   of Menlo Park?

4      A.    I think that was in 2006, yes.

5      Q.    Okay.  And when you protested in the City of

6   Menlo Park in 2006, where was that protest, the physical

7   location or an address if you have it?

8      A.    I don't recall, unfortunately.  I can tell you

9   the occasion and you can look it up.

10      Q.    Okay.

11      A.    It was -- the first protest that I conducted in

12   public was in 2005.  It was at WebEx User Conference in

13   San Francisco.  And as a result of my protest, Min Zhu

14   had to leave WebEx and the United States.

15          In 2006, if memory serves, he came back briefly

16   to appear in Menlo Park and then at Stanford University.

17   And I was present at both occasions.

18      Q.    Okay.  And was that a multiple-day protest or a

19   single-day protest?

20      A.    I think it was two days altogether.

21      Q.    One day in Menlo Park, one day at --

22      A.    Stanford.

23      Q.    -- Stanford?

24      A.    Yes.

25      Q.    Okay.  And did you have any direct contact with

57

1    I received in 2008, and there is a police report in

2    Hollywood that you may consult.  I'll be able to give

3    you the particulars.

4        Q.    Have you received any death threats since the

5    2008 time period?

6        A.    No.

7        Q.    My question, once again referring back to

8    Exhibit 1, is it indicates that, additionally, owing to

9    death threats you had received and this incident that

10   occurred in San Francisco, that you intend to bring with

11   you exposed unloaded firearms accompanied by loaded

12   magazines and speedloaders.  Is that correct?

13       A.    Yes.

14       Q.    Okay.  And the purpose of bringing the firearms

15   and the loaded magazines and speedloaders, is that in

16   terms of self-defense in that particular instance?

17       A.    Two reasons.  Going back to 2005, I conducted

18   my protest on May 2nd and May 3rd, the next day.  The

19   conference was supposed to continue.  WebEx, however,

20   canceled it, and in their official notice to the

21   attendees they said that they were canceling it because

22   a protester was found to have had firearms.  That made

23   me understand that the mere presence of a firearm makes

24   my message much more effective.  And that was one of the

25   inspirations.

58

1            Another one was, of course, self-protection.

2    Q.    So in your mind, it served the two purposes.

3 Self-protection and scaring the people you're protesting

4 or just -- what do you mean by that?

5    A.    I object to the term "scaring." I never

6 brandished a firearm in my life unless I was being

7 assaulted, which hasn't happened in the course of any of

8 these protests. I do not intend to produce fear in

9 any -- anybody observing my protest.

10           I do, however, want to attract their attention.

11 And experience has taught me that nothing attracts

12 attention as much as a gun displayed publicly.

13    Q.    Can you understand -- asking you to kind of

14 step back and look back and look upon what you do, do

15 you have an understanding as to why people might be

16 fearful to see someone either protesting in

17 San Francisco or in Menlo Park or Los Angeles with

18 firearms on them? Do you understand how people could be

19 fearful of seeing something like that?

20    A.    Yes, I do.

21           MR. ROBINSON: Object that it calls for

22 speculation.

23           You can answer.

24           THE WITNESS: I did answer. Yes, I understand

25 that.

59

1     MR. MASTER: Q. Okay. And is there anything
2  that you do or you try to do when you have arrived --
3  and we haven't gone through all the episodes yet where
4  you protested with the handguns aside from the 2005
5  protest, which you didn't have on you -- did you do
6  anything to kind of respond to that fear that people
7  might have with your guns? Anything you tried to do to
8  allay that fear and focus more on using them to just
9  garner attention to your message?
10     Do you understand my question?
11  A.     I think I do. And to the extent that I
12  understand it, first and foremost, I always kept the gun
13  pointed in a safe direction, generally toward the ground
14  next to my foot.
15     Secondly, if somebody addresses me and voices
16  that sort of concern, which has happened in the past, I
17  try to explained my situation to them. And I stress
18  that under no circumstances will I initiate any kind of
19  violence with or without firearms.
20  Q.     Once again referring to Exhibit 1, did you, in
21  fact, conduct a protest after sending this October 26,
22  2009 email in front of NEA?
23  A.     Yes, I did.
24  Q.     And did you bring those unloaded firearms
25  accompanied by loaded magazines and speedloaders?

60

1    A.    Yes.

2    Q.    And when you say loaded magazines and

3  speedloaders, I'm not a gun person.  You're the expert

4  here.  That means, in my mind, with live ammunition.

5    A.    Yes.

6    Q.    Okay.  And that would be live ammunition in the

7  magazines, which is something you would put into a gun,

8  correct?

9    A.    Yes.  But it's not inserted in the gun.  That's

10  what makes the gun unloaded.

11    Q.    And then speedloaders, what does that refer to?

12    A.    It's a device for loading a revolver that holds

13  six or more rounds together for rapid insertion.  It's a

14  revolver cylinder.

15    Q.    And so the purpose of carrying the loaded

16  magazines and speedloaders is for self-defense?

17    A.    In part, yes.  In another part, it also makes

18  the display much more authentic.

19    Q.    And how does it make it more authentic having

20  live ammunition with you than simply just having an

21  unloaded gun with you?  Is there something in your mind

22  that's differentiated between those two?

23    A.    A gun without ammunition is useless.  And if I

24  ever am called upon to use a gun in self-defense, I

25  would have to have ammunition accessible to me.

MADELEINE M. FREDA, INC.
CERTIFIED SHORTHAND REPORTERS

**ER-156**

61

1    Q.    So, then, the purpose of having the loaded

2    magazines and speedloaders was primarily in case you had

3    to use a gun, you didn't want to have just unloaded guns

4    with you, correct?

5         MR. ROBINSON:  Objection.  Asked and answered.

6    Misstates his prior testimony.

7         You can answer.

8         THE WITNESS:  Yes.  And that also comported

9    with at the time the most recent ruling in an appellate

10   court that pertained to the legality of carrying a

11   firearm in California.

12        MR. MASTER:  Q.  And which case is that?

13   A.    I don't have it right here.  I can send you the

14   information afterwards.

15   Q.    Okay.  When did you last conduct a protest in

16   the City of Menlo Park?

17   A.    2012.

18   Q.    And that would be about June?

19   A.    Yes.

20   Q.    So between the 2006'ish time period and

21   June 2012, were all those protests concerning the same

22   general subject matter?  And what I mean by that is

23   Mr. Zhu and the allegations against him as related to

24   Erin Zhu.

25   A.    That is correct, yes.

Case 3:17-cv-07357-RS Document 163-1 Filed 01/21/23 Page 128 of 135

67

1    Q.    Okay.  So between the 2006 time period when you

2    first protested in Menlo Park and until June of 2012 how

3    many times would you say that you protested against NEA

4    within the City of Menlo Park?

5    A.    If by times you mean an appearance on a

6    particular day --

7    Q.    Yes.

8    A.    -- at least several dozen.  I can't give you a

9    better estimate, I'm afraid.

10    Q.    So several dozen.  Are we between 25 and 50?

11    A.    Something like that, yes.

12    Q.    Something like that, okay.

13          During any of those -- strike that.

14          With the exception of the 2006 appearance

15    where, as you sit here today, you don't recall

16    specifically where that occurred, did all the other

17    protests against NEA either occur directly in front of

18    the NEA building within the complex or on Sand Hill Road

19    in front of the main entrance of that complex?

20    A.    That is correct.

21    Q.    Because I understand as a result of the NEA

22    lawsuit against you for trespassing, you were moved

23    outside of that complex onto the public right-of-way on

24    Sand Hill Road.  Is that correct?

25    A.    Yeah, that's right.

68

1    Q.    And after that settlement was made between you

2    and NEA, you resumed protests on the public sidewalk in

3    front of NEA, that entrance there?

4    A.    That is correct.

5    Q.    Okay.  So since your 2008 protest where you

6    walked between the parking lot and the entrance to the

7    NEA building, have you always had on you or in your

8    possession firearms when you were doing your protests in

9    Menlo Park?

10   A.    As far as I can recall, that is true.

11   Q.    And, again, when we reference the 2009 emails,

12   Exhibit 1, in all those occasions when you were carrying

13   unloaded firearms as part of your protests against NEA,

14   whether that initially be within the private property

15   where NEA is housed and then subsequently within the

16   public right-of-way on the sidewalk on Sand Hill Road,

17   did you always carry with you live ammunition for those

18   said firearms?

19   A.    Yes.

20   Q.    And we have the police reports that --

21              (Coughing interruption.)

22   A.    Excuse me.  Sorry.  Went the wrong way.

23   Q.    It happens.  Are you okay?

24   A.    I'm good.

25   Q.    Have you read through all of the police reports

MADELEINE M. FREDA, INC.
CERTIFIED SHORTHAND REPORTERS

**ER-159**

69

1    that the City produced in this litigation?

2        A.    Not yet, no.

3        Q.    Not yet?  Okay.

4              Do you recall reading through any of the

5    reports that identify the particular types of firearms

6    that you had with you when you were protesting in the

7    City of Menlo Park?

8        A.    I saw several reports with such identification.

9        Q.    Okay.  And would it be fair to say, Mr. Zeleny,

10   that between, let's say, 2008 and June of 2012 when you

11   were protesting either on the private property or within

12   the public right-of-way on Sand Hill Road, that when

13   police officers responded, that they would make contact

14   with you?

15       A.    Yes.  Either me or in the 2009 and I think 2010

16   occasions they made contact with some of my associates

17   and contract employees.

18       Q.    Brian Wong, for example?

19       A.    Michael Wong.

20       Q.    Michael Wong, I'm sorry.

21       A.    And Paul Mitchell, yes.

22       Q.    And during those contacts they made with you,

23   did they ask to look at your guns?

24       A.    Yes.

25       Q.    And did you understand why they were asking to

1    look at your guns?

2    A.    Yes, I understood that.

3    Q.    What was your understanding of why they asked

4    you?

5         MR. ROBINSON:  Objection.  Calls for

6    speculation.

7         You can answer.

8         THE WITNESS:  They wanted to check that the

9    guns were unloaded.  And, in fact, in the course of one

10    such check the police officer apparently inadvertently

11    loaded the gun and was about to fire it when I stopped

12    him.

13         MR. MASTER:  Q.  Okay.  Well, good.  I'm glad

14    you did that.

15         So they told you or did they ask you,

16    "Mr. Zeleny, may we look at your firearms to make sure

17    they're unloaded?"  Is that correct?

18    A.    Yes.

19    Q.    And your response to them was?

20    A.    Yes.  In the affirmative.  Always.

21    Q.    Always.  So during the entirety of your protest

22    within the City of Menlo Park when police officers came

23    and asked you to inspect your weapons, you were always

24    very forthcoming saying, "Yes, you may take a look at my

25    weapons to confirm they're unloaded," correct?

71

1    A.    That's correct.

2    Q.    And after they confirmed that they were

3    unloaded, did they let you continue to do your protests?

4    A.    Generally, yes.  Sometimes they engaged me in

5    conversation.

6    Q.    And the conversation they engaged you in was

7    what?

8    A.    As to the purposes of my protest and various

9    background facts.  There was one particular occasion in

10   which a female officer has attempted to interview me,

11   and I cooperated with that attempt.

12   Q.    Did the Menlo Park Police Department at any

13   time prevent you from continuing your protests when they

14   made contact with you?

15   A.    On numerous occasions I was asked to modify the

16   area of my appearances, to change or to lower the volume

17   of the music that my associates were playing at the

18   time, to move around the placards, that sort of thing.

19   Q.    Okay.

20   A.    So requests like that were made.  And for a

21   time until I could cooperate with them in full, we had

22   to interrupt what we were doing.

23   Q.    Okay.  And when you say you had to interrupt

24   what you were doing, for example, if an officer asked

25   you to modify the volume of the music, you had live

MADELEINE M. FREDA, INC.
CERTIFIED SHORTHAND REPORTERS

**ER-162**

72

1    music out there, correct?

2    A.    Yes.

3    Q.    And you understood that the individual or

4    businesses within the business complex did not

5    appreciate the volume of the music?

6    A.    That's as it has been communicated to me.  I

7    did not really believe it because all of the musicians

8    that I had hired, of all of them, none used any kind of

9    amplification.

10    Q.    What kind of instruments were they using?

11    A.    There was an accordion player, there was a

12    trumpet player.  I guess the bagpipes player might have

13    been a bit loud.  It's in the nature of the instrument.

14    Q.    And that's the purpose of using the

15    instruments, correct?

16    A.    The purpose is to attract attention.

17    Q.    And where were the musicians stationed when

18    they did play music as part of your protests?

19    A.    Inside the Rosewood Complex around the corner

20    of the building partially occupied by NEA.

21    Q.    So when they were performing the music and you

22    were inside the complex, was that before you and NEA

23    entered into a settlement regarding their trespass

24    claim?

25    A.    That was actually before they filed that

73

complaint.  Simultaneous with their filing of the
complaint, the City of Menlo Park unilaterally decided
that the *Pruneyard* dispensation, to which I referred, I
believe, yeah, in this email, did not apply to me.  So
they requested that I remove myself and my associates
from the Rosewood Complex, and we complied with that.

Q.     And that was prior to June 2012?

A.     That was in 2010, yeah.

Q.     Okay.  You also mentioned that you were asked
to modify the area of your protests?

A.     Move around, yes.

Q.     And when you say move around, what are you
referring to specifically?

A.     I think there was at least one occasion in
which a Menlo Park police officer got the idea that they
were interfering with access to NEA.  So he asked us to
move away from the passage, and we complied.

Q.     And that was when you were on the private
property in front of the building?

A.     That's right.

Q.     Okay.  So during your protests of NEA between
2008 and June of 2012, were there any particular
firearms that you would bring with you to those protests
or did you bring something new every time?

A.     In 2010 I believe what I had on me was a

74

1    Winchester 97 trench gun and a bandolier full of

2    12-gauge ammunition.  In 2012 I used military gear, body

3    armor, and a semi-automatic M14 type rifle.

4        Q.    Let me ask you what these are because I just

5    don't know what these rifles are.  And these are as

6    explained in the police reports.  I can try to pull

7    those up if you need to.  But this is the police

8    department's description of them.  Whether they're

9    accurate or not is another story.

10       A.    All right.

11       Q.    They refer to a protest on June 21st, 2012 as

12   you carrying an LRB rifle.  Do you know what that refers

13   to?

14       A.    Yes.  It's a semi-automatic version of the

15   military M14 type rifle.

16       Q.    Okay.  .308 caliber?

17       A.    Correct.

18       Q.    Okay.

19       A.    7.62 actually.

20       Q.    What does that refer to?

21       A.    It's the NATO designation to which .308 is a

22   commercial counterpart.

23       Q.    They also identified you having a .357 Magnum

24   revolver.

25       A.     I may have.  If they say so, I'm sure I did.

93

1    A.    No.  The closest thing I had to a television

2    screen was a viewfinder on my film camera.  I purchased

3    an outdoor television set subsequently to my acquittal.

4    And I featured -- I mentioned it in the correspondence

5    that I had with Menlo Park City authorities starting in

6    2015 with reference to my intent to display it in future

7    appearances.

8    Q.    I appreciate that.  I guess just to be

9    abundantly clear, I'm talking about -- you have not

10   protested out there since June 2012, correct?

11   A.    That's correct.

12   Q.    So at any time when you've been on-site, either

13   on NEA's property or within that complex or on Sand Hill

14   Road within the public right-of-way on the sidewalk, did

15   you ever use a television screen to promote any of your

16   theories or ideas as part of your protest?

17   A.    I have to say no.  I may have used an iPad, but

18   I'm only mentioning it because it's the only thing

19   similar to a television that I had available at the time

20   and I had it configured for that.  I don't believe that

21   I brought it ever.

22   Q.    Okay.

23   A.    So the answer again, to emphasize, is no.

24   Q.    So you say you had a portable battery --

25   A.    Yes.

1    would be doing for you in reference to this part of

2    Exhibit 2?

3        A.    Essentially all aspects of supporting my

4    presence on-site 24/7.

5        Q.    Can you give me some examples of what you were

6    envisioning by needing to have someone there to support

7    you?

8        A.    Oh, for example, just for one example, I would

9    have to have a porta-potty there.  So somebody would

10   have to manage that.  Somebody would have to provide me

11   with meals.  Maybe assist with guarding the site at

12   night.  That is the general thrust of it.

13       Q.    So assist with guarding the site at night.

14   This would consist of, for example, you getting some

15   sleep and someone guarding the center median to protect

16   your weapons?

17       A.    Something like that.  An armed guard, yes, that

18   I would hire.

19       Q.    And this porta-potty and the staff, they would

20   also be on-site in the center median with you?

21       A.    That was the intent, yes.

22       Q.    Okay.

23       A.    I was intending to employ the bed of my truck

24   for most of the equipment.

25       Q.    With the exception of the porta-potty.

108

1    A.    That's correct, right.

2    Q.    Okay.  And how were you envisioning getting

3    onto the center median with your truck?

4    A.    I was requesting that the City allow me to

5    drive onto it.

6    Q.    Did you have a particular plan on how you would

7    access the center median?

8    A.    I know how to get over a curb with my truck.  I

9    have equipment for that.  So yes.  And the answer is in

10   the affirmative.

11   Q.    So in the center median there's a curb there;

12   is that correct?

13   A.    I believe so.

14   Q.    So your idea was that you would use your

15   vehicle and get up over the curb and park on the center

16   median?

17   A.    Yes.

18   Q.    And in the center median, in addition to your

19   truck, the staff, and the porta-potties, that would

20   include -- and I'm referring to Exhibit 2 here, it's

21   line 5 -- exposed and unloaded military grade firearms;

22   is that correct?

23   A.    That is correct.

24   Q.    And it also indicates loaded ammunition feeding

25   devices for those specific firearms; is that correct?

109

1    A.    Yes.

2    Q.    Okay.  And then you indicate -- you identify

3    some of those firearms; is that correct?

4    A.    That is right.

5    Q.    And you reference a 9mm Para semi-automatic SIG

6    P210 pistol?

7    A.    That's right.

8    Q.    And you would have associated live ammunition

9    separate and apart from that weapon, correct?

10   A.    That is right.

11   Q.    Then you would have a 7.65 x 51mm NATO,

12   N-A-T-O, all caps, semi-automatic LRB M25 rifle as well;

13   is that correct?

14   A.    That is correct.

15   Q.    And is that the same LRB rifle that we

16   referenced in prior photographs this morning?

17   A.    It is one of them.

18   Q.    Okay.  And, in addition, you would have a

19   tripod-mounted belt-fed Browning, capital

20   B-r-o-w-n-i-n-g, M1919A4; is that correct?

21   A.    Semi-automatic modifies both LRB M25 rifle and

22   belt-fed -- tripod-mounted belt-fed Browning M1919A4.

23   They're not machine guns.  The actual military issue are

24   fully automatic.

25   Q.    They're fully automatic.

110

1      A.     These are semi-automatic, both of them.

2      Q.     Okay.  Now, in my doing quick research -- and

3  by no means am I the historian; you're the expert when

4  it comes to history so I'll let you correct me if I'm

5  wrong -- the belt-fed Browning M1919, is that a .30

6  caliber machine -- medium machine gun?

7      A.     In this particular instance it's a highly

8  modified version of that weapon designed to fire in

9  semi-automatic mode only and to make it well-nigh

10 impossible to convert it to full automatic operation.

11     Q.     So, forgive me, but being converted to

12 semi-automatic, is that something you did to this

13 particular firearm?

14     A.     No, that's how they're sold.  It's a particular

15 popular firearm for that purpose.

16     Q.     And how many rounds a minute can you shoot with

17 the semi-automatic version of the Browning?

18     A.     Quite frankly, I never even fired that thing

19 and I don't know if I intend to.  I'm more of a rifle

20 man.

21     Q.     Okay.  And do you have a permit associated with

22 the Browning?  Is it registered to you or do you have a

23 permit for it?

24     A.     It is registered to me.  There is no permit

25 required in this state to own a semi-automatic weapon.

1    Q.    Where is it registered to you, what database?

2    A.    That would be with California Department of

3    Justice.

4    Q.    Okay.  Did you ever -- I'm sorry.  Go ahead.

5    A.    If you wish, I can explain the process of

6    registration.

7    Q.    Please do.  That would be helpful.

8    A.    The way you acquire firearms in this state, as

9    of now, there used to be some exemptions, but all modern

10    firearms made post-1898 have to be transferred to the

11    end user by a federal licensed dealer.

12    At the time of this transfer the end user

13    completes a 4473 form that basically answers the

14    questions of his eligibility under federal law to own

15    modern firearms.  And he makes these assertions,

16    checking the relevant boxes on the form, under penalty

17    of perjury.

18    Ten days later -- there's a waiting period

19    mandatory in California.  Ten days later, assuming the

20    Department of Justice running the checks with the FBI

21    comes back and indicates to the dealer, transferring

22    dealer, that there is no reason to prevent the transfer,

23    the end user may appear at the dealer and pick up his

24    weapon.

25    That is what happened with every weapon that I

112

1   own in this state, exclusive of those that I brought

2   with me upon moving here in 1983, having purchased them

3   in a different jurisdiction.

4       Q.    Okay.  Thank you very much.

5             Now, if you refer to Exhibit 3, which is in

6   that stack in front of you --

7       A.    Oh, sorry.

8       Q.    It's a separate document.

9       A.    Right.

10      Q.    If you look at Exhibit 3, I'll represent to you

11  this is a photograph that I pulled off the web -- I'm

12  not saying this is your gun -- when I searched for

13  belt-fed Browning M1919A4.

14            Does Exhibit 3, at least to your knowledge and

15  given your history and experience with these weapons,

16  does this accurately depict the type of weapon that you

17  were intending to bring with you as part of your special

18  event permit application?

19      A.    That is right.  The only exception in this case

20  being that I would have used a different tripod.

21      Q.    Okay.  So but for the tripod, the firearm

22  itself in Exhibit 3 is an accurate depiction of what you

23  described in your special event permit application?

24      A.    That is right.

25      Q.    Okay.  Thank you.

1          Had you ever brought this belt-fed Browning

2   M1919A4 to any of your prior protests in Menlo Park?

3     A.    No.  I purchased this specifically for the next

4   round that hasn't commenced yet.

5     Q.    When did you purchase the firearm?

6     A.    If memory serves, I bought it in early 2015.  I

7   can check that.

8     Q.    Would it be fair to say sometime between your

9   acquittal in the criminal matter and the filing of your

10  special event permit application on July 10, 2015?

11    A.    This would make sense to me.  That's why I'm

12  guessing as to the date.

13    Q.    I don't want you to guess.  That's always a

14  word that lawyers don't like.  But is that a fair

15  estimate of a time frame?

16    A.    It is a fair estimate, yes.  Sorry about that.

17    Q.    That's fine.

18          Okay.  I'm done with Exhibit 3 for the time

19  being.  You can tuck that away.

20          You also reference in Exhibit 2, and I'm

21  looking at your email here in the first full paragraph,

22  that you intended to bring a 55-inch portable media

23  display powered by a portable gas generator; is that

24  correct?

25    A.    That is right.

1    Q.    And my understanding through subsequent

2    correspondence with the City is that you intended to

3    display that television -- and that's a television,

4    correct?

5    A.    Yes.

6    Q.    You intended to display that television from

7    the bed of your truck; is that correct?

8    A.    That is right.

9    Q.    And what direction would it be pointed to or

10   how would it be angled or configured vis-a-vis Sand Hill

11   Road?

12   A.    Well, I should make a very general statement

13   here.  I was asking the City for the parameters that it

14   would consider acceptable.  I did not indicate any

15   particular direction.  What I tried to do instead was to

16   elicit the City's requirements for approving the permit

17   and to comply with them.  No such requirements were

18   furnished to me so that matter of orientation, along

19   with many other matters, was left undetermined.

20   Q.    Did you actually specifically write in an email

21   or correspondence to the City asking the City which

22   direction of orientation the TV could be used?

23   A.    I recall asking the City for its requirements

24   for approving an application like this.  I recall asking

25   the City several times for these requirements.  I never

115

1    received any sort of response to that inquiry.

2        Q.    And pursuant to our prior discussion here and

3    your prior testimony today, to the extent that there

4    was, for lack of a better term, give and take between

5    you and the City with regard to either your special

6    event permit application or your subsequent film

7    application, that would be documented in writing?

8        A.    Yes, indeed.  And the only amendment I would

9    make to your characterization, it was all give on my

10   part.  It would have been all take on the part of the

11   City.

12       Q.    Okay.

13       A.    I in this particular case, as on prior

14   occasions, have resolved to humor your client in any

15   requests that they make, to the extent that I'm capable,

16   without putting the kibosh on my entire performance.

17       Q.    Okay.  Now, the portable media display on this

18   55-inch television, you indicate here -- again, I'm

19   referring to Exhibit 2, the first page, the first

20   paragraph -- that it would display, quote, videos

21   featuring explicit representations of sexual violence

22   committed by NEA's publicly disgraced protégé, end of

23   quote.

24            Did I read that correctly?

25       A.    That's right.

116

```
 1        Q.      Okay.  And then you refer to a sample image.

 2   Do you see that?

 3        A.      Yes.

 4        Q.      And that's from your LiveJournal?

 5        A.      Yes.

 6        Q.      And if you'd turn to Exhibit 4, which is in

 7   front of you.  Do you have that in front of you?

 8        A.      I got it.

 9        Q.      And is Exhibit 4 a document, as far as you

10   understand in looking at it, that is taken from your

11   LiveJournal?

12        A.      Yes.  Except this would have been an animation,

13   not a still.

14        Q.      Thank you.  That's what I wanted to ask you.

15               So contained within Exhibit 4 is an animation,

16   i.e., a cartoon, correct?

17        A.      That's right.

18        Q.      And I understand what you're telling me is that

19   when you go on your LiveJournal and you get to this

20   portion of it, it's not a still image.  It's an image

21   that moves, correct?

22        A.      That is right.

23        Q.      Okay.  Obviously I can't attach that here

24   today, so I'm giving you the still image version of it.

25   Right?
```

117

1    A.    That's right.

2    Q.    Okay.  And so that's the sample of what you

3    wanted to display on the television monitor in the back

4    of your truck.

5    A.    It is indeed one of the centerpieces.

6    Q.    Okay.  And that particular image that's

7    contained within Exhibit 4 to your deposition, had you

8    ever displayed that image in any of your prior protests

9    within the City of Menlo Park?

10   A.    No.

11   Q.    And why not?

12   A.    It hadn't been created then.  This posting

13   dates to December 14, 2012.  Based on the date, I would

14   make my best recollection of the production of this

15   animation to date back to November, in November of that

16   year.  So that would have been after my last appearance

17   in Menlo Park.

18   Q.    Thank you.

19         Sir, if you could please turn to, it's the

20   third page within Exhibit 2, so I'm jumping around back

21   to Exhibit 2.  Set Exhibit 4 aside.  It's actually the

22   first page of the actual special event application.

23         Have you had a chance to look over this

24   application here today?

25   A.    I'm looking at it right now.

118

1    Q.    Okay.  Go ahead.

2    A.    But I would like to do it more thoroughly.

3    Q.    Take your time.

4    A.    Yes, we're done.

5    Q.    Okay.  I think you testified previously that

6    you prepared this application yourself, correct?

7    A.    Yes.

8    Q.    And that's your signature on the last page of

9    this exhibit, on Bates number MP240?

10   A.    Yes, it is.

11   Q.    Okay.  Turning back to the first page of the

12   application that's Bates number 236, there's the

13   applicant name, which is yourself.  I'm sorry.

14         MR. ROBINSON:  Bottom right.

15         THE WITNESS:  Okay.

16         MR. MASTER:  Q.  I'm sorry.  When I refer to

17   Bates number, I'm referring to the number on the bottom

18   right.

19         The applicant name is yourself, correct?

20   A.    M-hm.

21   Q.    Yes?

22   A.    Yes.

23   Q.    And then organization name, Mass Means, Inc.,

24   is this a -- this event was going to be sponsored by

25   your company?

119

1      A.     The company at that time was already a

2   suspended corporation.  I was trying at the time to

3   reincorporate.  So that was a bit of a hopeful

4   designation.

5      Q.     Okay.  And the name of your event was Child

6   Rape Tools; is that correct?

7      A.     That is right.

8      Q.     Okay.  And then continuing down in these

9   various blocks here, we have the section the Purpose of

10  Event.  We've already talked about that, correct?

11     A.     That's right.

12     Q.     And it's described there, correct?

13     A.     Yes.

14     Q.     The next box, if you will, is called Location

15  of Event.  And that identifies the median strip on

16  Sand Hill Road at 2825 Sand Hill Road, correct?

17     A.     Yes.

18     Q.     Now, the way I understand it is 2855 Sand Hill

19  Road is actually the address of NEA within the complex.

20  Is that your understanding?

21     A.     Yes.

22     Q.     And the center median is actually right in the

23  middle of Sand Hill Road, correct?

24     A.     That's right.

25     Q.     And my understanding is that NEA's building

120

1    does not have a front or an entrance directly to

2    Sand Hill Road at the center median, correct?

3        A.    That is right.  That is why I specified this at

4    the median strip.

5        Q.    Gotcha.  Then continuing down under Event

6    Timeline, are you there?

7        A.    Yes.

8        Q.    We have the set-up and preparation, which you

9    indicate would begin on September 30th, 2015 at

10   9:00 a.m. and then end at 10:00 p.m.

11             Do you see that?

12       A.    Yes.

13       Q.    So 13 hours for set-up and preparation?

14       A.    Yes.

15       Q.    So did you envision taking an entire day to set

16   up your vehicle and put everything you need to put in

17   the center median to begin the event the following day?

18             Is that kind of the idea?

19       A.    That was the idea, yes.

20       Q.    And then the event itself would have begun the

21   following day, on October 1st, 2015 at 7:00 a.m.; is

22   that correct?

23       A.    That is correct.

24       Q.    And it would have been ongoing an indefinite

25   time period.

Case 3:17-cv-07357-RS Document 116-1 Filed 01/21/23 Page 152 of 285

121

1      A.      That was my request.

2      Q.      Okay.  If you continue to go down the

3   application, there's the -- next to the question that

4   reads, "Any City streets closed"; do you see that?

5      A.      Yes.

6      Q.      And you said no.

7      A.      Yes.

8      Q.      And did you do any analysis yourself to come to

9   that conclusion?

10     A.      Yes, I did.

11     Q.      And what was that?

12     A.      I wouldn't be impeding any traffic on Sand Hill

13   Road, certainly not anywhere else.  So there would be no

14   need for the City to close any streets.

15     Q.      And how would you get -- because you're saying

16   that you'd be essentially living on that center median

17   because you have a porta-potty there, correct?

18     A.      That's a fair characterization, yes.

19     Q.      And how would the support staff -- would they

20   be living with you, was that your intention, or would

21   they be coming and going, relieving each other, if you

22   will?

23     A.      They would be coming and going.

24     Q.      And how did you envision them accomplishing

25   that?

Case 3:17-cv-07357-RS Document 196-1 Filed 01/22/23 Page 152 of 254

1    A.    I was contemplating hiring a security guard for

2  nighttime protection.  Other people would come and

3  attend to the daily needs.

4    Q.    I guess my question is, physically how would

5  you envision them getting there?  How would they get to

6  and from the center median?  For example, how would they

7  get to the event?

8    A.    They would cross at a pedestrian crossing.  I

9  believe the center median extends all the way from the

10  intersection.  They would walk the center median to my

11  location and do whatever it is they have to do.

12    Q.    And then obviously the reverse to leave.

13    A.    Yes.

14    Q.    And where were they going to be parking their

15  vehicles?  Where did you envision that occurring?

16    A.    I didn't really get that far.  They could have

17  had one person driving a car or truck around, another

18  person descending and going to the median.  It would

19  have been up for grabs.  Maybe we could have negotiated

20  a parking space in the complex on the other side of

21  Sand Hill Road.  I was contemplating that.  There were

22  some contingency plans, in other words.

23    Q.    Did you actually communicate with the folks on

24  the opposite side of Sand Hill Road to talk to them

25  about the idea of renting out or leasing some parking

123

1    spaces during your event?

2        A.    No, I didn't.  Because my first priority on

3    which everything else was contingent was to get to an

4    approval point with the City of Menlo Park.

5        Q.    Continuing down on page Bates number 236, the

6    first page of your application, there's a section

7    entitled Temporary lighting.  Do you see that?

8        A.    Yes.

9        Q.    And you indicate that there would be temporary

10   lighting, correct?

11       A.    Yes.

12       Q.    And that would consist of portable spotlights

13   focused on display.

14       A.    That is right.

15       Q.    When you say display, what are you referring

16   to?

17       A.    The 55-inch television screen.

18       Q.    So there would be -- now, the television screen

19   is self-illuminating, correct?

20       A.    Yes, but around it I intended to display the

21   same kind of signage that you have shown to me in the

22   photographs.

23       Q.    The placards?

24       A.    Yes.

25       Q.    So you envisioned having the television monitor

124

1    in the back of the bed of your truck and then displaying

2    those posters or placards that we previously looked at

3    along the center median as well, and you envisioned

4    having portable spotlights focused on the placards?

5        A.    That is correct.

6        Q.    Okay.

7        A.    If I may, if you wish to think, if you wish to

8    understand what I had in mind, as you are driving, say,

9    on 280 you will see some billboards, some animations

10   even.  That was the kind of thing I was trying to

11   achieve.

12       Q.    So you were trying not just to catch the

13   attention of the folks working and/or driving along

14   Sand Hill Road, but to catch the eye, if you will, of

15   folks driving either north or south on 280?

16       A.    No.  I mentioned 280 in order to give you a

17   reference point.

18       Q.    Yeah.  Of where this would be occurring.

19       A.    No.  What kind of display it would be.

20       Q.    Okay.

21       A.    It would be just like some kinds of

22   advertisement that you see when you drive along the

23   freeway.

24       Q.    I see those more on 101 than I do on 280.

25   That's why I was questioning.

125

1    A.    You're right.  I haven't been here in a couple

2    of years.  Yes, 101 it is.

3    Q.    So basically advertising on the road, that kind

4    of thing.

5    A.    Yes.

6    Q.    Okay.  Thank you for clarifying that.

7          And I don't want to go through this entire

8    application, but would it be fair and correct that when

9    you filled this out, this was an accurate representation

10   of what you intended to do out there?

11   A.    With the caveat that my whole attitude in this

12   process was to comply with any reasonable requirement

13   that the City might impose.  And I believe I have

14   articulated that repeatedly in my emails.

15   Q.    Okay.

16         MR. MASTER:  Go ahead and mark this next.  I'm

17   sorry.

18                (Defendants' Exhibit 5 marked for

19                 identification.)

20         MR. MASTER:  Q.  So I'm showing you,

21   Mr. Zeleny, what's been marked as Exhibit 5.  The other

22   copy is the same thing.  This is for your attorney, if

23   he wants it.

24   A.    Yes.

25   Q.    I'll ask you just to take a moment or take as

126

1    much time as you'd like to look through what's been

2    marked as Exhibit 5, which I will reference is an email

3    chain Bates numbered MP290 through 294 and then --

4    actually, it's 295, with the last page being a

5    black-and-white photocopy of a photograph.

6        A.    Right.

7        Q.    Have you seen what's been marked as Exhibit 5

8    prior to today?

9        A.    I have composed it so, yes, I have seen it.

10       Q.    And would it be fair to say, without getting

11   into each of the emails, that this is a true and correct

12   copy or representation of communications that you had

13   with Menlo Park, either the City and/or Bill McClure,

14   the City Attorney, between the date of your application

15   dated July 10th, 2015 and July 28, 2015, which is the

16   email on the first page of Exhibit 5?

17       A.    To answer with the utmost precision that I can

18   muster, I'm not in a position at this time to judge

19   whether or not any kind of editing has been performed on

20   this particular document.  What I see appears to me to

21   be a true and correct printout of the email, but I

22   cannot vouch for it not having been modified by

23   somebody.

24       Q.    Why don't you go ahead and take the time to

25   read through the email just to confirm.  Because the

127

1    only thing I want to make sure of is that we're on the

2    same page and that I am showing you a true and correct

3    copy of emails that you have prepared and that have not

4    been edited.  Okay?

5        A.    The only way I could do that would be to look

6    at my email client and compare this document to that.  I

7    don't think that's practicable.

8        Q.    Okay.

9        A.    So let's say for the sake of argument that I

10   concede that there's a very high probability that this

11   hasn't been tampered with.

12       Q.    Well, what I'd like you to do, sir, so we don't

13   have to argue one way or the other on that is to take an

14   opportunity to read through your emails that are

15   attached within Exhibit 5 and, to your point, to the

16   best of the your ability indicate whether or not it

17   appears to be an email that you prepared, to the best of

18   your knowledge, and/or whether or not there is something

19   in here in one of your emails that clearly in your

20   opinion does not exemplify something that you would have

21   written.  Okay?

22       A.    Again, I'm not in a position to vouch for every

23   word here having been composed by me.  Like I say, the

24   best I can -- I can tell you at this time without

25   looking at my copy that is on my clients -- we have a

128

1    computer here that I could compare it to, if you wish --

2    again, this does not appear to have been tampered with,

3    but I can't vouch for it.

4        Q.    I'll represent to you that these are emails

5    that the City IT team, if you will, pulled off of the

6    City's server and were sent to me, which I printed out

7    and gave to you and which are in front of you today.

8            So with that being said, let me ask you this.

9    Looking at your email dated -- let me ask you, the first

10   page of Exhibit 5, does this appear to be an email that

11   you prepared?

12       A.    As I said, yes, it has that appearance.

13       Q.    Okay.  And it's dated July 28, 2015.  Do you

14   see that?

15       A.    I see that.

16       Q.    And do you recall sending an email to

17   Mr. McClure and the individuals identified in the CC on

18   or about that date in response to the City's initial

19   response to your special event permit?

20       A.    I do.

21       Q.    Okay.  Now, in your email at the top there it

22   refers to attachments and it reads Browning

23   M1919A4.jpeg.  Do you see that?

24       A.    That is right.

25       Q.    And if you look to the last page of Exhibit 5,

129

1    there is a black-and-white photocopy.  Is this

2    a photocopy of the attachment that was included with

3    your email of July 28, 2015?

4       A.    That is it, yes.

5       Q.    And is this the actual Browning that you

6    intended to bring with you to the event that's described

7    in Exhibit 2?

8       A.    From the tripod's head up it is the actual

9    weapon.  The tripod would have been different.  It would

10   have been much taller.

11      Q.    Much taller, okay.

12      A.    I do have this tripod as well.  I didn't intend

13   to use it.

14      Q.    So the photograph that's attached to Exhibit 5,

15   is that a photograph of your actual Browning?

16      A.    That is right.

17      Q.    Okay.

18            Let's go ahead and mark the next.

19                  (Defendants' Exhibit 6 marked for

20                  identification.)

21            MR. MASTER:  Q.  So I went ahead and marked as

22   Exhibit 6 to your deposition a September 21, 2015 letter

23   from the Office of the City Attorney of Menlo Park,

24   William McClure, City Attorney, addressed to you via

25   email and Bates numbered MP000352 through MP000355.

```
                                                              130
 1            Have you seen this correspondence before today?

 2      A.    Yes, I have.

 3      Q.    Okay.  And the email address that's identified

 4   on the first page of Exhibit 6, is that your email

 5   address?

 6      A.    Yes, it is, michael@massmeans.com.

 7      Q.    Do you recall receiving an email of this

 8   correspondence on or about September 21st, 2015?

 9      A.    Yes, I do.

10      Q.    And did you understand this to be the City's

11   response or initial response to your special event

12   permit application?

13      A.    I did.

14      Q.    And you understood the City to be denying your

15   application and the reasons are explained herein?

16      A.    Yes.

17      Q.    And attached to this correspondence is a

18   two-page document entitled Film Production in Menlo

19   Park.  Do you see that?

20      A.    Yes.

21      Q.    Do you recall this attachment being included

22   with this email that you received?

23      A.    Yes.

24      Q.    And at that point in time did you have any

25   desire to apply to the City for permission to do a film
```

1   production in the City pursuant to the two pages that

2   were attached to this letter?

3       A.    My intention was to exhaust every opportunity

4   at getting my special event permit approved.  The

5   application for a film permit would have followed if my

6   application were deemed unsuccessful.

7       Q.    So the idea was to exhaust the special event

8   permit process first.  If that --

9       A.    Yes.  Sorry.

10      Q.    That's all right.

11            If that didn't succeed, in your mind, then you

12  would pursue the film permit?

13      A.    That's right.

14      Q.    Okay.

15            Sorry.  We're going to keep doing this for a

16  while here.  Another document marked next in order.

17                  (Defendants' Exhibit 7 marked for

18                   identification.)

19            MR. MASTER:  Q.  Mr. Zeleny, I'm showing you

20  what's been marked Exhibit 7, which I'll represent to

21  you is an email chain, a chain of emails in two

22  thousand -- bear with me -- 2015 to 2016.  The Bates

23  numbers are MP435 through MP450.  And I'll give you a

24  moment to kind of look through that or read it at your

25  leisure, and then I'll ask you a couple questions.

136

1    you a minute to get there.

2        A.    439A.  Yes, I do.

3        Q.    Are you familiar with what's depicted on this

4    page of Exhibit 7?

5        A.    Yes, I am.

6        Q.    And what's depicted in this Google map, or map,

7    if you will?

8        A.    It is a depiction of the median strip of

9    Sand Hill Road extending to the intersection and back to

10   280 and beyond.  And the dark rectangle is where I was

11   proposing to park my truck.

12       Q.    Okay.  And is this a Google map that you

13   prepared?

14       A.    It's a Google map that I prepared to the extent

15   of putting a black rectangle there required preparation.

16       Q.    Right.  And did you put the address points, or

17   whatnot, for where New Enterprise Associates is located?

18   Is that something you did in your search to create this?

19       A.    No, that's all from Google except for the black

20   rectangle.

21       Q.    Let me show you -- if you continue on within

22   Exhibit 7, the next page appears to be your special

23   event application.

24       A.    440?

25       Q.    Yes, 440.

143

1    Q.    -- bed and cabin, as driven to and parked at

2    the designated location?

3    A.    Yes.

4    Q.    The designated location is the area that you

5    identify with the -- well, it's a red rectangle, but we

6    have a black-and-white copy of that in the prior

7    exhibit?

8    A.    Yes.

9    Q.    And that's in the center median, correct?

10   A.    Yes.

11   Q.    And you continue to write in that paragraph

12   that you will remain on-site around the clock until NEA

13   publicly acknowledges its wrongdoing, et cetera; is that

14   correct?

15   A.    Yes.

16   Q.    Okay.  So you indicated earlier that your

17   application, you had modified it so that you would be

18   there throughout October 2015 rather than starting

19   October 15 and going indefinitely.

20         Do you remember that?

21   A.    Yes.

22   Q.    By way of this email are you now suggesting

23   that you're going to be there until NEA publicly

24   acknowledges what they're doing, whether that occurs in

25   one day or 31 days or 60 days, or whatever days?

144

1      A.     Okay.  My expectation based on my previous

2  appearances was that once I started that, NEA would not

3  exist in its present form for longer than 30 days from

4  the start.

5      Q.     So you thought you could get done what you

6  needed to get done and get them to acknowledge their

7  wrongdoing within the month of October?

8      A.     If you recall, 2016 was when the Me Too

9  Movement started getting prominent.  My expectation

10  would have been based on previous disclosures by NEA

11  that they're not exactly on a very firm footing in this

12  matter, and I would have fully expected their company to

13  implode within -- well before the 31-day term would have

14  ran out.

15          MR. MASTER:  Okay.  Let's mark this.

16          And you can put that here, sir.  These are

17  always here if you need to reference them.

18          Let's mark that next.  Forgive me, I'm not sure

19  why I printed it out so small, but we'll do our best

20  here.

21              (Defendants' Exhibit 10 marked for

22                  identification.)

23          MR. ROBINSON:  This is 10?

24          MR. MASTER:  Yeah.

25          MR. ROBINSON:  Todd, whenever you get to a

165

1          A.      No, that is not correct.

2          Q.      What's incorrect about it?

3          A.      I requested the City to recognize my exemption

4     from a ban on open and concealed carry of firearms

5     pursuant to my acting as an authorized participant in a

6     video production.  The City declined to recognize my

7     status like that based on their interpretation of

8     authorization lying exclusively with the City and not

9     with any member of the production itself.

10         Q.      Okay.  Let me ask you a question about that, a

11    couple questions about that.  Number one, did you ever

12    have any intention to conduct your protest without

13    firearms?

14         A.      No.

15         Q.      Why not?

16         A.      As I said before, I found firearms, conspicuous

17    display of firearms to be the best way of attracting

18    attention to my cause.  I also found that the State of

19    California has carved out exemptions to the ban on open

20    and concealed carry of firearms that apply to authorized

21    participants in entertainment events and/or film or

22    video productions.

23              Pursuant to these statutes, I intended to hold

24    myself out as an authorized participant, not requiring

25    authorization from anybody but the parties conducting

175

1     A.     Yes.

2     Q.     And did you receive each of these documents on

3 or about September 5, 2017?

4     A.     I did.

5     Q.     And you understood this to be the City Council

6 advising you or the City advising you of the City

7 Council's decision to deny the appeal of your special

8 event permit application; is that correct?

9     A.     Yes.

10           MR. MASTER:  Okay.  I've got the next one.

11                (Defendants' Exhibit 19 marked for

12                identification.)

13           MR. MASTER:  Q.  Mr. Zeleny, do you recognize

14 what's been marked as Exhibit 19?

15    A.     Yes.

16    Q.     And just for the record, Exhibit 19 is a

17 two-page email exchange Bates numbered MP1221 through

18 1222.  And this appears to be your response to the

19 City's September 5th, 2017 denial of your special event

20 permit application dated September 7, 2017; is that

21 correct?

22    A.     Yes.

23    Q.     And by way of your email to Ms. Harada, who is

24 the City Clerk, you're requesting that Menlo Park

25 reconsider your special event permit application as

176

1   requesting a film permit?

2     A.     That's correct.

3     Q.     Okay.  And we discussed that earlier today

4   whereby you wanted to run the course of the special

5   event permit and, depending on what happened there, you

6   would then proceed with the film permit, correct?

7     A.     Yes.

8          MR. MASTER:  Let's go ahead and mark this next.

9               (Defendants' Exhibit 20 marked for

10              identification.)

11         MR. MASTER:  Q.  Mr. Zeleny, I'm showing you

12  what's been marked as Exhibit 20, which is an email

13  chain including a, it looks like your application for

14  the film -- strike that -- along with some information

15  from the City concerning your desire to seek a film

16  permit.

17     A.     Yeah.

18     Q.     It's Bates numbered 1231 through 1238.

19         My question to you is, do you recall receiving

20  either the email from Mr. Milde or, sorry, Mr. Toews,

21  T-o-e-w-s, dated September 28, 2017?

22     A.     That's how you pronounce it.

23     Q.     Yeah.

24     A.     Yes, I do.

25     Q.     And by way of his September 28, 2017 email he

181

1    A.    The television set that I have and that I have

2    offered as the major prop in this does have its own

3    speakers.  I was not planning to amplify it

4    significantly past that.

5    Q.    Are we talking about music?  What kind of sound

6    is going to be emanating from this?  Because we talked

7    about the animation.  Was there sound associated with

8    the animation that would be on the TV?

9    A.    I would have commissioned a musical

10   performance.  That was the plan.  And I would have

11   played it out in the course of the event.

12   Q.    Did you describe that in any particularity at

13   all in your film permit application?

14   A.    No, that was up in the air.  And as I said,

15   time, place, and manner would have been subject to

16   discussion and amendment.  So, in particular, I would

17   comply or attempt to comply with all reasonable requests

18   about the volume and the -- anything other than content

19   essentially.

20   Q.    And you mentioned that you'd have cameras

21   directed to capture the public's response to your

22   presentation?

23   A.    That was the intent, yes.

24   Q.    When you say cameras, video?  Still cameras?

25   Both?

182

1    A.    Both.

2    Q.    And are you looking to capture -- when you say

3    the public response, you're talking about vehicles?

4    Cyclists?  Pedestrians?  All the above?

5    A.    I can't recall ever having seen a pedestrian on

6    that part, on that stretch of Sand Hill Road.  There is

7    a lot of traffic that goes past these points.  The first

8    wave is in the morning and the second wave is late

9    afternoon.  So my interest was in filming the drivers

10   and passengers that go by the display, that look at it,

11   and that react to it.

12   Q.    And what are you hoping to get at in terms of a

13   response from these folks?  What reaction are you

14   looking for from these people?

15   A.    It's not what reaction I'm looking for.  It's

16   more of the kind of reaction I had received previously.

17   I'm making a pretty outrageous allegation.  This

18   allegation, quite significantly, has never been denied

19   by any interested party.  The City apparently assumes no

20   position in the matter.  NEA apparently assumes no

21   position in the matter.  Min Zhu never even denied the

22   accusation in the deposition that we have taken of him.

23        The display of this to people who are

24   integrated, presumably most of them are well-integrated

25   in the Menlo Park community, which is a very prestigious

1  community, it interested me to see how they would

2  respond to a disclosure of something that outrageous

3  happening in their community.

4         To that effect, I have previously received

5  responses, I have photographed them, I have videographed

6  them.  There was a whole spectrum.

7     Q.    What kinds of responses?

8     A.    Some people were outraged, some people

9  expressed support.  There was a girl that was delivering

10 food to Rosewood Complex.  She gave me some drinks on

11 several occasions.  I think she may have had some

12 personal interest in preventing child molestation.

13 There were firemen that egged me on pretty much, gave me

14 (indicating).

15    Q.    Pulled the horn?

16    A.    Gave me a visible gesture of approval.

17 Initially even the police officers of Menlo Park Police

18 have approved of this starting in 2006, I believe.  So

19 there was a whole spectrum.

20        On the other hand, I have received a phone call

21 on one occasion in 2012 of a woman who represented

22 herself as a mother of children, who was conducting them

23 to school.  She had her husband and their father working

24 at NEA, and the children have expressed -- had expressed

25 a concern for the safety of their father.  So she aired

184

1    it out to me.

2        Q.    What did you hope to do with the public

3    responses that you were filming?  What would you do with

4    those responses?

5        A.    Shut down NEA.

6        Q.    Well, okay.  I know that's the goal.  But

7    physically what would you do with them?  You're going to

8    be photographing people and videoing responses.  What

9    would you be doing with the photographs and/or the video

10   that you're taking of drivers passing by and their

11   responses to your --

12       A.    Publicizing them by every means available to

13   me.

14       Q.    On the internet?

15       A.    Wherever.  Including the journalist that

16   previously expressed interest in this matter.

17       Q.    And when you say their reactions, you're

18   talking about reactions to the placards, the television

19   monitor, the display on the television monitor, and/or

20   the firearms?  What reactions are you looking for?

21       A.    It's not what reactions I'm looking for.  I

22   take whatever I get.  I have a genuine interest in how

23   the general public considers this matter.  I find it to

24   be pretty outrageous, but that's based on my own

25   beliefs.

1    Q.    What's outrageous?

2    A.    That a company that holds itself out as the

3    wealthiest, most important venture capital firm in the

4    world would knowingly and deliberately sponsor somebody

5    who has been credibly accused of incestuous child rape

6    and fled the country as a result of disclosing this

7    accusation.

8    Q.    And I believe you said in one of the emails

9    when it was asked of you that in terms of reactions, you

10   weren't intending to point a firearm at someone and get

11   their reaction.

12   A.    Never.

13   Q.    Okay.  So your plan in terms of getting

14   reactions was to have the firearms present, not pointed

15   at anybody, but have your television screen on the back

16   of your -- well, this wouldn't be in the back of a truck

17   now, this would be on the corner of Sand Hill Road and

18   the entrance to Rosewood -- having all that there and

19   just filming reactions to all of it taken as a whole?

20   A.    That's right.

21         MR. MASTER:  Let's do this one next.

22              (Defendants' Exhibit 22 marked for

23              identification.)

24         MR. MASTER:  Q.  What I went ahead and marked

25   as Exhibit 22 appears to be a follow-up email that you

1   to be with the special event permit, but in this

2   particular instance where you were going to put the

3   guns, where you were going to put the TV monitor, where

4   you were going to put the generator; you just felt like

5   that wasn't your responsibility?

6      A.    Based on my previous exchanges with the City

7   starting in 2015 and leading up to December 21st of

8   2017, my last communication with them, I received a firm

9   impression of a game being played where I am asked to

10   spell out the criteria for my entertainment event,

11   first, second, film permit, and then the City would come

12   up with objections to the specific criteria.

13        The caselaw from the Ninth Circuit that I have

14   cited, the ruling in *Epona, LLC v. County of Ventura*,

15   clearly and unambiguously says that that is

16   impermissible.  It is up to the local authorities to

17   spell out the criteria with which an applicant may

18   attempt subsequently to comply.  That hasn't happened.

19      Q.    Okay.  Why are you applying for a film permit?

20      A.    I think I already answered that.  I was

21   applying for a film permit in order to display my

22   animations and associated content and film the responses

23   of the drivers that pass by that display on Sand Hill

24   Road.  That is a film.  That is a film production.

25      Q.    Anything to do with your desire to carry

209

1    unloaded firearms?

2        A.    Absolutely, yes.  I am -- as an authorized

3    participant in a film production, I am allowed by

4    California law to carry unloaded firearms in the process

5    of that production.

6        Q.    Okay.  And so as part of this film permit we

7    discussed earlier -- I'm looking at Exhibit 24.  I'm

8    sorry to jump around on you.

9        A.    No problem.

10       Q.    On the first page of Exhibit 24, this is your

11   November 9, 2017 email to Mr. Toews answering some

12   questions.  In paragraph 4 relating to the site plan,

13   you reference the 55-inch SunBrite outdoor television

14   being mounted in a Gator G-Tour E-Lift powered by a

15   generator.

16            Do you see that?

17       A.    That is right.

18       Q.    Where did you envision placing that?

19       A.    I was envisioning placing that on the City

20   grounds that run along Sand Hill Road where there is no

21   sidewalk.

22       Q.    So would that be on the pavement or would it be

23   in the brush, the dirt?

24       A.    That would be in the brush and the dirt where

25   the cars don't drive.

210

1    Q.    Okay.  But not in the center median.  You're

2   talking about on the side closest to NEA.

3    A.    The center median issue had been resolved.  The

4   City declined to accommodate me and the center median in

5   the course of my application for an entertainment

6   permit.  So I didn't revisit that.

7    Q.    Okay.

8    A.    Because that was the one instance in which the

9   City -- I can't think of any other one -- in which the

10   City actually spelled out its criteria.

11    Q.    Okay.  And how were you intending to get the

12   television, the E-Lift, the generator, and all the

13   equipment identified on Exhibit 24 to that location?

14    A.    I expected to have somebody that I hired to

15   drive a truck there to stop there for a few minutes, as

16   allowed by the Vehicle Code, and to unload the equipment

17   with me and then to set it up after -- well, I wouldn't.

18   Somebody else would set it up after the truck drives

19   away.

20    Q.    Would they be stopped on the side of Sand Hill

21   Road?

22    A.    I think so, yes.  That was what I was

23   contemplating.  If the City had objected to it, I would

24   have found some other way.

25    Q.    Have you ever been convicted of a felony?

211

1    A.    No.

2    Q.    Okay.

3    A.    Not even a misdemeanor.

4        MR. MASTER:  Damion, I'm just going to refer to

5    the complaint and just ask a couple of questions.  I

6    want to make sure that he has it in front of him.  I'm

7    not going to attach it as an exhibit.  It's a filed

8    document.

9    Q.    This is document number one in this case,

10   Complaint for Declaratory and Injunctive Relief.  And

11   I'm going to refer you to page 6.

12       And before I ask you this question, sir, I

13   should have asked you this.  I asked earlier but just

14   now that you have the document in front of you, you've

15   read this document before today, correct?

16   A.    I did.

17   Q.    And when you read through it, you concluded

18   that everything was accurate in terms of what was set

19   forth in there?

20   A.    Yes.

21   Q.    Okay.  So at line 14 on page 6 of the

22   complaint, it's under the caption "Zeleny becomes aware

23   of Min Zhu's conduct."  Do you see that?

24   A.    Yes.

25   Q.    So my question here in paragraph 27 where you

212

1  describe becoming aware of his conduct when you

2  developed a professional and personal relationship with

3  Erin Zhu, and you say here from the early 1990's to

4  2000, my question is, in 2000, is that when either the

5  professional relationship terminated or the personal

6  relationship terminated or both terminated?

7     A.    Our personal relationship terminated around

8  '95, I believe.  Erin and her boyfriend at the time

9  lived in my house for several years.  We also, Erin and

10  I and five of our employees, maintained a business

11  there, first a partnership and, secondly, a corporation

12  that was created in keeping with a deal that Erin had

13  made with WebEx on our behalf.

14     Q.    And what was the name of your company?

15     A.    Our partnership was named ptyx.  That's Peter,

16  Thomas, Y, and X.  And the corporation was called Live

17  Share, as I previously said.

18     Q.    And do you still maintain a professional

19  relationship with Ms. Zhu?

20     A.    Not at all.

21     Q.    So if the personal relationship ended in 1995,

22  when did your professional relationship end with her?

23     A.    We entered a dissolution agreement in late '99.

24  Erin performed under it for about a year, and at the end

25  of 2000 she declined to continue.

213

1      Q.      Okay.

2      A.      So that's when we stopped being business

3    associates.

4      Q.      Okay.  So as of the end -- well, 1999 or early

5    2000, that would be when you last had communication with

6    Ms. Zhu or a relationship with her in any capacity?

7      A.      I had her deposed in a lawsuit.  In my lawsuit

8    against her and her parents and WebEx I had her deposed.

9    That deposition took place in 2004, late 2004, if memory

10   serves.  That was the last time I saw her.

11     Q.      Okay.  And so just a practical question.  I

12   appreciate your concern about what you claim Mr. Zhu to

13   have done, which is horrific.  But given -- I'm sorry.

14   Go ahead.

15     A.      One thing, I have to amend my previous

16   response.  Looking at this, these dates, I was mistaken

17   in saying that I filed my lawsuit in late 1999.  It was

18   actually in late 2000.

19     Q.      Okay.  Thank you.  That was your lawsuit

20   against WebEx?

21     A.      Correct.

22     Q.      Okay.  Thank you.

23             So the question is, the outstanding one I

24   prefaced just a moment ago, was why 20 years later are

25   you still doing what you're doing in terms of protesting

217

1    right for the most effective way of exposing this

2    horrendous conduct.

3        Q.    Okay.

4        A.    That does, in fact, as I said previously,

5    involve exposed and conspicuous carry of firearms

6    because I found through experience that that attracts

7    the most attention.

8        Q.    Okay.  And have you been told by the City that

9    if you complete your application for a film permit, that

10   you would be permitted to carry, openly carry unloaded

11   weapons as part of an issued film permit?

12       A.    That is what the City said.  But at the same

13   time, the City declined to spell out the conditions that

14   it imposed on approving the permits.

15       Q.    Okay.

16       A.    And the Ninth Circuit case that I previously

17   cited identified that kind of behavior as impermissible

18   violation of the First Amendment.

19       Q.    Did the City ever tell you that your film

20   permit was actually denied or did the City tell you that

21   your film permit was incomplete?

22       A.    The City told me that my film permit was

23   incomplete.  The City also told me -- invited me to

24   complete it, while declining to spell out the criteria

25   under which it would be considered.

220

1          I, JUDY BRENNAN, a Certified Shorthand Reporter

2     duly licensed by the State of California, do hereby

3     certify:

4          That MICHAEL ZELENY, the witness in the

5     foregoing deposition, was by me duly sworn to testify

6     the truth, the whole truth, and nothing but the truth,

7     in the within-entitled cause;

8          That said deposition was reported at the time

9     and place therein stated by me, and thereafter

10    transcribed under my direction;

11         That when so transcribed, the witness was

12    afforded the opportunity to read, correct and sign the

13    deposition.

14         I further certify that I am not interested in

15    the outcome of said action, nor connected with, nor

16    related to, any of the parties in said action or to

17    their respective Counsel.

18         IN WITNESS WHEREOF, I have hereunto set my hand

19    this _____ day of April, 2019.

20

21                    _____

22                    JUDY BRENNAN, CSR NO. 5138

23

24

25

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO


MICHAEL ZELENY, an individual,

       Plaintiff,

   vs.                        No. 17-cv-07357-RS

EDMUND G. BROWN, JR., an
individual, in his official
capacity, et al.,

       Defendants.

_____/

**EXHIBITS (VOLUME 1) 1 - 17**

**to the**

DEPOSITION OF MICHAEL ZELENY

Monday, March 18, 2019

1100 Alma Street, Suite 210

Menlo Park, California


MADELEINE M. FREDA, INC.
Certified Shorthand Reporters

Reported by:              2000 Broadway
   Judy Brennan          P.O. Box 3119
   CSR No. 5138          Redwood City, CA 94064
Our File No. 40464      (650) 365-6152

**From:** larvatus@gmail.com <larvatus@gmail.com>
**To:** Bruce Goitia <policechief@menlopark.org>
**Cc:** Subrah Iyar <Subrah.Iyar@webex.com>; Scott Sandell; David W. Affeld <DWA@affeldlaw.com>
**Sent:** Mon Oct 26 16:25:20 2009
**Subject:** Notice of Public Protests in Menlo Park

Dear Chief Goitia,

Please be advised that my associates and I will hold open-ended peaceful public protests starting 27 October 2009, in front of NEA, 2855 Sand Hill Road, Menlo Park, CA 94025 and Cisco/WebEx, 3979 Freedom Cir, Santa Clara, CA 95054. The purpose of the demonstrations will be to protest Subrah Iyar's employment by Cisco/WebEx and Scott Sandell's employment by NEA and Min Zhu's association with it, as explained at http://www.subrah.com.

My associates and I will exercise a right to free expression on private property readily accessible to general public, pursuant to the rulings in *Pruneyard Shopping Center v. Robins*, 447 U.S. 74 (1980) and progeny. It is our belief that the strip of private property directly in front of the main entrances to 2855 Sand Hill Road, Menlo Park, CA 94025 and 3979 Freedom Cir, Santa Clara, CA 95054 falls within the purview of *Pruneyard* in virtue of housing several unrelated businesses and being readily accessible to the general public. Additionally, owing to death threats received in the matter at issue, and police and hotel management misconduct at a previous event, we shall exercise our right to bear arms pursuant to the Second Amendment of the U.S. Constitution and all applicable federal and state laws, by carrying exposed, unloaded firearms, legally owned by my associates and me in the state of California, accompanied by loaded magazines and speedloaders, subject to the definitions of *People v. Clark*, 45 Cal.App.4th 1147, 53 Cal.Rptr. 2d 99. None of the firearms in question will qualify as assault weapons under California law, as listed or described in Penal Code Sections 12276, 12276.1, and 12276.5. My associates and I agree to Section 12031(e) inspections of our firearms on demand by police officers. Please take note of case law, beginning with *Florida v. J.L.*, 529 U.S. 266 (2000), to the effect that detaining a man observed as openly carrying an unloaded firearm in public violates the Fourth Amendment. My associates and I are pledged to abide by all applicable laws. Our prior events in San Diego, Milpitas, and Santa Clara were unmarked by any disturbances, and we hope that the same will be the case in your jurisdiction. We intend to enforce our right to free expression to the full extent of the law, against any illegal infringement. We will not interfere in any way with the operation of NEA, Cisco/WebEx, or any of their employees, associates, or visitors, including, but not limited to, Iyar and Sandell. Concerned parties may address their communications to my lawyer David W. Affeld, 12400 Wilshire Boulevard, Suite 1180, Los Angeles CA 90025, phone: (310) 979-8700, fax: (310) 979-8701. I may be reached at the number listed below.

Michael Zeleny@post.harvard.edu -- http://larvatus.livejournal.com/ -- 7576 Willow Glen Road, Los Angeles, CA 90046 -- 323.363.1860
All of old. Nothing else ever. Ever tried. Ever failed. No matter. Try again. Fail again. Fail better. -- Samuel Beckett

**Ex. No.** 1
Plf.☐ Deft.☑ Pet.☐ Rsp.☐
Wit: *Zeleny*
Date: *3.18.19*
Judy Brennan, CSR #5138

MP000002

This electronic mail message, including any attachments hereto, is intended only for the
addressee and may contain privileged and/or confidential information. If you are not the
addressee indicated in this message (or responsible for delivery of the message to such
person), you are hereby notified that you must not use, disseminate, copy it in any form,
or take any action based upon it. If you have received this message by error, please
immediately delete it and any copies of it, including any attachments hereto, and notify
the sender at New Enterprise Associates by reply electronic mail message, fax or phone.
Thank you.

Confidentiality Notice: The Information in this e-mail (including attachments, if any) is
considered confidential and is intended only for the recipient(s) listed above. Any review,
use, disclosure, distribution or copying of this e-mail is prohibited except by or on behalf of
the intended recipient. If you have received this email in error, please notify me
immediately by reply email, delete this email, and do not disclose its contents to anyone.

Bingham McCutchen LLP Circular 230 Notice: To ensure compliance with IRS requirements,
we inform you that any U.S. federal tax advice contained in this communication is not
intended or written to be used, and cannot be used by any taxpayer, for the purpose of
avoiding any federal tax penalties. Any legal advice expressed in this message is being
delivered to you solely for your use in connection with the matters addressed herein and
may not be relied upon by any other person or entity or used for any other purpose without
our prior written consent.

MP000003

| From: | jarvatus@gmail.com on behalf of Michael Zeleny |
|---|---|
| To: | McClure, William; Scott Sandell; Milde, Matt L; Police Chief |
| Cc: | David W. Affeld; Peter Shimamoto |
| Subject: | Special Event Permit Application |
| Date: | Friday, July 10, 2015 11:05:37 AM |
| Attachments: | Special Event Permits - Completed Application - signed.pdf |

Michael Zeleny
michael@massmeans.com
zeleny@post.harvard.edu
7576 Willow Glen Road, Los Angeles, CA 90046
voice:323.363.1860
fax:323.410.2373

City of Menlo Park
Matt Milde
Recreation Program Coordinator
mlmilde@menlopark.org
701 Laurel Street
Menlo Park, CA 94025
voice:650.330.2223
fax:650.330.2242

By email, fax, and postal mail.

Starting in October 2015, we shall maintain a portable multimedia presentation illustrating
ongoing corporate support of New Enterprise Associates (NEA) for incestuous child rapist
Min Zhu, and continuing until NEA publicly acknowledges its wrongdoing and severs its
relationship with Min Zhu, Scott Sandell, and Dick Kramlich. I shall be present on site around
the clock, served by support staff and equipped with fully operational, exposed and unloaded
military grade firearms and loaded ammunition feeding devices therefor, including without
limitation, a 9mm Para semiautomatic SIG P210 pistol, and a 7.65x51mm NATO
semiautomatic LRB M25 rifle and tripod-mounted belt-fed Browning M1919a4, in full
compliance with all applicable laws. A 55" portable media display powered by a portable gas
generator will display videos featuring explicit representations of sexual violence committed
by NEA's publicly disgraced protégé. A sample image can be found at
http://larvatus.livejournal.com/371973.html. All media aspects of this event will be subject to
content-neutral regulation negotiated with Menlo Park authorities. My fundamental rights
under the First and Second Amendments of the Constitution of the United States are reserved
and non-negotiable.

A site map can be found at https://www.google.com/maps/@37.4197308,-122.2137188,17z/.
My display will be confined to the median strip on Sand Hill Road directly across the NEA
headquarters. No obstruction of automotive or foot traffic will take place. Please contact me to
arrange for the payment of the special event fee and discuss any organizational matters. Please
address all legal inquiries and requests to David W. Affeld, Affeld Grivakes Zucker
LLP, 2049 Century Park East, Suite 2460, Los Angeles, CA 90067, voice:310.979.8700,
fax:310.979.8701.

cc:



Ex. No. 2
Plf.□ Deft.□ Pet.□ Rsp.□
Wit: Zeleny
Date: 3.18.19
Judy Brennan, CSR #5138

MP000234

Bill McClure
Menlo Park City Attorney
wlm@jsmf.com voice:650-330-6610
Jorgenson, Siegel, McClure & Flegel, LLP
1100 Alma Street, Suite 210
Menlo Park, CA 94025
voice:650.324.9300
fax:650.324.0227

Robert Jonsen
Menlo Park Police Chief
policechief@menlopark.org
701 Laurel St.
Menlo Park, CA 94025
voice:650.330.6600

Scott Sandell
New Enterprise Associates
ssandell@nea.com
2855 Sand Hill Road
Menlo Park, CA 94025
United States
voice:650.854.9499
fax:650.854.9397


Michael@massmeans.com | Zeleny@post.harvard.edu | 7576 Willow Glen Road, Los
Angeles, CA 90046 | voice:323.363.1860 | fax:323.410.2373
http://larvatus.livejournal.com | "All of old. Nothing else ever. Ever tried. Ever failed. No
matter. Try again. Fail again. Fail better." — Samuel Beckett

MP000235





# CITY OF MENLO PARK
## Special Event Application
701 Laurel Street, Menlo Park, CA 94025  Ph: 650-330-2223  Fax: 650-330-2242

| | | | |
|---|---|---|---|
| Applicant Name:  Michael Zeleny | | | |
| Organization Name:  Mass Means, Inc. | | | |
| Name of Event:  Child Rape Tools | | | |
| Address: 7576 Willow Glen Rd | City: Los Angeles | State: CA | Zip: 90046 |
| Home Phone: 323-363-1860 | Alternate Phone: none | | |
| E-mail Address: zeleny@post.harvard.edu | Fax: 323-410-2373 | | |
| Estimated Attendance: drive-by only | Event open the public: Yes ☒ No ☐ | | |
| Number of Event Staff: 1 | Number of Event Volunteers:  5 | | |

Purpose of Event:  Outing New Enterprise Associates as the corporate sponsors of incestuous child rapist Min Zhu.

Location of Event (please be specific and attach map): 2825 Sand Hill Rd, Menlo Park, CA 94025, at the median strip, per the attached.

| Event Timeline | Day | Date | Start Time | End Time | Total Hours |
|---|---|---|---|---|---|
| *Set up/Preparation* | Wed | 9/30/2015 | 9 a.m. | 10 p.m. | 13 hours |
| *Special Event* | Thu | 10/1/2015 | 7 a.m. | ongoing | indefinite |
| *Tear down/Clean up* | | | | | |

| | | |
|---|---|---|
| Do you plan to use a City building or park? Yes ☐ No ☒ | Do you plan to use Private Property: Yes ☐ No ☒ | If yes, do you have written approval from Private Property owner: |
| City Facility Reservation Permit Included: Yes ☐ No ☒  Pending ☐ | If yes, provide address of location: | Yes ☐ No ☐ |
| Any City streets closed? Yes ☐ No ☒ Name of streets: | Any sidewalks blocked? Yes ☐ No ☒ | Traffic Control Plan Included: Yes ☐ No ☐ N/A ☒ |
| Renting barricades from City: Yes ☐ No ☒ | Park sprinklers turned off: Yes ☐ No ☒ | |
| Amplified sound (i.e. Music, PA system): Yes ☒ No ☐  Time of use: 7 a.m. to 9 p.m. | | |
| Temporary lighting: Yes ☒ No ☐   Please describe: Portable spotlights focused on display. | | |
| Charge for event: Yes ☐ No ☒ $____/person | Event is reoccurring more than annually?: Yes ☐ No ☐ | |
| Is this event a fundraiser: Yes ☐ No ☒ | Proof of 501c3: Yes ☐ No ☒ | |
| Will alcohol be served: Yes ☐ No ☒  Will you be selling alcohol: Yes ☐ No ☒ | ABC Permit Attached: Yes ☐ No ☐ Pending ☐ | |
| Will food be served: Yes ☐ No ☒  Will you be selling food: Yes ☐ No ☒ | I will apply for San Mateo County Temporary Event Food Permit:  Yes ☐ No ☒ Pending ☐ | |
| Selling any other items: Yes ☐ No ☒ Describe: | Menlo Park Business License: Yes ☐ No ☒ | |
| Will portable rest rooms be provided: Yes ☒ No ☐ | No. of portable toilets    1  No. of ADA compliant portable toilets    0 | |
| Will you be using a tent, canopy, or other temporary structure? Yes ☒ No ☐ | Please describe: Canopy to be erected at the median strip of Sand Hill Rd. | |

MP000236

**ER-216**

## SECTION 2: EVENT NARRATIVE

**Event Description**
Briefly provide a description of the event, including activities, timeline, and sequence of events:

Starting in October 2015, we shall maintain a portable multimedia presentation illustrating ongoing corporate support of New Enterprise Associates (NEA) for incestuous child rapist Min Zhu. I shall be present on site around the clock, equipped with fully operational, exposed and unloaded firearms and loaded ammunition feeding devices therefor, in full compliance with all applicable laws. All media aspects of this event will be subject to content-neutral regulation negotiated with Menlo Park authorities.

**Parking**
Describe where event participants are expected to park their vehicles:

Off-site parking only; all on-site transportation to be provided to drop off and pick up the participants.

**Security / Emergency Action Plan**
Describe the security plan, including crowd control (including the security company name, contact information, and the amount of security personnel):

No need for crowd control is anticipated, owing to the lack of sidewalks and no stopping allowed on the Sand Hill roadside. Participant assumes full personal responsibility for the lawful defense of the site.

**Americans with Disabilities (ADA) compliance**
Describe how the event will be accessible to people with disabilities (such as parking, restrooms, and accessible path of travel to all event functions):

N/A.

**Recyclables and garbage handling**
Describe the plan for cleanup and removal of recyclable goods and garbage during and after the event (include if additional street sweeping will be arranged).

All garbage generated by the event will be picked up promptly and removed from the site daily for sanitary and lawful disposal.

*Please note:* For larger events where additional garbage removal will be needed, please contact Recology at www.recologysanmateocounty.com or call (650) 595-3900. Failure to remove trash from event will result in a $250 fine.

MP000237

**ER-217**

## SECTION 3: SITE MAP CHECKLIST

Please provide a detailed site plan/route map of the event on a separate sheet. If site map is larger than 11x17 size paper, please provide SIX (6) copies of this map in application packet. The map should include the following information:

| Yes | N/A | |
|-----|-----|---|
| ☒ | ☐ | Outline of event site, including names of streets or areas that are a part of the venue and surrounding area. If the event includes a moving route (i.e. parade or run), indicate the direction of travel and start/finish locations. |
| ☐ | ☒ | Any street or lane closures |
| ☐ | ☒ | The locations of fencing, barriers or barricades. |
| ☐ | ☒ | Location of first-aid facilities |
| ☒ | ☐ | Location of all stages, platforms, booths, food areas, trash containers, tents, etc (include dimensions) |
| ☒ | ☐ | Generator locations and/or source of electricity |
| ☐ | ☒ | Placement of vehicles or trailers used for the event (include dimensions) |
| ☐ | ☒ | Anticipated parking locations and number of parking (include ADA parking) |
| ☒ | ☐ | Placement of promotional signs or banners |
| ☒ | ☐ | Placement of portable restrooms (including labeling ADA restrooms) |
| ☐ | ☒ | Exit locations for events with fences |
| ☒ | ☐ | Location of all event activities |
| ☒ | ☐ | Location of temporary lighting |
| ☒ | ☐ | Location of sound system |
| ☒ | ☐ | Fire truck access to existing building/structures shall remain clear and unobstructed (20 feet minimum) |
| ☒ | ☐ | Fire equipment shall remain clear and unobstructed (25 feet minimum) |
| ☐ | ☒ | For large event, traffic impact and traffic handling plan including re-routing of vehicles, bicycles, and pedestrians. |

**Note:** Incomplete and vague site maps will delay the permit process.


## SECTION 4: INSURANCE INFORMATION

A Certificate of Liability Insurance must be provided and must contain the following:
- The special event permit name must be listed as the one "insured."
- The policy must not expire before the planned event date.
- The policy must be for a minimum of $1,000,000 unless otherwise specified.
- The "description" should list the rental location, day, and event planned.
- The City of Menlo Park at 701 Laurel Street, Menlo Park, CA 94025 must be noted as "additional insured."

A special event permit **will not** be issued until the required application fees, insurance, and other supplementary materials, as indicated in the Special Event Application, have been received. A special event permit issued for a private function on private property is not required to submit proof of liability insurance to the City.

MP000238

## SECTION 5: PUBLIC NOTIFICATION

Public Notification will be required for some permits based on your application. If noise ordinance is exceeded, the Planning Division will prepare a public notice to be mailed to all property owners, residents, and businesses within 300 feet of the subject property. The notice will state the decision of the City and will serve as the noise permit unless the request is appealed. The Planning Division will mail the notices on the decision date, which starts the 10-day appeal period. If the Planning Division does not receive an appeal in writing, the decision will be become effective on the 11th day. If the decision is appealed, the item will be scheduled for the next available Planning Commission meeting. The Planning Commission generally meets on the first and third Mondays of every month. The minimum lead-time between an appeal and a Planning Commission meeting is approximately 3-weeks. The decision will also be posted at the Civic Center and on the City's web page: www.menlopark.org.

## SECTION 6: FIRE DISTRICT NOTIFICATION

If necessary, you will be asked to seek approval of the Menlo Park Fire Protection District. They will be informed of any street closures and other impacts to emergency services. Please keep in mind that there are several streets within Menlo Park that cannot be closed because they are deemed primary response routes. You must receive Conditional of Approval from the City prior to contacting the Fire District.

## SECTION 7: POLICE STAFFING

For events requiring Police assistance, the Police Department will review the application and be involved in the initial meeting with the applicant. Based on the details for the event, the Police Department will provide an estimate of costs based on the number of officers needed and hours needed at the event (payment of 50% of estimated Police services is due before your permit can be issued). Post event, an invoice will be provided by the to the applicant for Police services (based on incurred costs, minus any pre-paid amount). Any additional costs incurred that were not anticipated such as extra staffing or longer hours will be billed to the applicant. All payments are due to the Menlo Park Police Department by contacting Sgt. Matt Ortega at (650) 330-6347. Non-payment for Police assistance after the event will result in the inability to apply for a special event permit in the future, until any balance is paid in full.

## SECTION 8: PARK USAGE

Rental fees for special events held on city parkland, picnic areas, or tennis courts may be applied and are subject to availability. Please review the city's Master Fee Schedule for current park usage fees. Additionally, the organizing party of an event held in these areas is responsible for following all park rules, usage guidelines, and city ordinances. Sharon Park is reserved for weddings only.

## SECTION 9: SOUND

Approval of a Special Event permit does not necessarily exempt the planned event from the requirements of Chapter 8.06 (Noise) of the Menlo Park Municipal Code. All sources of sound measured from any residential property shall not exceed 50 dBA during the "Nighttime" hours, or 60 dBA during the "Daytime" hours. Nighttime hours are considered the period between 10 p.m. and 7 a.m. daily. If you believe your planned event could exceed the noise limitations set by Chapter 8.06 of the Municipal Code, please discuss the noise permitting requirements with a member of the Planning Division. A noise permit can be obtained as part of the Special Events permit application, subject to review and action by the Planning Division and the public notification and appeal process set forth in Section 5. The Planning Division can be reached at (650) 330-6702 or by email at planning@menlopark.org.

## SECTION 10: CONFIRMATION

Please check all that apply:

- ☒ I have read all policies regarding the Special Event Application process.
- ☒ I have reviewed the Special Event Permit FAQs.
- ☒ I have read and will abide by all Sections as written and described herein.
- ☒ I am submitting the most current version of the Special Event Permit Application found at: www.menlopark.org/eventpermits
- ☒ I am providing the correct payment with my application.
- ☒ I have filled out all portions of this application completely and to the best of my knowledge.

MP000239

I hereby certify and agree that I shall be personally responsible on behalf of myself/organization for any damage sustained by the facility, property, or equipment, as a result of the occupancy of said facility or property by my group/organization. I hereby waive, release, discharge and agree to indemnify, defend and hold harmless the City, its officers, employees, and agents from and against any and all claims by any person or entity, demands, causes of action or judgments for personal injury, death, damage or loss of property, or any other damage and/or liability occasioned by, arising out of out of the event for the actions (active or passive) of invitees', event participants, event sponsors, and event spectators while on the property, or resulting from this reservation of the facilities or use or property. I hereby declare that I have read and understand and agree to abide by and to enforce the rules, regulations, and policies affecting the use of the facilities or property. If any portion of the Special Event is held on non-city owned property I have included letters of approval for each respective property owner.

_____          10 July 2015
Signature of Applicant                                              Date

**Payment Information:**

☐ Cash   ☒ Check   ☐ Visa   ☐ Mastercard      Amount $250 _____ ($125 minor / $250 major)

Account # _____ Exp. _____ Account Holder Name _____
I agree to pay the above charges and authorize the City of Menlo Park to charge these costs to my credit card. Checks payable to: City of Menlo Park.
Authorized Signature: _____
*Note: There is a $30 charge for returned checks. Additional fees from other city departments may be required before permit maybe issued, please refer to the Master Fee Schedule for updates on current fees.*

MP000240

**ER-220**



Ex. No. 3
Pltf.☐ Deft.☐ Ptd.☐ Rsp.☐
Wit: Zelony
Date: 3.18.19
Jody Birman, CSR 85138

Case 3:17-cv-07357-RS Document 163-1, Filed 01/21/23, Page 203 of 294

LARVATUS SUBSCRIBE

FIND MORE SHOP HELP

LOGIN CREATE BLOG ENGLISH (EN) 🔍

▢ READABILITY

# the origins of webex - larvatus prodeo

[Recent Entries][Archive][Friends][Profile]

### December 14th, 2012

*04:10 pm*

[Link] **the origins of webex**

As savvy politicians are wont to observe, victory has a hundred fathers but defeat is an orphan. The progenitors of WebEx number four: high-powered financier Scott Sandell, salesman extraordinary Subrah Iyar, brilliant engineer Min Zhu, and his bodacious daughter Erin Yue Bargeld. Here is a graphic representation of their relationship:





Ex. No. 4
PHLD Def. ▢ Pet. ▢ Rsp. ▢
Wit: *Zeleny*
Date: *3.18.19*
Judy Brennan, CSR #5138

3/14/2019

the origins of webex - larvatus prodeo

**Tags:** business, degenerates, ethics, sex, tasteless, webex



( 4 comments | Leave a comment )

3/14/2019

the origins of webex – larvatus prodeo

## Comments

Log in to stop seeing ads in this journal

**From:** ⚲ hyok_kim
**Date:** December 15th, 2012 10:58 pm (UTC)

### The reason........

Why did she leave you? I am sorry if you're affronted by my question.

I did notice about photos and how people smile in their photos. All three gents you mentioned smile in a particular fashion in their photos.

I don't like that kind of smile and do not trust people who smile like that in their photos.

I do like how you portray your face in your photos and your parents as well.

I never smile in photos.
(Reply) (Thread)

(Link)



**From:** ⚲ larvatus
**Date:** December 19th, 2012 11:09 pm (UTC)

### Re: The reason........

Love is evanescent. A better question to ask is why she stayed with my business after leaving me. The wench is desperate for approval. As her subsequent career suggests, she sells herself as a serial entrepreneur.
(Reply) (Parent) (Thread)

(Link)

**From:** ⚲ hyok_kim
**Date:** December 20th, 2012 12:54 am (UTC)

ER-224

## Re: The reason.........

"Love is evanescent."

Now, that is the most beautiful, accurate, and concise definition of 'love' I've read. I didn't even know the word, 'evanescent' even existed.

I can see why you consider yourself a poet.

For some reason, it reminds me of the last scene in the movie, 'Once upon a time in America', where 'Noodles' drifted into opium drenched sleep/melancholia where the camera focuses into his face and smile from the ceiling.

(Reply) (Parent) (Thread)



**From:** larvatus
**Date:** December 20th, 2012 08:45 pm (UTC)

### Re: The reason.........

Poets make things. I consider myself an assclown.

(Reply) (Parent) (Thread)

(Link)

(Link)

Subrah Iyar Appreciation Society.   Powered by LiveJournal.com

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

MICHAEL ZELENY, an individual,

       Plaintiff,

    vs.                     No. 17-cv-07357-RS

EDMUND G. BROWN, JR., an
individual, in his official
capacity, et al.,

       Defendants.

_____/


**EXHIBITS (VOLUME 2) 18 - 28**

**to the**

DEPOSITION OF MICHAEL ZELENY

Monday, March 18, 2019

1100 Alma Street, Suite 210

Menlo Park, California


MADELEINE M. FREDA, INC.
Certified Shorthand Reporters

Reported by:
    Judy Brennan
    CSR No. 5139
Our File No. 78964

2000 Broadway
P.O. Box 3119
Redwood City, CA 94064
(650) 365-6152



Ex. No. _21_
Plf.☐ Deft.☐ Tel.☐ Rsp.☐
Wit: _Zeleny_
Date: _3.18.19_
Judy Brennan, CSR #5138

| | |
|---|---|
| From: | Michael Zeleny |
| To: | Toews, Ivan J |
| Cc: | Harada, Jelena V; McClure, William; McIntyre, Alex D; Bertini, David C; dwa@agzlaw.com; Flegel, Nicolas A. |
| Subject: | Re: Notice re Menlo Park City Council Decision |
| Date: | Friday, October 06, 2017 3:04:25 AM |
| Attachments: | image001.png
Encroachment Permit-Film Permit_-_signed.pdf |

Dear Mr Toews,

Attached please find a completed application for a film permit.

Starting on 30 October 2017 and continuing through 27 December 2017, I shall maintain a portable multimedia presentation illustrating ongoing corporate support of New Enterprise Associates (NEA) for incestuous child rapist Min Zhu. I shall be present in the vicinity of 2825 Sand Hill Road from 08:00 till 18:00 every weekday, served by a support staff of one personal assistant and one cinematographer. My props are to include fully operational, exposed and unloaded military grade firearms and loaded ammunition feeding devices therefor, including without limitation, a 9mm Para semiautomatic SIG P210 pistol, and a 7.65x51mm NATO semiautomatic LRB M25 rifle and tripod-mounted belt-fed semiautomatic Browning M1919a4, in full compliance with all applicable laws. A 55" portable media display powered by a portable gas generator will display videos featuring explicit representations of sexual violence committed by NEA's publicly disgraced protégé. A sample image can be found at http://larvatus.livejournal.com/371973.html. Two tripod-mounted cameras will be placed on either side of Sand Hill Road, focusing on public reactions to my display. One of them will be attended by a cinematographer. I will operate the other one remotely. All their footage, complemented by output of body cams, will be live streamed on the Internet.

A site map can be found at https://www.google.com/maps/@37.4197308,-122.2137188,17z/. All placements of equipment and personnel will be determined to avoid interference with automotive and foot traffic, in consultation with the Menlo Park City authorities. All media aspects of this event will be subject to content-neutral regulation negotiated with Menlo Park City authorities. My fundamental rights under the First and Second Amendments of the Constitution of the United States are reserved and non-negotiable.

Please note that my standing and circumstances require accommodations not anticipated by your application format and requirements. As an individual engaged in a non-profit endeavor of public interest, I hereby apply for a waiver of all applicable fees. I will furnish all requisite liability waivers and procure the appropriate insurance coverage upon your conditional approval of this application.

Please address all legal inquiries and requests to David W. Affeld, Affeld Grivakes LLP, 2049 Century Park East, Suite 2460, Los Angeles, CA 90067, voice:310.979.8700, fax:310.979.8701.

---

Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com
7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373
**Wronged by the high and mighty? Cut them down to size with legally safe and ethically sound degradation of unworthy moguls and scrofulous celebrities.**

On Thu, Sep 28, 2017 at 1:00 PM, Toews, Ivan J <IJToews@menlopark.org> wrote:

> Dear Mr. Zeleny,
>
>
> Please see attached film permit application and film permit conditions. Application can be submitted via email. Thank you.

MP001242

**Ivan Toews- Land Development Engineer**

City of Menlo Park |

701 Laurel St. | Menlo Park, CA 94025

Direct (650)-330-6712 | | Fax 650-327-5497

IJToews@menlopark.org



---

**From:** Nicolas A. Flegel [mailto:naf@jsmf.com]
**Sent:** Wednesday, September 27, 2017 11:35 AM
**To:** michael@massmeans.com
**Cc:** Harada, Jelena V <jvharada@menlopark.org>; McClure, William <wlm@jsmf.com>; McIntyre, Alex D <admcintyre@menlopark.org>; Bertini, David C <dcbertini@menlopark.org>; dwa@agzlaw.com; Toews, Ivan J <IJToews@menlopark.org>
**Subject:** RE: Notice re Menlo Park City Council Decision

Dear Mr. Zeleny,

Thank you for your email of September 7, 2017, requesting that the City of Menlo Park reconsider your special events permit application as a film permit application. The City has asked that I respond to your email. The City has a film permit application process, and therefore you should submit a film permit application to staff. This is a different permit than a special event permit, so you will need to follow/comply with the film permit requirements. I am copying Ivan Toews of the Public Works Department, who handles film permits, and am requesting Ivan by this email to forward you the necessary application and information. Ivan's contact information is:

Ivan Toews- Land Development Engineer

MP001243

City of Menlo Park |

701 Laurel St. | Menlo Park, CA 94025

Direct (650)-330-6742 | | Fax 650-327-5497

jltoews@menlopark.org

Thank you for your attention to this matter.

Nick Flegel

(650) 324-9300

**From:** Michael Zeleny (mailto:michael@massmeans.com)
**Sent:** Thursday, September 7, 2017 2:28 AM
**To:** Harada, Jelena V <jvharada@menlopark.org>
**Cc:** William L. McClure <wlm@jsmf.com>; grubens@adcl.com; McIntyre, Alex D <admcintyre@menlopark.org>; Bertini, David C <dcbertini@menlopark.org>; David W. Affeld <dwa@agzlaw.com>
**Subject:** Re: Notice re Menlo Park City Council Decision

Thank you for your email. In keeping with the substance of our exchanges in last week's hearing, and in the mutual interests of efficiency, I would like the City of Menlo Park to reconsider my special event permit mitapplication as requesting a film permit.

The salient points of my request are as follows:

- The videography is to take place alongside 2855 Sand Hill Road, Menlo Park, CA 94025, and continue indefinitely, Monday through Friday, from 8 a.m. to 7 p.m.;
- All participants, cameras, and props will be placed so as to avoid any interference with automotive and foot traffic;
- The City will recognize all participants in the film production that are so authorized in advance by myself, as exempt from sanctions for carrying a concealed firearm or openly carrying an unloaded handgun or a long gun under California Penal Code Sections 25400 (a) (2), 26350 (a) (1), and 26400 (a), pursuant to the relevant exemptions under P.C. Sections 25510, 26375, and 26405, as applicable to authorized participants in a motion picture, television or video production, or entertainment event.

MP001244

I remain open to reasonable time, place, and manner regulations.

Please let me know how to proceed in order to ensure an expeditious determination from the City authorities.

Michael@massmeans.com | Zeleny@post.harvard.edu | 7576 Willow Glen Road, Los Angeles, CA 90046 | voice: 323.363.1860 | fax: 323.410.2373

http://larvatus.livejournal.com | "All of old. Nothing else ever. Ever tried. Ever failed. No matter. Try again. Fail again. Fail better." — Samuel Beckett

On Sep 5, 2017, at 10:14 PM, Harada, Jelena V <jvharada@menlopark.org> wrote:

> Mr. Zeleny,
>
>
> Attached is correspondence informing you of the Menlo Park City Council's decision made at the City Council special meeting of August 29, 2017, related to your Appeal of Denial of Special Event Permit Application. This item is also being sent to you via US mail.
>
>
> Sincerely,
>
>
> **Jelena Harada**
>
> Deputy City Clerk
>
> City of Menlo Park
>
> 701 Laurel St., Menlo Park, CA 94025
>
> 650-330-6612 | jvharada@menlopark.org
>
> <image001.jpg>
>
>
> <Zeleny Letter - city council action.pdf>

MP001245

MP001246



MP001247



**City of Menlo Park**
**Engineering Division**
**701 Laurel Street**
**Menlo Park, CA 94025**
Telephone (650) 330-6740

PERMIT NO.: _____
Keep this permit at the work site at all times

Call 24 hours in advance of working in the public right of way AND for each inspection request.
*Uninspected work will be rejected.*

## ENCROACHMENT PERMIT APPLICATION

☐ Major Encroachment     ☐ Temporary Encroachment     ☑ Other FILM PERMIT

☐ Minor Encroachment     ☐ Debris or Container Box     ☐ City-Mandated Repairs

### ONE PERMIT PER ADDRESS

| Location of Work 2825 Sand Hill Rd, Menlo Park, CA 94025 | Applicant Represents ☐ Contractor ☑ Owner | Applicant e-mail: zeleny@post.harvard.edu Applicant fax: |
|---|---|---|

| Name of Applicant (person) Michael Zeleny | Address 7576 Willow Glen Road | City Los Angeles | State CA | Zip 90046 | Telephone 323-363-1860 |
|---|---|---|---|---|---|
| Name of Contractor n/a | Address | City | State | Zip | Telephone |

| California Construction License No. n/a | Menlo Park Business License No. n/a | Est. Start Date 30 October 2017 | Est. Complete Date 29 December 2017 |
|---|---|---|---|

| Estimated Construction Cost (Estimate work in city R/W only. Do not include value of utility.) $ 0 | Bond or Deposit * $ to be furnished | Bond or Deposit provided by: ☐ Contractor ☑ Owner ☐ Other (provide name, company, address) |
|---|---|---|

**Description of work to be done:**

Making a multimedia presentation and filming public responses thereto.

Applicant submits the following:
☐ 3 copies of sketch or plans
☐ 3 copies of traffic control plans
☐ insurance certificate

*Call Underground Service Alert (USA) at 1-800-227-2600 before you dig*

GENERAL CONDITIONS OF PERMIT ATTACHED.
Signature below acknowledges that special working hours may apply – check the approved traffic control plan.

I hereby acknowledge that I have read this permit and the attached conditions, that the information given by me is correct, that I am the owner or the duly authorized agent of the owner, and that I agree to comply with the conditions and all applicable provisions of state laws, city ordinances, and the rules of any governmental agency involved.

| Signature of Applicant (Owner or authorized agent) | Principal Title | 6 October 2017 Date |
|---|---|---|

### DO NOT WRITE BELOW THIS LINE -- CITY STAFF USE ONLY

| Approved by Engineering Division | Date | Permit expires | Fees (retained by City) | $ |
|---|---|---|---|---|
| | | Total Due to City | ☐ Paid | $ |

* Bond or deposit requests must originate from the bond/deposit provider. A copy of the original receipt must accompany the refund request. All deposits or bonds are subject to forfeiture to comply with City Codes and Ordinances.

MP001248

**ER-233**



# GENERAL CONDITIONS OF PERMIT

### Engineering Division
### 701 Laurel Street
### Menlo Park, CA 94025
### Notification of Work or Inspection Requests: (650) 330-6740

**CITY OF MENLO PARK**

1. This permit, regardless of when dated, shall not be in effect until the applicant has obtained all licenses and other permits required by law.

2. This permit is declared null and void if work has not commenced three (3) months after the date of permit issuance.

3. Traffic control plan is required for work that will block public right-of-way. Plan shall include re-routing of vehicles, bicycles and pedestrians.

4. Any damages to existing facilities and improvements above ground or below ground, shall be promptly repaired or replaced at the permittee's expense, and claims for damage to City property must be promptly paid.

5. Applicant is responsible for determining exact locations or depths of existing utilities or other facilities. Call Underground Service Alert (USA) at 1-800-227-2600 a minimum of 48 hours prior to performing work.

6. Applicant carries sufficient insurance to work in the public right of way, and names City of Menlo Park as additional insured. Applicant agrees to keep insurance active for the duration of the project.

7. All work shall comply with the City and Caltrans Standards, including traffic control.

8. **Street Opening, Sidewalk, Curb and Gutter, and Driveway Permits.** Permittee shall notify the Public Works Inspector at least 24 hours prior to: beginning work, inspection requests, or concrete placement. The number and type of inspections required, and any tests that may be required will be as directed by the Public Works Inspector. The Public Works Inspector may be contacted by calling (650) 330-6740.

9. All trench plates used in the public right of way must have a non-skid surface.

10. Construction activities are restricted to Monday through Friday (City holidays excepted) between the hours of 8:00 AM and 5:00 PM, unless otherwise approved in writing by the Engineering Services Division.

11. A faithful performance bond or a cash deposit in an amount equal to the estimated cost of the proposed work is required for curb and gutter, driveway, or street opening permits

12. This grant of permission does not constitute a deed or grant of easement by the City, is not transferable or assignable and is revocable at any time at the will of the City.

13. This permit does not authorize tree trimming or tree removal.

14. *The traffic control plan as attached must be adhered to at all times. Note that the traffic control plan may have restricted working hours for working in the public right of way, which supersedes the standard encroachment permit working hours.*

15. The use of City property by permittee shall be limited to the purposes set forth by this permit and no structures of any kind, except those expressly permitted shall be erected or placed thereon.

16. Debris boxes/storage containers shall have reflectors so that they can be seen at night. This permit must be taped to the outside of debris boxes in a visible location.

17. This permit does not include overnight street parking for any vehicles. A separate parking permit can be obtained from the Police Department.

18. All stormwater BMP's must be in place between October 15th and April 15th, or as directed by the Public Works Inspector.

19. Additional conditions (if any) are attached to this permit and shall be followed accordingly.

**Additional Conditions:**

MP001249

# Exhibit 3

FIND MORE    SHOP    HELP                    LOGIN    CREATE BLOG    ENGLIS

LARVATUS    SUBSCRIBE                                    ☐ READABILITY

## anti-slapp - larvatus prodeo



[Recent Entries][Archive][Friends][Profile]

### March 17th, 2005

*05:45 pm*

< ✚ >

[Link] **anti-slapp**

Following a sanction awarded against them in Santa Clara for failing to stipulate to a change of venue, WebEx Communications, Inc. got judicially sanctioned for the second time yesterday for bringing up its mendacious libel lawsuit, Los Angeles Superior Court Case No. BC324927, against Michael Zeleny. Defendant Zeleny brought his anti-SLAPP motion against plaintiff WebEx on February 25, 20005, arguing that WebEx filed its lawsuit in order to infringe his Constitutional right to participate in a public forum. On March 16, 2005, Judge Michael L. Stern granted Zeleny's motion on two out of three causes of action remaining against him. The fourth cause of action had been previously dropped by WebEx prior to their failed opposition in the November 5, 2004 hearing on Zeleny's change of venue motion in Santa Clara Superior Court, where it originally filed its lawsuit. Upon the granting of that motion, Santa Clara Superior Court Judge Socrates Manoukian exercised his discretion in consideration of plaintiff WebEx having knowingly and maliciously brought up its lawsuit against defendant Zeleny in a wrong venue, by ordering them to pay his attorneys' fees. Under California law, a similar award is mandatory in favor of defendant prevailing in an anti-SLAPP motion, in an amount to be determined in a subsequent hearing.

Thus WebEx shareholders continue paying for a failed attempt to cover up WebEx founder and ex-President Min Zhu's rape of his daughter Erin Zhu. There remains their libel claim against Zeleny. WebEx objects to Zeleny's claim that WebEx used 5,000 shares of its stock that it owed to Zeleny's company to pay hush money to Min Zhu's daughter Erin for her childhood rape by Min Zhu. WebEx further objects to Zeleny's claim that his life had been threatened in the names and on the behalves of Min Zhu and WebEx. Look forward to hearings in this lawsuit determining the disposition of sociopathic child rapist Min Zhu on his way out as an executive of a publicly traded American corporation.



**Tags:** lawyers, webex

(Leave a comment)

Log in to stop seeing ads in this journal

# Exhibit 4



LARVATUS    SUBSCRIBE       FIND MORE    SHOP    HELP       LOGIN    CREATE BLOG       ENGLISH (EN)    READABILITY

# "i'm somebody now!" © 1979 navin r. johnson - larvatus prodeo

[Recent Entries] [Archive] [Friends] [Profile]

## February 9th, 2012

*07:02 pm*

[Link] **"i'm somebody now!" © 1979 navin r. johnson**
**Man with semi-automatic weapon protests at hotel**

With due respect to Buffalo Springfield, there's a man with a gun over there, and what he wants ain't exactly clear. "There" is a corner of Sand Hill Road at the entrance to the Rosewood Sand Hill hotel near Interstate 280 in Menlo Park. The man with the gun said he is Los Angeles resident Michael Zeleny, who showed up there on Thursday (Feb. 9). He's wearing a surplus military uniform complete with combat helmet and bullet-proof vest. He's carrying a semi-automatic M14 military rifle that he says is unloaded, and a long-lens camera.

Police arrived, questioned the man, but made no arrest. [And so on, with photos and comments.]

By Dave Boyce
Almanac Staff Writer

ER-238

ZEL 0001

1/3

2/7/2019

2/3

**UPDATE**: To clarify, here is my comment, partially redacted by the *Almanac* because "[their] forum is not the place to make allegations of criminal wrongdoing":

Thanks to Dave Boyce for this fair and balanced report.

In regard of my demands, the hotel complex at which I am holding my protest also houses New Enterprise Associates (NEA), self-described in their court filings in connection with this matter as our world's wealthiest and most important venture capital firm, with over $11 billion under management. It is also the firm that funded its protégé Min Zhu, the founder of WebEx Communications, right after my outing of him as a rapist of his 14-year old daughter at the 2005 WebEx user conference in San Francisco caused Min to resign from his job and flee the United States. The public deserves to learn the lesson Min had taught me, that a violent incestuous paedophile will treat his business partners like family.

I might have overlooked this matter even after receiving independently witnessed death threats against me and my family, made in the names and on the behalves of Min Zhu and WebEx, in the course of our $70 million business dispute. I went public with my story only after my father Isaak, plaintiff in a related lawsuit, died from injuries sustained in an apartment fire of suspicious causes and origins. As the poet said, there is some shit I will not eat. An apology from all responsible parties is in order.

You can find my story along with links to supporting documentation at subrah.com.

**Tags:** law, police, webex

(1 comment | Leave a comment)

Log in to stop seeing ads in this journal

# Comments

**(Deleted comment)**

**From:** larvatus
**Date:** February 10th, 2012 04:31 am (UTC)

ZEL 0002

Case: 22-15870, 06/25/2024, ID: 12891324, DktEntry: 28-8, Page 220 of 294

(**Link**)

Subrah Iyar Appreciation Society.  Powered by LiveJournal.com



Roger wilco.
(Reply) (Parent) (Thread)

2/7/2019

3/3

ZEL 0003

https://larvatus.livejournal.com/333844.html

# Exhibit 5

2/7/2019

LARVATUS        SUBSCRIBE                FIND MORE    SHOP    HELP              LOGIN    CREATE BLOG    ENGLISH (EN)    🔍

☐ READABILITY



# notice of peaceful protests in the san francisco bay area - larvatus prodeo

[Recent Entries] [Archive] [Friends] [Profile]

## June 25th, 2012

*04:09 pm*

[Link] **notice of peaceful protests in the san francisco bay area**

Dear Bay Area law enforcement personnel,

Over the following year, I shall reside and appear in your jurisdictions, exercising my fundamental rights under the First and Second Amendments to the Constitution of the United States in the course of ongoing peaceful public protests, as documented at http://www.subrah.com/ and http://larvatus.livejournal.com/tag/webex. The attached images and the article "Man with semi-automatic weapon protests on Sand Hill", published in a local newspaper, should give you an adequate idea concerning the parameters of my performances.



ZEL 0248

1/11

https://larvatus.livejournal.com/343319.html

ZEL 0249

2/11

Case: 22-15870, 06/06/2024, ID: 12893470, DktEntry: 28-3, Page 223 of 294



Case: 22-15870, 06/05/2024, ID: 12895363, DktEntry: 28-3, Page 224 of 294



ZEL 0250

3/11

https://larvatus.livejournal.com/343319.html

2/7/2019

I conduct my protests in response to independently witnessed and officially documented death threats made against me and my family in order to deter us from pursuing claims recorded in a lawsuit subsequently filed in California Superior Court, County of Santa Clara as case No. 1-02-CV-809286, *Zeleny v. Zhu and WebEx*, in the names and on the behalves of Min Zhu and WebEx Communications, Inc. The evidence of these threats and their gravity sufficed for Judge Jacob Adajian of Los Angeles Superior Court to acquit me on 11 April 2003 of weapons charges on the grounds of necessity, in a bench trial of case No. 2CR11665. In accounting for his acquittal, he ruled:

> He wouldn't get a gun permit. He wouldn't get a gun permit. We just don't issue those in L.A. unless you're a movie star or somebody who shouldn't have one. But they manage to get one. Attorney's [sic.] should have one. I couldn't get one when I was an attorney. I know when I became a judge, a responsible person, I was able to get one. Not as an attorney. I think he had a good-faith belief in the threat. He did go to the police. He did do the right thing.

Ten months after this decision, <u>my father Isaak Zelyony</u>, plaintiff in a related lawsuit No. 1-02-CV-810705, styled *Zelyony v. Zhu*, suffered fatal injuries in an apartment fire that appeared to start at two locations at once. A thorough investigation of causes and origins of this fire, which a retired Los Angeles Fire Department captain undertook on my behalf, failed to rule out the likelihood of foul play. My father was important to me. I am seeking amends for unlawful threats of violence that were followed by his violent death under suspicious circumstances. As of this writing, I have a <u>pending lawsuit in federal court</u> against callers who <u>warned me that my father's death was not an accident and promised to arrange for me to rejoin him</u>. I am protesting the ongoing institutional and individual support of a violent sexual deviant, who represents a grave personal threat to me and my family.

5/11

ZEL 0252

2/7/2019

https://larvatus.livejournal.com/343319.html

Case: 22-15870, 06/06/2024, ID: 12893313, DktEntry: 28-3, Page 226 of 294

# WANTED: SUBRAH IYAR



# CHILD RAPE TOOL

**WHAT WOULD YOU DO IF YOU FOUND OUT THAT YOUR BUSINESS PARTNER BRUTALLY RAPED HIS DAUGHTER?**

[ ] REPORT HIM TO THE POLICE

[ ] REFER HIM TO A PSYCHIATRIST

[ ] USE CORPORATE ASSETS TO COVER UP HIS RAPE

[ ] GIVE HIM MONEY TO START ANOTHER BUSINESS

6/11

ZEL 0253

Case: 22-15870, 06/05/2024, ID: 12894343, DktEntry: 28-3, Page 227 of 294

2/7/2019

https://larvatus.livejournal.com/343319.html

# WANTED: SCOTT SANDELL



# CHILD RAPE TOOL

WHAT WOULD YOU DO IF YOU FOUND OUT THAT YOUR

BUSINESS PARTNER BRUTALLY RAPED HIS DAUGHTER?

[ ] REPORT HIM TO THE POLICE

[ ] REFER HIM TO A PSYCHIATRIST

[ ] USE CORPORATE ASSETS TO COVER UP HIS RAPE

[ ] GIVE HIM MONEY TO START ANOTHER BUSINESS

As law enforcement officers, you are well placed to assess my situation. For starters, you might consult the 1988 sealed police report of childhood sexual abuse made by Min Zhu's then 14 year-old daughter Erin. On numerous occasions Erin recounted Min's prior use of the terms that failed to dissuade me from pursuing my claim against him and his company, to persuade her to yield to his sexual advances. Her subsequent complaints of her molestation by Min Zhu can be found on newsgroup alt.sexual.abuse.recovery via Google Groups search for the terms "Erin Zhu sexual abuse". Additionally, they can be found along with her draft complaint against Min Zhu for childhood sexual abuse, her email correspondence with Blixa Bargeld to that effect, and various declarations by third parties attesting to the same facts, as matters of public record in Santa Clara Superior Court case 1-02-CV-809286, *Zeleny v. Zhu & WebEx*. Erin Zhu has authenticated the accounts of her rape by her father that she had authored and relayed or publicized in sworn depositions in that case. Moreover, in a sworn deposition taken by John Walton on 3 November 2003, in *Zelyony v. Zhu*, Santa Clara Superior Court Case Number CV-810705, she confirmed under oath having settled her childhood sexual abuse claim against her father Min Zhu for $300,000, paying her lawyer David Affeld a contingency fee of 2.5%. She admitted having participated in the preparation of the draft complaint, which included a graphic description of her rape by Min Zhu. She acknowledged that after she settled her claim against them, her parents made her the beneficiary of a trust, and although she denied linking it to the settlement, she later settled a claim by her lawyer, who sued her for a contingency fee portion of the trust. While denying on that occasion that her childhood sexual abuse by her father involved "penetration", Erin Zhu confirmed under oath having told her lawyer when they prepared the draft complaint that it did involve penetration, and never having told him otherwise; and she further confirmed under oath that this sexual abuse occurred between 1 and 20 times. I urge you to consult the relevant parts of the transcript of Erin Zhu's referenced deposition, as entered in evidence and permanently consigned to the public record in *NEA v. Zeleny*, San Mateo Superior Court Case No. CIV499465, in the context of California Penal Code Section 263 providing: "The essential guilt of rape consists in the outrage to the person and feelings of the victim of the rape. Any sexual penetration, however slight, is sufficient to complete the crime."

Case: 22-15870, 06/16/2022, ID: 12467341, DktEntry: 22-3, Page 229 of 294





My revelations of these facts failed to diminish the support of Min Zhu by the Menlo Park venture capital firm New Enterprise Associates (NEA). By NEA's accounts, its business relationship with Min Zhu began in 1999 when it invested

https://larvatus.livejournal.com/343319.html

8/11

ZEL 0255

2/7/2019

9/11

2/7/2019

https://larvatus.livejournal.com/343319.html

ZEL 0256

in the company that he founded, WebEx Communications, Inc. According to SEC filings, NEA's General Partner Scott Sandell was on the Board of Directors of WebEx until February 2002. In his sworn declaration Sandell testified that "Min Zhu was a consultant at NEA, with the title Venture Partner, from March 17 2004 through March 2008." NEA has acknowledged that in 2004 I emailed them about Erin Zhu's claims concerning her childhood sexual abuse by her father Min Zhu. In my communications I pointed out that Erin verified under oath having made these claims between 1991 and 2001 in conversation with her friends, associates, and employees; in public Usenet postings and letters to her husband Blixa Bargeld; and in statements to her lawyer David Affeld in connection with the claim for childhood sexual abuse that he presented to her parents and settled on her behalf. My notices went unanswered and had no effect on NEA's support of Min Zhu and his position at WebEx. Meanwhile, WebEx's CEO Subrah Iyar attempted to cover up Min Zhu's rape of his daughter. In the course of defending against my lawsuit under his leadership, WebEx filed sworn corporate declarations claiming that there was "absolutely no truth" to the allegations that Min had raped his daughter seven years prior to its founding, while allowing him to use its corporate assets as hush money to buy her silence about his crimes, and employ its corporate counsel in defending against my claims made against him as an individual, independently of his connection with WebEx. Min Zhu resigned from WebEx and fled the United States to China only after I exposed him as a child rapist at the WebEx User Conference in San Francisco, on 2 May 2005. Yet in September of the same year, NEA funded Min Zhu's next venture in China, in full knowledge of the foregoing events. Witness this pointed observation published by China Venture News on 23 September 2005: "What's missing in the Private Equity Online article or any NEA release is any mention of the previous controversy surrounding NEA's venture partner, Min Zhu, who joined NEA in 2004, after his forced resignation as WebEx President and Director." Another side of Min Zhu's character is captured in the 2007 report of a joint investigation of WebEx by FBI and NSA, which found it illicitly transferring the records of its customers' confidential communications to China. To connect the dots, NEA's knowing sponsorship of a duplicitous child rapist has been an open secret in the venture capital community for over seven years. This is especially noteworthy in an industry, whose foundations can be shaken by a female partner's displeasure at receiving a copy of Leonard Cohen's *The Book of Longing* from her male colleague.

According to Min Zhu, as of 2008, NEA continued to invest money in his company Cybernaut. I have no reason to doubt that their business relationship has continued to this day. By all accounts, Min Zhu has established himself as an excellent profit earner, inspiring investments from numerous profit-seeking institutions and individuals undeterred by scruples about his character. In bringing to light its defects, I look forward to finding out, how far the turpitude of Silicon Valley capital is matched by its shamelessness.

Please be assured that I am sensitive to your concerns for public safety. Accordingly, in the course of my Constitutionally protected activities, I pledge to abstain from any unlawful actions, including, without limitation, the following:

- loading any firearms in the absence of a reasonable fear for life or limb;
- deploying or firing any deadly weapons or firearms in the absence of a clear and present danger to life or limb;
- making any threats of unlawful violence, including, but not limited to, drawing or exhibiting any deadly weapons or firearms in the presence of another person, in a rude, angry, or threatening manner;
- stalking, accosting, or harassing any individual, including, but not limited to, making harassing telephone calls to any individual or institution, or sending harassing correspondence to any individual or institution by any means;
- making any statement or engaging in a course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose; and

• capturing visual images or audio recordings of any individual who has a reasonable expectation of privacy, or otherwise attempting to frustrate such an expectation.

I am pleased to point out that my prior events in San Diego, Milpitas, Menlo Park, and Santa Clara were unmarked by any disturbances. I hope that the same will be the case on this occasion of scaling up my activities within the bounds of legitimacy sanctioned by the authorities of the United States Court of Appeals for the Ninth Circuit and the United States Supreme Court. Owing to substantial gains in my quest for legitimate remedies, my protests shall include topical artistic performances by bagpipers, clowns, rappers, and a brass band. I shall employ portable generators, high-intensity floodlights, and night vision devices to discover the identities and whereabouts of other friends and supporters of Min Zhu. It is my position that the mounting of these performances and the use of these instruments are protected under the First Amendment, and therefore are not subject to local permit requirements. However, as an accommodation provided in the spirit of courtesy, I shall consider reasonable requests for placing time, place, and manner constraints on my performances on a case-by-case basis. Lastly, I continue to claim the right protected by the First Amendment, to hold press conferences at the sites of my protests and to film all passerby there being questioned as to their opinion of their subject matter. I hope to forestall dangerous misunderstandings and futile litigation bound to be costly and disappointing to your taxpayers by giving you this advance notice of my plan.

My protests will take place, without limitation, at the public grounds adjacent to the following institutions and residences:

1. New Enterprise Associates (NEA), 2855 Sand Hill Road, Menlo Park, CA 94025;
2. Cisco/WebEx, 3979 Freedom Circle, Santa Clara, CA 95054;
3. Silk Road Software & Services, Inc. (SRS2), One Market Street, San Francisco, CA 94105;
4. Subrah and Rupar Iyar, 15292 Kennedy Rd, Unit A, Los Gatos, CA 95032
5. Scott Sandell, 120 Deer Meadow Ln, Portola Valley, CA 94028;
6. Forest Baskett, 24 Alexander Ave, Sausalito, CA 94965;
7. Robert J. Garland, 636 Melville Ave, Palo Alto, CA 94301;
8. C. Richard Kramlich, 3699 Washington St, San Francisco, CA 94118;
9. Jake R. Nunn, 2120 Ashton Ave, Menlo Park, CA 94025;
10. Arno Allan Penzias, 19 Calle Del Mar, Stinson Beach, CA 94970;
11. Brooke A. Seawell, 1155 Trinity Dr, Menlo Park, CA 94025;
12. Peter Sonsini, 350 Olive St, Menlo Park, CA 94025; and
13. Sigrid Van Bladel, 1338 Masonic Ave, San Francisco, CA 94117.

This list will be extended and updated in future online postings and email communications. My protests will continue until I receive full satisfaction for Min Zhu's offenses against me and my family. All concerned parties may address their communications to my lawyers Michael D. Pinnisi <mpinnisi@pinnisianderson.com>, Pinnisi & Anderson, 410 East Upland Road, Ithaca, NY 14850, phone: (607) 257-8000, and David W. Affeld <dwa@agzlaw.com>, Affeld Grivakes Zucker LLP, 12400 Wilshire Boulevard, Suite 1180, Los Angeles CA 90025, phone: (310) 979-8700, fax: (310) 979-8701. I may be reached at the number listed below.

Case: 22-15870, 06/06/2024, ID: 12890343, DktEntry: 28-3, Page 232 of 294

2/7/2019



# NEA: DAUGHTERFUCKERS FUNDED HERE

# subrah.com

Michael@massmeans.com --- http://larvatus.livejournal.com/ --- http://www.subrah.com
Zeleny@post.harvard.edu | 7576 Willow Glen Rd, Los Angeles, CA 90046 | 323.363.1860
**Wronged by the high and mighty? Cut them down to size with legally safe and ethically sound
degradation of unworthy moguls and scrofulous celebrities.**

**Tags:** america, business, exceptionalism, laws, lawyers, police, webex

(Leave a comment)

Subrah Iyar Appreciation Society.   Powered by LiveJournal.com

ZEL 0258

https://larvatus.livejournal.com/343319.html

**ER-252**

# **Exhibit 6**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE MATTER OF: )
)
)
) **CERTIFIED COPY**
MICHAEL ZELENY, )
)
        Plaintiff, )
)
    vs. ) CASE NO. CV 17-7357 JCS
)
EDMUND G. BROWN, JR., et al., )
)
        Defendant. )
)

VIDEOTAPED DEPOSITION OF CHIEF DAVE BERTINI

VOLUME I

Menlo Park, California

Tuesday, March 19, 2019

Stenographically Reported by:

HEATHER J. BAUTISTA, CSR, CRR, RPR



WATSON
COURT REPORTERS

1545 SAWTELLE BLVD. SUITE 100 LOS ANGELES CA 90025 • PHONE 310.231.4333 OR 800.373.0888 FAX 310.231.4332 • WATSONCSR.COM

ER-254

```
 1              VIDEOTAPED DEPOSITION of CHIEF DAVE BERTINI,

 2    taken before Heather J. Bautista, CSR No. 11600, a

 3    Certified Shorthand Reporter for the State of

 4    California, with principal office in the County of Santa

 5    Clara, commencing on Tuesday, March 19, 2019, 10:07

 6    a.m., at 1100 Alma Street, Suite 210, Menlo Park,

 7    California 94025.

 8

 9    APPEARANCES OF COUNSEL:

10

11         For the Plaintiff:

12              Affeld Grivakes LLP
                BY:  DAMION ROBINSON, ESQ.
13              2049 Century Park East
                Suite 2460
14              Los Angeles, California 90067
                Phone:  (310) 979-8700 / Fax:  (310) 979-8701
15              dr@agzlaw.com

16

           For the Defendant:
17
                Howard Rome Martin & Ridley LLP
18              BY:  TODD H. MASTER, ESQ.
                1900 O'Farrell Street
19              Suite 280
                San Mateo, California 94403
20              Phone:  (650) 365-7715 / Fax:  (650) 364-5297
                tmaster@hrmrlaw.com
21

22    ALSO PRESENT:

23              Nick Perry, Videographer

24              Michael Zeleny, Plaintiff

25
```

ER-255

```
     1    A.    Are you speaking --

     2          MR. MASTER:   Is that a question?

     3    Q.    (By Mr. Robinson)   I'm asking you to -- I'm

     4    asking you to clarify that that's the only thing, in

11:12 5   your view, that he's done that's unsafe, as the person

     6    most knowledgeable on behalf of the City of Menlo Park.

     7    A.    In -- when he was protesting?

     8    Q.    Correct.

     9    A.    When we speak of the broader public safety

11:12 10  realm, we are also speaking of the impact on passersby.

     11   We receive numerous 9-1-1 calls and complaints about an

     12   armed man standing at a corner of a street, which

     13   obviously impacts public safety, it impacts our

     14   resources, et cetera, and could, in fact, cause a safety

11:13 15  concern based on a driver driving by and seeing an armed

     16   man.

     17   Q.    That's something related to Mr. Zeleny carrying

     18   the unloaded weapons; right?

     19   A.    Yes.

11:13 20  Q.    So other than Mr. Zeleny carrying unloaded

     21   weapons and ammunition, is there anything else that he's

     22   done that the City of Menlo Park considers unsafe?

     23         MR. MASTER:   I'll just object as to relevance,

     24   "safety"; but vague and ambiguous.

11:13 25        You can answer.
```

**ER-256**

```
      1    under problem-solving; could have been put under other

      2    parts.  It's really not formal as to where it goes.

      3        Q.   Was Mr. Zeleny's protest considered a problem

      4    by the City of Menlo Park in 2012?

15:42 5        A.   Yes.

      6        Q.   Why was it considered a problem?

      7        A.   Because, as it states here, both subjects were

      8    wearing military style uniforms, Level 3A tactical

      9    vests, one with a ceramic trauma plate.  The rifles

15:42 10   carried by the subjects were M1A type .308 caliber, and

     11    they each had several loaded ten-round magazines on

     12    their person but not loaded in the rifles.

     13             That is why it was a problem for the Menlo Park

     14    Police Department.

15:43 15       Q.   What about that is a problem?

     16        A.   These two men were a public safety concern,

     17    both because of the fact that, very easily, they could

     18    load those weapons and become active shooters, number

     19    one.

15:43 20            Number two, they created a visual hazard for

     21    people who are passing by.  And both men put themselves

     22    in very dangerous, precarious positions, because if a

     23    passerby saw these men in the society we live in today,

     24    with active shooters and mass shootings permeating the

15:43 25   world, that a person who happened to have a gun legally
```

```
 1    may consider them a threat, and who knows what could

 2    have happened.

 3              So, yes, this was a problem.

 4        Q.   At the time that the City -- in the 2012 time

15:43  5    frame, when the City of Menlo Park apparently considered

 6    Mr. Zeleny's activities a problem, Mr. Zeleny was not

 7    doing anything illegal; correct?

 8        A.   No, he was not doing anything illegal.

 9        Q.   He was exercising his constitutional right to

15:44 10    bear arms; true?

11        A.   Certainly.

12        Q.   And Mr. Zeleny's exercise of his constitutional

13    right to bear arms was a problem for the City of Menlo

14    Park?

15:44 15              MR. MASTER:  Objection.  Argumentative.  Asked

16    and answered.

17              THE WITNESS:  It caused a public safety issue.

18        Q.   (By Mr. Robinson)  So his exercise of his

19    constitutional right to bear arms was a problem for the

15:44 20    City of Menlo Park because, in your view, it created a

21    public safety issue; is that accurate?

22        A.   That is accurate.

23              MR. ROBINSON:  Let's take a look at Exhibit 49.

24              (Exhibit 49 was marked for identification.)

15:46 25        Q.   (By Mr. Robinson)  Do you recognize Exhibit 49?
```

1    I, HEATHER J. BAUTISTA, CSR No. 11600, Certified

2    Shorthand Reporter, certify:

3    That the foregoing  proceedings were taken before

4    me at the time and place therein set forth, at which

5    time the witness declared under penalty of perjury; that

6    the testimony of the witness and all objections made at

7    the time of the examination were recorded

8    stenographically by me and were thereafter transcribed

9    under my direction and supervision;

10   That the foregoing is a full, true, and correct

11   transcript of my shorthand notes so taken and of the

12   testimony so given;

13   (  ) Reading and signing was requested.

14   (  ) Reading and signing was waived.

15   (XX) Reading and signing was not requested.

16   I further certify that I am not financially

17   interested in the action, and I am not a relative or

18   employee of any attorney of the parties, nor of any of

19   the parties.

20   I declare under penalty of perjury under the laws

21   of California that the foregoing is true and correct.

22   Dated:  March 31, 2019

23

24   _____

25   HEATHER J. BAUTISTA, CSR, CRR, RPR, CLR

**ER-259**

```
 1                 UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                        ---oOo---

 4   MICHAEL ZELENY,

 5        Plaintiff,

 6   vs.                    Case No.  CV 17-7357 JCS

 7   GAVIN NEWSOM, et al.,

 8        Defendants.
     _____/

 9   Pages 278 - 286 ARE CONFIDENTIAL

10   AND BOUND SEPARATELY

11

12   Pages 310 - 324 ARE CONFIDENTIAL

13   AND BOUND SEPARATELY

14

15    CONTINUED VIDEOTAPED DEPOSITION OF CHIEF DAVE BERTINI

16                  BY VIDEOCONFERENCE

17             (Volume II - Pages 229 to 534

18

19       Taken before DENISE M. LOMBARDO, CSR No. 5419

20                  RPR, RMR, RDR, CRR

21                   August 7, 2020

22

23

24

25

                                        Page 229
```

```
 1                    I N D E X

 2                                              PAGE

 3   EXAMINATION BY MR. ROBINSON                236

 4

 5

 6

 7

 8

 9     WHEREUPON, THE DEPONENT WAS INSTRUCTED NOT TO ANSWER

10              THE FOLLOWING QUESTIONS:

11                     PAGE     LINE

12                      237      11

13                      262      17

14                      273      10

15                      273      16

16                      274       3

17                      449      18

18

19

20

21

22

23

24

25

                                          Page 230
```

```
 1                    E X H I B I T S
 2    PLAINTIFF'S                                      PAGE
 3    Exhibit 250   City of Menlo Park Special         247
                    Event Application, Bates
 4                  No. MP 1938 through MP 1950
 5    Exhibit 251   Defendant Dave Bertini's           260
                    Second Supplemental Response
 6                  to Plaintiff's Interrogatories
 7    Exhibit 252   Agreement for Maintenance of       265
                    State Highway in the City of
 8                  Menlo Park, Bates No. MP 6656
                    through MP 6673
 9    Exhibit 253   Test messages, Bates No. MP        269
10                  6683 through MP 6688
11    Exhibit 254   Menlo Park Police Department       287
                    letter dated January 1, 2010,
12                  Bates No. MP 5382 through MP
                    5388
13    Exhibit 255   E-mail correspondence, Bates       298
14                  No. MP 51 through MP 52
15    Exhibit 256   E-mail correspondence, Bates       301
                    No. MP 5380 through MP 5381
16    Exhibit 257   (Confidential document)            ---
17    Exhibit 258   Menlo Park Police Department       345
18                  CAD Incident Report, dated
                    2/27/2019, Bates No. MP 5095
19                  through MP 5096
20    Exhibit 259   Menlo Park Police Department       354
                    Felony Report 12-1825, Bates
21                  No. MP 170 through MP 179
22    Exhibit 260   Menlo Park Police Department       360
                    General Case Report 12-1596,
23                  Bates No. MP 1858 through MP
24                  1866
25

                                        Page 231
```

```
 1                    E X H I B I T S (cont'd)
 2   PLAINTIFF'S                                      PAGE
 3   Exhibit 261   E-mail correspondence, Bates      365
                   No. MP 219 through MP 221
 4   Exhibit 262   E-mail correspondence, Bates      385
 5                 No. MP 258 through MP 260
 6   Exhibit 263   E-mail correspondence, Bates      399
                   No. MP 296 through MP 300
 7   Exhibit 264   Menlo Park Police Department      405
 8                 Agenda Items, September 2,
                   2015, Bates No. 5326 through
 9                 MP 5337
10   Exhibit 265   E-mail correspondence, Bates      411
                   No. 345 through MP 350
11   Exhibit 266   E-mail correspondence, Bates      416
12                 No. NEA_Subpoena 37
13   Exhibit 267   E-mail correspondence, Bates      435
                   No. MP 451 through MP 456
14   Exhibit 268   E-mail correspondence, Bates      457
15                 No. MP 473 through MP 476
16   Exhibit 269   Letter dated September 12,        466
                   2016, Bates No. MP 948 through
17                 MP 951
18   Exhibit 270   E-mail correspondence, Bates      470
                   No. MP 883 through MP 886
19   Exhibit 271   E-mail correspondence, Bates      471
20                 No. MP 1195 through MP 1205
21   Exhibit 272   E-mail correspondence, Bates      501
                   No. MP 1290 through MP 1299
22   Exhibit 273   E-mail correspondence, Bates      507
23                 No. 1415 through MP1426
24
25
                                          Page 232
```

```
1    CONTINUED VIDEOTAPED DEPOSITION OF CHIEF DAVE BERTINI

2

3         BE IT REMEMBERED, that pursuant to Notice, and on

4    the 7th day of August 2020, commencing at the hour of

5    10:05 a.m., before me, DENISE M. LOMBARDO, a Certified

6    Shorthand Reporter, appeared by videoconference CHIEF

7    DAVE BERTINI, produced as a witness in said action, and

8    being by me first duly sworn, was thereupon examined as

9    a witness in said cause.

10

11                       ---o0o---

12   APPEARANCES:

13

14   Appearing on behalf of the Plaintiff:

15        DAMION ROBINSON (by Zoom)

16        DAVID MARKEVITCH (by Zoom)

17        Affeld Grivakes LLP

18        2049 Century Park East, Suite 2460

19        Los Angeles, California 90067

20        (310) 979-8700

21

22

23

24

25
```

Page 233

1   Appearing on behalf of the Defendant City of Menlo Park;

2   and the Deponent, Chief Dave Bertini:

3        TODD H. MASTER (by Zoom)

4        Howard, Rome, Martin & Ridley LLP

5        1900 O'Farrell Street, Suite 280

6        San Mateo, California 94403

7        (650) 365-7715

8        tmaster@hrmrlaw.com

9

10  Appearing on behalf of the Defendant Attorney General

11  Xavier Becerra:

12        JOHN W. KILLEEN (by Zoom)

13        Deputy Attorney General

14        Office of the Attorney General

15        (916) 210-6045

16        john.killeen@doj.ca.gov

17

18  ALSO PRESENT:

19        Ted Hoppe, Videographer (by Zoom)

20        Veritext Legal Solutions

21

22        Michael Zeleny (by Zoom)

23

24

25

Page 234

```
 1    And Sergeant Kaufman sent an e-mail that was
 2    forwarded to me, via the chief, to bring me up to
 3    speed about what his -- what Mr. Zeleny's
 4    activities were prior to me being employed.
 5        Q.  How did he describe Mr. Zeleny's           11:53
 6    activities?
 7        A.  How did Chief Roberts describe it?
 8        Q.  Correct.
 9        A.  He just -- he gave me a background of the
10    fact that Mr. Zeleny would come to protest a       11:53
11    company called NEA, which I had never heard of
12    before, and that in the past, he had actually gone
13    on the property with weapons and caused quite a
14    disturbance and that since that time, there had
15    been some kind of either stay-away order or a      11:54
16    trespass order instructing him to stay off the
17    property and that he continued his protest on the
18    public right-of-way.
19        Q.  Did you have any understanding or did you
20    ever develop an understanding of what Chief Roberts  11:54
21    meant by "It's very touchy and political"?
22        A.  All I could -- no.  The only thing that he
23    spoke about is the fact that whenever Mr. Zeleny
24    appeared with all his weapons, we would be
25    inundated with phone calls, both by residents but    11:54
```

Page 302

```
 1   also by the companies and the organizations and the

 2   entities that were in that shopping -- or that --

 3   that's not a shopping center -- in that complex.

 4       Q.  Sir, you said something to the effect that

 5   the department would be inundated with phone calls;    11:55

 6   right?

 7       A.  He said in the past, they had been

 8   inundated with phone calls, yes.

 9       Q.  Did the department stop being inundated

10   with phone calls after you started?                    11:55

11       A.  As I told you, there were phone calls.  I

12   could not estimate how many were received for each

13   instance that he showed up.

14       Q.  And beyond the effect on the police

15   department and the level of calls, did he say          11:55

16   anything else about why the situation was touchy

17   and political?

18       A.  No.

19       Q.  Do you see the handwriting on Exhibit 256?

20       A.  I do.                                          11:55

21       Q.  Do you know whose handwriting that is?

22       A.  That's mine.

23       Q.  The top note here says, "NEA Rosewood."

24   Do you see that?

25       A.  No.  It says, "Near Rosewood."  That's my      11:55
```

Page 303

```
 1    handwriting.
 2        Q.  Near Rosewood?
 3        A.  Correct.
 4        Q.  Got it.  What does the handwriting at the
 5    bottom say?                                        11:56
 6        A.  "Special operations" I think I wrote.
 7        Q.  Separate from any discussion -- strike
 8    that.
 9            After Chief Roberts sent you this e-mail,
10    did you speak to Sergeant Kaufman or Sergeant      11:56
11    Romero about Michael Zeleny?
12        A.  Yes.
13        Q.  What did you talk about?
14        A.  Again, they were bringing me up to speed.
15    I was brand-new as a commander.  I had never heard 11:56
16    of Michael Zeleny nor NEA nor any of these issues
17    in the past.  So they were just basically bringing
18    me up to speed about what has happened in the past
19    and what our response would normally be so that I
20    would have some historical perspective about how   11:57
21    the police department handled these in the past.
22        Q.  There was a period of time when you were a
23    commander and Zeleny continued to protest; right?
24        A.  (No response.)
25        Q.  Let me rephrase that a little bit.         11:57
```

Page 304

```
 1          Mr. Zeleny continued protesting at NEA
 2    after you became employed with the City of Menlo
 3    Park; right?
 4          A.  That's correct.
 5          Q.  During that time period, he continued to     11:57
 6    protest with unloaded firearms; right?
 7          A.  Yes.
 8          Q.  Did you wish that he would stop
 9    protesting?
10          A.  I had no personal opinion, other than as a    11:57
11    police commander, my concern is resources, public
12    safety and having to deal with folks who are
13    calling the police department saying, There's an
14    armed person, why aren't you doing anything about
15    this.  There were several calls of that nature.  So   11:58
16    it was something we had to deal with.
17          Q.  Those were negative factors in terms of
18    managing the police department; right?  The drain
19    on resources, inundation with calls, those weren't
20    good things; were they?                              11:58
21          MR. MASTER:  Objection.  Vague and
22    ambiguous.  Overbroad.
23          MR. ROBINSON:  You can answer.
24          THE WITNESS:  I'm not quite sure what
25    you're getting at.  But this is part of our job.     11:58
```

Page 305

```
 1    We have to deal with this.  Now, obviously, it
 2    would be easier from a resource perspective that if
 3    he wasn't there with guns, those resources could be
 4    used somewhere else.
 5    BY MR. ROBINSON:                                    11:58
 6        Q.  As a police commander, were you glad that
 7    Michael Zeleny was using up the resources of the
 8    department?
 9            MR. MASTER:  Objection.  Vague and
10    ambiguous.  Overbroad.                              11:58
11            THE WITNESS:  Was I happy and glad?  Is
12    that what you're asking me?
13            MR. ROBINSON:  Correct.
14            THE WITNESS:  No.
15    BY MR. ROBINSON:                                    11:59
16        Q.  Okay.  So it wasn't good for the
17    department that Mr. Zeleny was using up resources
18    for his protests; was it?
19        A.  Again, this is -- this is what the police
20    department is there for.  I'm not sure what exactly  11:59
21    you are asking.  You know, we have to give up
22    resources for all -- a myriad of calls, and this is
23    just one of them.
24        Q.  How about being inundated with calls; were
25    you happy or glad that the police department was    11:59
```

Page 306

```
 1                REPORTER'S CERTIFICATE

 2

 3

 4       I, DENISE M. LOMBARDO, do hereby certify:

 5       That DAVE BERTINI, in the foregoing deposition

 6   named, was present by videoconference and by me

 7   sworn as a witness in the above-entitled action at

 8   the time and place therein specified;

 9       That said deposition was taken before me at

10   said time and place, and was taken down in

11   shorthand by me, a Certified Shorthand Reporter of

12   the State of California, and was thereafter

13   transcribed into typewriting, and that the

14   foregoing transcript constitutes a full, true and

15   correct report of said deposition and of the

16   proceedings that took place;

17       And that the aforementioned 306-page

18   transcript meets the California minimum transcript

19   format standards.

20       IN WITNESS WHEREOF, I have hereunder

21   subscribed my hand this 3rd day of September, 2020.

22

23       _Denise M. Lombardo_

24       DENISE M. LOMBARDO, CSR No. 5419

25       State of California
```

Page 534

# Exhibit 7



## Special Event Permit Application

**Michael Zeleny** <zeleny@post.harvard.edu>                  Fri, Jul 10, 2015 at 11:04 AM
To: "McClure, William" <wlm@jsmf.com>, Scott Sandell <ssandell@nea.com>, mlmilde@menlopark.org, Bruce Goitia
<policechief@menlopark.org>
Cc: "David W. Affeld" <dwa@agzlaw.com>, Peter Shimamoto <ps@agzlaw.com>

Michael Zeleny
michael@massmeans.com
zeleny@post.harvard.edu
7576 Willow Glen Road, Los Angeles, CA 90046
voice:323.363.1860
fax:323.410.2373

City of Menlo Park
Matt Milde
Recreation Program Coordinator
mlmilde@menlopark.org
701 Laurel Street
Menlo Park, CA 94025
voice:650.330.2223
fax:650.330.2242

By email, fax, and postal mail.

Starting in October 2015, we shall maintain a portable multimedia presentation illustrating ongoing corporate support of New
Enterprise Associates (NEA) for incestuous child rapist Min Zhu, and continuing until NEA publicly acknowledges its
wrongdoing and severs its relationship with Min Zhu, Scott Sandell, and Dick Kramlich. I shall be present on site around the
clock, served by support staff and equipped with fully operational, exposed and unloaded military grade firearms and loaded
ammunition feeding devices therefor, including without limitation, a 9mm Para semiautomatic SIG P210 pistol, and a
7.65x51mm NATO semiautomatic LRB M25 rifle and tripod-mounted belt-fed Browning M1919a4, in full compliance with all
applicable laws. A 55" portable media display powered by a portable gas generator will display videos featuring explicit
representations of sexual violence committed by NEA's publicly disgraced protégé. A sample image can be found at
http://larvatus.livejournal.com/371973.html. All media aspects of this event will be subject to content-neutral regulation
negotiated with Menlo Park authorities. My fundamental rights under the First and Second Amendments of the Constitution
of the United States are reserved and non-negotiable.

A site map can be found at https://www.google.com/maps/@37.4197308,-122.2137188,17z/. My display will be confined to
the median strip on Sand Hill Road directly across the NEA headquarters. No obstruction of automotive or foot traffic will
take place. Please contact me to arrange for the payment of the special event fee and discuss any organizational matters.
Please address all legal inquiries and requests to David W. Affeld, Affeld Grivakes Zucker LLP, 2049 Century Park East,
Suite 2460, Los Angeles, CA 90067, voice:310.979.8700, fax:310.979.8701.

cc:

Bill McClure
Menlo Park City Attorney
wlm@jsmf.comvoice:650-330-6610
Jorgenson, Siegel, McClure & Flegel, LLP
1100 Alma Street, Suite 210
Menlo Park, CA 94025
voice:650.324.9300
fax:650.324.0227

Robert Jonsen
Menlo Park Police Chief
policechief@menlopark.org
701 Laurel St.

ZEL 0181

Menlo Park, CA 94025
voice:650.330.6600

Scott Sandell
New Enterprise Associates
ssandell@nea.com
2855 Sand Hill Road
Menlo Park, CA 94025
United States
voice:650.854.9499
fax:650.854.9397

—

Michael@massmeans.com | Zeleny@post.harvard.edu | 7576 Willow Glen Road, Los Angeles, CA 90046 |
voice:323.363.1860 | fax:323.410.2373
http://larvatus.livejournal.com | "All of old. Nothing else ever. Ever tried. Ever failed. No matter. Try again. Fail again. Fail
better." —Samuel Beckett

---

🔴 **Special Event Permits - Completed Application - signed.pdf**
400K

ZEL 0182

**ER-274**

# Exhibit 8

| From: | larvatus@gmail.com on behalf of Michael Zeleny |
|---|---|
| To: | McClure, William; Scott Sandell; Milde, Matt L; Police Chief |
| Cc: | David W. Affeld; Peter Shimamoto |
| Subject: | Special Event Permit Application |
| Date: | Friday, July 10, 2015 11:05:37 AM |
| Attachments: | Special Event Permits - Completed Application - signed.pdf |

Michael Zeleny
michael@massmeans.com
zeleny@post.harvard.edu
7576 Willow Glen Road, Los Angeles, CA 90046
voice:323.363.1860
fax:323.410.2373

City of Menlo Park
Matt Milde
Recreation Program Coordinator
mlmilde@menlopark.org
701 Laurel Street
Menlo Park, CA 94025
voice:650.330.2223
fax:650.330.2242

By email, fax, and postal mail.

Starting in October 2015, we shall maintain a portable multimedia presentation illustrating ongoing corporate support of New Enterprise Associates (NEA) for incestuous child rapist Min Zhu, and continuing until NEA publicly acknowledges its wrongdoing and severs its relationship with Min Zhu, Scott Sandell, and Dick Kramlich. I shall be present on site around the clock, served by support staff and equipped with fully operational, exposed and unloaded military grade firearms and loaded ammunition feeding devices therefor, including without limitation, a 9mm Para semiautomatic SIG P210 pistol, and a 7.65x51mm NATO semiautomatic LRB M25 rifle and tripod-mounted belt-fed Browning M1919a4, in full compliance with all applicable laws. A 55" portable media display powered by a portable gas generator will display videos featuring explicit representations of sexual violence committed by NEA's publicly disgraced protégé. A sample image can be found at http://larvatus.livejournal.com/371973.html. All media aspects of this event will be subject to content-neutral regulation negotiated with Menlo Park authorities. My fundamental rights under the First and Second Amendments of the Constitution of the United States are reserved and non-negotiable.

A site map can be found at https://www.google.com/maps/@37.4197308,-122.2137188,17z/. My display will be confined to the median strip on Sand Hill Road directly across the NEA headquarters. No obstruction of automotive or foot traffic will take place. Please contact me to arrange for the payment of the special event fee and discuss any organizational matters. Please address all legal inquiries and requests to David W. Affeld, Affeld Grivakes Zucker LLP, 2049 Century Park East, Suite 2460, Los Angeles, CA 90067, voice:310.979.8700, fax:310.979.8701.

cc:

MP000234

Bill McClure
Menlo Park City Attorney
wlm@jsmf.comvoice:650-330-6610
Jorgenson, Siegel, McClure & Flegel, LLP
1100 Alma Street, Suite 210
Menlo Park, CA 94025
voice:650.324.9300
fax:650.324.0227

Robert Jonsen
Menlo Park Police Chief
policechief@menlopark.org
701 Laurel St.
Menlo Park, CA 94025
voice:650.330.6600

Scott Sandell
New Enterprise Associates
ssandell@nea.com
2855 Sand Hill Road
Menlo Park, CA 94025
United States
voice:650.854.9499
fax:650.854.9397

—

Michael@massmeans.com | Zeleny@post.harvard.edu | 7576 Willow Glen Road, Los Angeles, CA 90046 | voice:323.363.1860 | fax:323.410.2373 http://larvatus.livejournal.com | "All of old. Nothing else ever. Ever tried. Ever failed. No matter. Try again. Fail again. Fail better." — Samuel Beckett

MP000235



# CITY OF MENLO PARK
## Special Event Application
701 Laurel Street, Menlo Park, CA 94025  Ph: 650-330-2223  Fax: 650-330-2242

| | |
|---|---|
| Applicant Name: Michael Zeleny | |
| Organization Name: Mass Means, Inc. | |
| Name of Event: Child Rape Tools | |

| Address: 7576 Willow Glen Rd | City: Los Angeles | State: CA | Zip: 90046 |
|---|---|---|---|

| Home Phone: 323-363-1860 | Alternate Phone: none |
|---|---|
| E-mail Address: zeleny@post.harvard.edu | Fax: 323-410-2373 |
| Estimated Attendance: drive-by only | Event open the public: Yes ☒ No ☐ |
| Number of Event Staff: 1 | Number of Event Volunteers: 5 |

| Purpose of Event: Outing New Enterprise Associates as the corporate sponsors of incestuous child rapist Min Zhu. |
|---|

| Location of Event (please be specific and attach map): 2825 Sand Hill Rd, Menlo Park, CA 94025, at the median strip, per the attached. |
|---|

| Event Timeline | Day | Date | Start Time | End Time | Total Hours |
|---|---|---|---|---|---|
| Set up/Preparation | Wed | 9/30/2015 | 9 a.m. | 10 p.m. | 13 hours |
| Special Event | Thu | 10/1/2015 | 7 a.m. | ongoing | indefinite |
| Tear down/Clean up | | | | | |

| Do you plan to use a City building or park? Yes ☐ No ☒  City Facility Reservation Permit Included: Yes ☐ No ☒ Pending ☐ | Do you plan to use Private Property: Yes ☐ No ☒  If yes, provide address of location: | If yes, do you have written approval from Private Property owner: Yes ☐ No ☐ |
|---|---|---|

| Any City streets closed? Yes ☐ No ☒  Name of streets: | Any sidewalks blocked? Yes ☐ No ☒ | Traffic Control Plan Included: Yes ☐ No ☐ N/A ☒ |
|---|---|---|

| Renting barricades from City: Yes ☐ No ☒ | Park sprinklers turned off: Yes ☐ No ☒ |
|---|---|
| Amplified sound (i.e. Music, PA system): Yes ☒ No ☐   Time of use: 7 a.m. to 9 p.m. | |
| Temporary lighting: Yes ☒ No ☐   Please describe: Portable spotlights focused on display. | |
| Charge for event: Yes ☐ No ☒ $_____/person | Event is reoccurring more than annually?: Yes ☐ No ☐ |
| Is this event a fundraiser: Yes ☐ No ☒ | Proof of 501c3: Yes ☐ No ☒ |
| Will alcohol be served: Yes ☐ No ☒  Will you be selling alcohol: Yes ☐ No ☒ | ABC Permit Attached: Yes ☐ No ☐ Pending ☐ |
| Will food be served: Yes ☐ No ☒  Will you be selling food: Yes ☐ No ☒ | I will apply for San Mateo County Temporary Event Food Permit: Yes ☐ No ☒ Pending ☐ |
| Selling any other items: Yes ☐ No ☒  Describe: | Menlo Park Business License: Yes ☐ No ☒ |
| Will portable rest rooms be provided:  Yes ☒ No ☐ | No. of portable toilets ___1___  No. of ADA compliant portable toilets ___0___ |
| Will you be using a tent, canopy, or other temporary structure?  Yes ☒ No ☐ | Please describe: Canopy to be erected at the median strip of Sand Hill Rd. |

MP000236

## SECTION 2: EVENT NARRATIVE

### Event Description
Briefly provide a description of the event, including activities, timeline, and sequence of events:

Starting in October 2015, we shall maintain a portable multimedia presentation illustrating ongoing corporate support of New Enterprise Associates (NEA) for incestuous child rapist Min Zhu. I shall be present on site around the clock, equipped with fully operational, exposed and unloaded firearms and loaded ammunition feeding devices therefor, in full compliance with all applicable laws. All media aspects of this event will be subject to content-neutral regulation negotiated with Menlo Park authorities.

### Parking
Describe where event participants are expected to park their vehicles:

Off-site parking only; all on-site transportation to be provided to drop off and pick up the participants.

### Security / Emergency Action Plan
Describe the security plan, including crowd control (including the security company name, contact information, and the amount of security personnel):

No need for crowd control is anticipated, owing to the lack of sidewalks and no stopping allowed on the Sand Hill roadside. Participant assumes full personal responsibility for the lawful defense of the site.

### Americans with Disabilities (ADA) compliance
Describe how the event will be accessible to people with disabilities (such as parking, restrooms, and accessible path of travel to all event functions):

N/A.

### Recyclables and garbage handling
Describe the plan for cleanup and removal of recyclable goods and garbage during and after the event (include if additional street sweeping will be arranged).

All garbage generated by the event will be picked up promptly and removed from the site daily for sanitary and lawful disposal.

*Please note:* For larger events where additional garbage removal will be needed, please contact Recology at www.recologysanmateocounty.com or call (650) 595-3900. Failure to remove trash from event will result in a $250 fine.

MP000237

**ER-279**

## SECTION 3: SITE MAP CHECKLIST

Please provide a **detailed** site plan/route map of the event on a separate sheet. If site map is larger than 11x17 size paper, please provide SIX (6) copies of this map in application packet. The map should include the following information:

| Yes | N/A | |
|:---:|:---:|---|
| ☒ | ☐ | Outline of event site, including names of streets or areas that are a part of the venue and surrounding area. If the event includes a moving route (i.e. parade or run), indicate the direction of travel and start/finish locations. |
| ☐ | ☒ | Any street or lane closures |
| ☐ | ☒ | The locations of fencing, barriers or barricades. |
| ☐ | ☒ | Location of first-aid facilities |
| ☒ | ☐ | Location of all stages, platforms, booths, food areas, trash containers, tents, etc (include dimensions) |
| ☒ | ☐ | Generator locations and/or source of electricity |
| ☐ | ☒ | Placement of vehicles or trailers used for the event (include dimensions) |
| ☐ | ☒ | Anticipated parking locations and number of parking (include ADA parking) |
| ☒ | ☐ | Placement of promotional signs or banners |
| ☒ | ☐ | Placement of portable restrooms (including labeling ADA restrooms) |
| ☐ | ☒ | Exit locations for events with fences |
| ☒ | ☐ | Location of all event activities |
| ☒ | ☐ | Location of temporary lighting |
| ☒ | ☐ | Location of sound system |
| ☒ | ☐ | Fire truck access to existing building/structures shall remain clear and unobstructed (20 feet minimum) |
| ☒ | ☐ | Fire equipment shall remain clear and unobstructed (25 feet minimum) |
| ☐ | ☒ | For large event, traffic impact and traffic handling plan including re-routing of vehicles, bicycles, and pedestrians. |

**Note:** Incomplete and vague site maps will delay the permit process.

## SECTION 4: INSURANCE INFORMATION

A Certificate of Liability Insurance must be provided and must contain the following:
- The special event permit name must be listed as the one "insured."
- The policy must not expire before the planned event date.
- The policy must be for a minimum of $1,000,000 unless otherwise specified.
- The "description" should list the rental location, day, and event planned.
- The City of Menlo Park at 701 Laurel Street, Menlo Park, CA 94025 must be noted as "additional insured."

A special event permit **will not** be issued until the required application fees, insurance, and other supplementary materials, as indicated in the Special Event Application, have been received. A special event permit issued for a private function on private property is not required to submit proof of liability insurance to the City.

MP000238

**SECTION 5: PUBLIC NOTIFICATION**

Public Notification will be required for some permits based on your application. If noise ordinance is exceeded, the Planning Division will prepare a public notice to be mailed to all property owners, residents, and businesses within 300 feet of the subject property. The notice will state the decision of the City and will serve as the noise permit unless the request is appealed. The Planning Division will mail the notices on the decision date, which starts the 10-day appeal period. If the Planning Division does not receive an appeal in writing, the decision will be become effective on the 11th day. If the decision is appealed, the item will be scheduled for the next available Planning Commission meeting. The Planning Commission generally meets on the first and third Mondays of every month. The minimum lead-time between an appeal and a Planning Commission meeting is approximately 3-weeks. The decision will also be posted at the Civic Center and on the City's web page: www.menlopark.org.

**SECTION 6: FIRE DISTRICT NOTIFICATION**

If necessary, you will be asked to seek approval of the Menlo Park Fire Protection District. They will be informed of any street closures and other impacts to emergency services. Please keep in mind that there are several streets within Menlo Park that cannot be closed because they are deemed primary response routes. You must receive Conditional of Approval from the City prior to contacting the Fire District.

**SECTION 7: POLICE STAFFING**

For events requiring Police assistance, the Police Department will review the application and be involved in the initial meeting with the applicant. Based on the details for the event, the Police Department will provide an estimate of costs based on the number of officers needed and hours needed at the event (payment of 50% of estimated Police services is due before your permit can be issued). Post event, an invoice will be provided by the to the applicant for Police services (based on incurred costs, minus any pre-paid amount). Any additional costs incurred that were not anticipated such as extra staffing or longer hours will be billed to the applicant. All payments are due to the Menlo Park Police Department by contacting Sgt. Matt Ortega at (650) 330-6347. Non-payment for Police assistance after the event will result in the inability to apply for a special event permit in the future, until any balance is paid in full.

**SECTION 8: PARK USAGE**

Rental fees for special events held on city parkland, picnic areas, or tennis courts may be applied and are subject to availability. Please review the city's Master Fee Schedule for current park usage fees. Additionally, the organizing party of an event held in these areas is responsible for following all park rules, usage guidelines, and city ordinances. Sharon Park is reserved for weddings only.

**SECTION 9: SOUND**

Approval of a Special Event permit does not necessarily exempt the planned event from the requirements of Chapter 8.06 (Noise) of the Menlo Park Municipal Code. All sources of sound measured from any residential property shall not exceed 50 dBA during the "Nighttime" hours, or 60 dBA during the "Daytime" hours. Nighttime hours are considered the period between 10 p.m. and 7 a.m. daily. If you believe your planned event could exceed the noise limitations set by Chapter 8.06 of the Municipal Code, please discuss the noise permitting requirements with a member of the Planning Division. A noise permit can be obtained as part of the Special Events permit application, subject to review and action by the Planning Division and the public notification and appeal process set forth in Section 5. The Planning Division can be reached at (650) 330-6702 or by email at planning@menlopark.org.

**SECTION 10: CONFIRMATION**

Please check all that apply:

- ☒ I have read all policies regarding the Special Event Application process.
- ☒ I have reviewed the Special Event Permit FAQs.
- ☒ I have read and will abide by all Sections as written and described herein.
- ☒ I am submitting the most current version of the Special Event Permit Application found at: www.menlopark.org/eventpermits
- ☒ I am providing the correct payment with my application.
- ☒ I have filled out all portions of this application completely and to the best of my knowledge.

MP000239

I hereby certify and agree that I shall be personally responsible on behalf of myself/organization for any damage sustained by the facility, property, or equipment, as a result of the occupancy of said facility or property by my group/organization. I hereby waive, release, discharge and agree to indemnify, defend and hold harmless the City, its officers, employees, and agents from and against any and all claims by any person or entity, demands, causes of action or judgments for personal injury, death, damage or loss of property, or any other damage and/or liability occasioned by, arising out of out of the event for the actions (active or passive) of invitees', event participants, event sponsors, and event spectators while on the property, or resulting from this reservation of the facilities or use or property. I hereby declare that I have read and understand and agree to abide by and to enforce the rules, regulations, and policies affecting the use of the facilities or property. If any portion of the Special Event is held on non-city owned property I have included letters of approval for each respective property owner.

_____          10 July 2015
Signature of Applicant                                         Date

**Payment Information:**

☐ **Cash**    ☒ **Check**    ☐ **Visa**    ☐ **Mastercard**    Amount _$250_____ ($125 minor / $250 major)

Account # _____ Exp. _____ Account Holder Name _____

I agree to pay the above charges and authorize the City of Menlo Park to charge these costs to my credit card. Checks payable to: City of Menlo Park.

Authorized Signature: _____

*Note: There is a $30 charge for returned checks. Additional fees from other city departments may be required before permit maybe issued, please refer to the Master Fee Schedule for updates on current fees.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Office Use Only:**

Date Permit Submitted: _____          Project No. _____

Permit Payment: $_____ Date _____          Processed By _____

| Approval: | Department | Received | Fee | | Paid | Signature | | Date |
|---|---|---|---|---|---|---|---|---|
| | Police | _____ | _____ | (50% Est.) | ☐ | _____ | | _____ |
| | Planning | _____ | _____ | | ☐ | _____ | | _____ |
| | Public Works Engineering | _____ | _____ | | ☐ | _____ | | _____ |
| | Public Works Maintenance | _____ | _____ | | ☐ | _____ | | _____ |
| | CSD/Recreation | _____ | _____ | | ☐ | _____ | | _____ |
| **REQUIRED:** Yes ☐ No ☐ | Fire District | _____ | _____ | | ☐ | _____ | | _____ |

**Event Permit Coordinator:** _____

☐ Application Initial Review Complete
☐ E-mail Acknowledgement Sent to Applicant          (Date: _____)
☐ Application Sent to Permit Committee
☐ Site Map Complete
☐ Insurance Certificate Provided
☐ Other Agencies Permits Included
☐ Public Notification Complete
☐ Approved to exceed noise ordinance: ☐Yes ☐No
☐ Staff Approvals Complete
☐ Traffic Control Plan Approved (Street closures only)
☐ Conditions-of-Approval or Denial Letter Sent          (Date: _____)
☐ Other Department Fees Paid
☐ Barricade Rental Information (Requesting _____ 3' barricades and _____ 12' barricades)
☐ Final Copies Sent to Approving Staff

**Special Event Permit Application Approval:**

_____          _____
**Signature of Permit Coordinator**          **Date**

Updated: 07/24/14

MP000240

# Exhibit 9



Michael Zeleny <michael@massmeans.com>

---

## MP/ Zeleny Permit

Michael Zeleny <michael@massmeans.com>
To: "William L. McClure" <wlm@jsmf.com>, "Robin H. Riggins" <rhr@jsmf.com>, Cherise Brandell <cebrandell@menlopark.org>
Cc: "Cindy S. Elmquist" <cse@jsmf.com>, "David C. Bertini" <dcbertini@menlopark.org>, "Matt L. Milde" <mlmilde@menlopark.org>, Scott Sandell <ssandell@nea.com>, Subrah Iyar <Subrah.I...
<dkramlich@nea.com>, "David W. Affeld" <dwa@agzlaw.com>, Dan Primack <danielprimack@gmail.com>, Louis Citron <lcitron@nea.com>, Forest Baskett <fbaskett@nea.com>, Brooke Seaw...
Sonsini <psonsini@nea.com>, Robert Garland <rgarland@nea.com>, Jake Nunn <jnunn@nea.com>, "Hawk, Robert B." <robert.hawk@hoganlovells.com>, Arno Penzias <apenzias@nea.com...
Bcc: p.mitchell@helicalplane.com, chienlingliu@ucla.edu

Dear Mr McClure,

I have received your second denial, dated 4 May 2016, of my amended application for a special event permit, submitted on 15 April 2016. My second appeal follows.

With respect to your complaint regarding my application being incomplete, please refer to the map I submitted with it, as reattached below for your convenience. The red rectangle that designa...
entertainment event represents the location of my Dodge Ram SRT-10 pickup truck. All my activities and all my equipment will be confined to its bed and cabin, as driven to and parked at the d...
presentation will be made with a 55" SunBrite outdoor TV, mounted in a Gator G-Tour E-Lift, and powered by a portable generator. As stated in my original application dated 28 July 2015, I will ...
until NEA publicly acknowledges its wrongdoing and severs all its relations with Min Zhu, Scott Sandell, and Dick Kramlich. My staff will attend to all my needs with daily deliveries, in full compl...
regulations.

My event is most certainly meant to be open to the community at large, and I will make every accommodation for all passerby to engage lawfully and safely with its content and its authors. Wit...
accommodations will include distribution of flyers and souvenirs, and opportunities to engage me in real-time discussion, broadcast via a live Internet linkage.

If the foregoing explanation satisfies your concerns, I will forgo carrying of loaded weapons in the spirit of compromise. However, if you continue to object to my carrying unloaded firearms in th...
event, I shall be happy to litigate the matter of loaded open carry within the scope of Constitutionally protected speech. Your citation of Penal Code §16840 providing that "a firearm shall be dee...
the firearm and the unexpended ammunition capable of being discharged from the firearm are in the immediate possession of the same person", is inapposite, because applicable solely to "[e]...
firearm with the intent to commit a felony" within the scope of Penal Code §25800. I assure you that I have no such intent.

Lastly, I do not understand your claim that "a practical reading of the entertainment exception would require the Department of Justice or the Menlo Park Police Department to authorize [my] ev...
Constitutionally protected speech stands in need of such authorization, as explained previously, I shall be happy to settle this matter within the scope of a civil action for deprivation of rights pur...
Indeed, if you compel me to do so, the venue of my performance will merely change, from Sand Hill Road, to a Federal courthouse. One way or another, my message will resonate with its inter...

I trust that I have answered all relevant questions and addressed all legitimate concerns. I hope that no further explanations will be necessary for you to make a final disposition of my applicatio...

---
Michael@massmeans.com Zeleny@post.harvard.edu | larvatus.livejournal.com | subrah.com
7576 Willow Glen Rd, Los Angeles, CA 90046, U.S.A. | voice:323.363.1860 | fax:323.410.2373
**Wronged by the high and mighty? Cut them down to size with legally safe and
ethically sound degradation of unworthy moguls and scrofulous celebrities.**
[Quoted text hidden]



ZEL 0167

https://mail.google.com/mail/u/1?ik=5575b16abd&view=pt&search=all&permmsgid=msg-f%3A1535510496647434422&simpl=msg-f%3A15355104966...          1/1

# Exhibit 10

Atkinson-Baker, Inc.
www.depo.com

```
1                IN THE UNITED STATES DISTRICT COURT

2                    FOR THE STATE OF CALIFORNIA

3                      SAN FRANCISCO DIVISION

4

5    MICHAEL ZELENY, an individual,     )
                                        )
6                    Plaintiff,         )
                                        )   No. 3:17-cv-07357 RS
7    vs.                                )
                                        )
8    GAVIN NEWSOM, an individual,       )
     in his official capacity;          )
9    XAVIER BECERRA, an individual,     )
     in his official capacity;          )
10   CITY OF MENLO PARK, a municipal    )
     corporation; and DAVE BERTINI,     )
11   in his official capacity,          )
                                        )
12                   Defendants.        )
     _____)
13

14

15                  VIDEOTAPED DEPOSITION OF

16                         DAVID HARDY

17                      TUCSON, ARIZONA

18                 FRIDAY, NOVEMBER 20, 2020

19

20   ATKINSON-BAKER, INC.
     (800) 288-3376
21   www.depo.com

22

23   REPORTED BY:        PAMELA J. MONCADA, CSR NO. 7739

24   FILE NO.            AE081FA

25
```

CERTIFIED COPY

Atkinson-Baker, Inc.
www.depo.com

1        IN THE UNITED STATES DISTRICT COURT

2            FOR THE STATE OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4

5   MICHAEL ZELENY, an individual,   )
                                     )
6                    Plaintiff,      )
                                     )   No. 3:17-cv-07357 RS
7   vs.                              )
                                     )
8   GAVIN NEWSOM, an individual,     )
    in his official capacity;        )
9   XAVIER BECERRA, an individual,   )
    in his official capacity;        )
10  CITY OF MENLO PARK, a municipal  )
    corporation; and DAVE BERTINI,   )
11  in his official capacity,        )
                                     )
12                   Defendants.     )
    _____)

13

14

15        Videotaped deposition of DAVID HARDY, taken on

16  behalf of Defendants, at Tucson, Arizona, commencing at

17  9:05 a.m., Friday, November 20, 2020, before Pamela

18  Moncada, CSR No. 7739.

19

20

21

22

23

24

25

Atkinson-Baker, Inc.
www.depo.com

```
 1              A P P E A R A N C E S:

 2   FOR PLAINTIFF:

 3   LAW OFFICES OF AFFELD, GRIVAKES, ZUCKER, LLP
     BY:  BRIAN RAY ENGLAND, ESQ.
 4   2049 Century Park E
     Suite 2460
 5   Los Angeles, CA 90067-3126
     (310) 979-8700
 6   bre@agzlaw.com

 7   FOR DEFENDANT ATTORNEY GENERAL XAVIER BECERRA:

 8   LAW OFFICES OF ATTORNEY GENERAL OF CALIFORNIA
     BY:  JOHN WILLIAM KILLEEN, Deputy Attorney General
 9   1300 I Street
     Suite 125
10   PO Box 944255
     Sacramento, CA 94244-2550
11   (916) 210-6045
     john.killeen@doj.ca.gov
12
     FOR DEFENDANTS CITY OF MENLO PARK AND DAVE BERTINI:
13
     LAW OFFICES OF HOWARD, ROME, MARTIN & RIDLEY, LLP
14   BY:  ROBERT JAY GUNDERT, ESQ.
     1900 Ofarrell Street
15   Suite 280
     San Mateo, CA 94403-1387
16   (650) 365-7715
     rgundert@hrmrlaw.com
17
     ALSO PRESENT:  JOSHUA DANIELS - VIDEOGRAPHER
18

19

20

21

22

23

24

25
```

```
 1    over.                                                        11:41AM

 2            So in this section you describe three specific       11:41AM

 3    sources of authority.  You refer to Professor Nicholas       11:42AM

 4    Johnson's book, you refer to the book by Mr. Cobb, and       11:42AM

 5    you refer to your conversations with Professor Olson.        11:42AM

 6            Other than the book by Mr. Johnson, the book by      11:42AM

 7    Mr. Cobb, and your conversations with Professor Olson,       11:42AM

 8    are there any other materials that you have relied on in     11:42AM

 9    forming the opinions in Paragraphs 28 through 33?            11:42AM

10        A.   One that I would have, my documentary also          11:42AM

11    interviewed Don Kates, K-a-t-e-s, who was also involved      11:42AM

12    in the Civil Rights movement and was armed.                  11:42AM

13        Q.   And did you consult with Mr. Kates about that       11:43AM

14    in preparing this Declaration?                               11:43AM

15        A.   I should have said the late Don Kates.  I would     11:43AM

16    have had no chance to interview him in preparing this        11:43AM

17    Declaration.                                                 11:43AM

18        Q.   Fair enough.                                        11:43AM

19            So in your mind, you rely on the content of          11:43AM

20    that documentary as the basis for forming the opinions      11:43AM

21    that you express in Paragraphs 28 through 33?                11:43AM

22        A.   Yes.                                                11:43AM

23        Q.   Mr. Hardy, is it your understanding that those     11:43AM

24    who carried weapons during civil rights protests            11:43AM

25    generally carried loaded weapons, or were they generally    11:43AM
```

Atkinson-Baker, Inc.
www.depo.com

```
 1   carrying unloaded weapons?                                11:43AM

 2          MR. ENGLAND:  Object to the form.                  11:43AM

 3          THE WITNESS:  No one has specified it to me,       11:43AM

 4   but I'm pretty sure they were carrying loaded ones.       11:43AM

 5   BY MR. KILLEEN:                                           11:44AM

 6      Q.   Right.  So for example, in Paragraph 28, you      11:44AM

 7   describe, quote, "Armed volunteers protecting Dr. Martin  11:44AM

 8   Luther King."                                             11:44AM

 9          Do you understand those volunteers to have been    11:44AM

10   carrying loaded weapons or unloaded ones?                 11:44AM

11      A.   I'm assuming loaded.                              11:44AM

12      Q.   That was assuming loaded?                         11:44AM

13      A.   Yes.                                              11:44AM

14      Q.   All right.                                        11:44AM

15          And similarly, the Deacons for Defense, would      11:44AM

16   you assume that their weapons would have been loaded, as  11:44AM

17   well?                                                     11:44AM

18      A.   Yes.  On one occasion they fired it on            11:44AM

19   Klansmen; so it's safe to say their weapons were loaded.  11:44AM

20      Q.   And in your conversations with Professor Olson,   11:44AM

21   did he convey to you that his fellow workers had loaded   11:44AM

22   weapons or unloaded weapons, generally speaking?          11:44AM

23      A.   I didn't ask him.  But the context was such       11:44AM

24   that it would have been loaded.                           11:45AM

25      Q.   Outside of the civil rights -- scratch that.      11:45AM
```

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | Are you aware of any history in this country of | 11:45AM |
| 2 | people carrying unloaded firearms while participating in | 11:45AM |
| 3 | peaceful protests? | 11:45AM |
| 4 | A. I cannot think of any. | 11:45AM |
| 5 | Q. And outside of the civil rights movement in the | 11:45AM |
| 6 | south, so in other parts of the country, maybe other | 11:45AM |
| 7 | times in the nation's history, are you aware of a | 11:45AM |
| 8 | history or tradition of carrying firearms while | 11:45AM |
| 9 | participating in peaceful protests? | 11:45AM |
| 10 | And I'm talking about either loaded or | 11:45AM |
| 11 | unloaded. | 11:45AM |
| 12 | MR. ENGLAND: Object to form. | 11:45AM |
| 13 | THE WITNESS: It's sort of hard to come up with | 11:46AM |
| 14 | the idea of peaceful protests until really the time of | 11:46AM |
| 15 | Martin Luther King. I'm sure there were some. But in | 11:46AM |
| 16 | the old days you might put up a liberty pole in your | 11:46AM |
| 17 | front yard or something like that, or go to the extreme | 11:46AM |
| 18 | of making it very much not non-violent. But I don't | 11:46AM |
| 19 | think there was a whole lot of peaceful protests up | 11:46AM |
| 20 | until the 1960s; so I'm not familiar with carrying | 11:46AM |
| 21 | firearms in a peaceful protest for that time, no. | 11:46AM |
| 22 | BY MR. KILLEEN: | 11:46AM |
| 23 | Q. All right. | 11:46AM |
| 24 | And going back to the civil rights movement | 11:46AM |
| 25 | that is the subject of your Declaration, are you aware | 11:46AM |

Atkinson-Baker, Inc.
www.depo.com

| | | |
|---|---|---|
| 1 | of any instances when civil rights protestors would have | 11:46AM |
| 2 | deliberately carried only unloaded weapons to amplify | 11:47AM |
| 3 | their protests? | 11:47AM |
| 4 | MR. ENGLAND: Object to the form. | 11:47AM |
| 5 | THE WITNESS: No. | 11:47AM |
| 6 | MR. KILLEEN: All right. Well, Brian, I'm just | 11:47AM |
| 7 | about done; so maybe we should go off the record for | 11:47AM |
| 8 | three minutes. And I'll check my transcript, and then | 11:47AM |
| 9 | turn it over to Bob for any questions, or if you have | 11:47AM |
| 10 | any questions? | 11:47AM |
| 11 | MR. ENGLAND: That's fine with me. | 11:47AM |
| 12 | Bob, do you have an estimate of time you'll | 11:47AM |
| 13 | need? | 11:47AM |
| 14 | MR. GUNDERT: It depends in part of what he | 11:47AM |
| 15 | says. But it could be as little as 10 minutes and it | 11:47AM |
| 16 | could be at most probably not even an hour. | 11:47AM |
| 17 | MR. ENGLAND: Okay. Let's take a five-minute | 11:47AM |
| 18 | break or 10 minutes now and we will come back. | 11:47AM |
| 19 | MR. KILLEEN: All right. Ten minutes. | 11:47AM |
| 20 | THE VIDEOGRAPHER: This marks the end of Media | 11:47AM |
| 21 | No. 1. The time is 11:48 a.m. We are off the record. | 11:47AM |
| 22 | (A recess was taken.) | 11:51AM |
| 23 | THE VIDEOGRAPHER: This marks the beginning of | 11:59AM |
| 24 | Media No. 2 in the deposition of David Hardy. The time | 11:59AM |
| 25 | is 11:59 a.m. We are back on the record. | 11:59AM |

1                    REPORTER'S CERTIFICATE

2

3

4          I, PAMELA J. MONCADA, CSR No. 7739, Certified

5    Shorthand Reporter, certify:

6          That the foregoing proceedings were taken by me

7    and was held via videoconferencing equipment; the

8    witness and the reporter were not in the same room, at

9    which time the witness was put under oath by me;

10         That the testimony of the witness, the

11   questions propounded, and all objections and statements

12   made at the time of the examination were recorded

13   Stenographically by me and were thereafter transcribed;

14         That the foregoing is a true and correct

15   transcript of my shorthand notes so taken.

16         I further certify that I am not a relative or

17   employee of any attorney of the parties, nor financially

18   Interested in the action.

19         I declare under penalty of perjury under the

20   laws of California that the foregoing is true and

21   correct.

22         Dated this 20th day of November, 2020.

23         _____
           PAMELA J. MONCADA, CSR No. 7739

24

25         SIGNATURE WAS REQUESTED

# Exhibit 11

David W. Affeld, State Bar No. 123922
Brian R. England, State Bar No. 211355
Damion Robinson, State Bar No. 262573
Affeld Grivakes LLP
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone:    (310) 979-8700

Attorneys for Plaintiff
Michael Zeleny

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ZELENY,<br><br>    Plaintiff,<br><br>    vs.<br><br>GAVIN NEWSOM, *et al.*,<br><br>    Defendants. | Case No. CV 17-7357 RS<br><br>Assigned to:<br>The Honorable Richard G. Seeborg<br><br>**EXPERT DECLARATION OF ROBERT LATHAM BROWN**<br><br>Action Filed:  December 28, 2017<br>Trial Date:    None set. |

- 1 -

I, Robert Latham Brown, declare as follows:

1.     I have been asked to provide my expert opinion and experience regarding the permitting process involved in filming a motion picture or television production that includes the use of firearms in the State of California.

2.     For my work on this case, I am being compensated at the hourly rate of $200/hour for the preparation of this report, and $300/hour for deposition or court testimony. I received no other form of compensation related to this case. No part of my compensation depends upon the outcome of this case.

3.     **Information Considered:** In preparing this expert report, I have reviewed and considered the following material:

    a.   The American Entertainment Armorers Association Amicus Brief in support of Plaintiffs and Petitioners (Proposed); Superior Court Case No. CPF-05-505960, (https://michellawyers.com/wp-content/uploads/2013/01/Fiscal_American-Entertainment-Armorers-Association-Amicus-Brief-In-Support-of-Plaintiffs-and-Petitioners-Proposed.pdf);

    b.   California Penal Code Sections 26350, 26375, and 25510;

    c.   FilmLA Permit website (https://www.filmla.com/for-filmmakers/permits/);

    d.   California Film Commission website (https://film.ca.gov/);

    e.   The Producers Guild Code of Credits (https://www.producersguild.org/page/code_of_credits); and

    f.   The Directors Guild of America Basic Agreement (https://www.dga.org/Contracts/~/link.aspx?_id=CC4363E3-BC29-443C-9E34-88F7A534F982&_z=z).

4.  **Education:**

    a.   Bachelor of Arts degree from Tulane University awarded in September 1969.

    b.   Two years of study for an MFA degree from The University of California, Los Angeles (1972 – 1974). Left before completion to enter the AMPTP/DGA Training Program.

- 2 -

c. Association of Motion Picture and Television Producers / Directors Guild of America (AMPTP/DGA) Training Program (1974-1976).

5. **Teaching:** I have been an adjunct professor at the USC School of Cinematic Arts since the fall of 1996. The main course I teach is Production Planning, which covers the methods a Producer uses from when he receives a script through to the point of when the film is delivered. This includes, but is not limited to, scheduling the shoot, budgeting the picture, selecting the locations, procuring required permits, hiring the crew, casting the picture, and all logistical arrangements.

6. **Author:** I wrote *Planning the Low-Budget Film* as the textbook for my USC class. The book covers all the basic steps to mounting a film production. It is now used as a text in film schools beyond USC and is currently ranked by Amazon.com at 1,152 in Film & Television.

7. **Film Production Experience:** I have worked as a Producer, Co-Producer, Production Manager, Unit Production Manager, First Assistant Director, and Second Assistant Director on over 40 motion picture and television productions, and generally all but the Assistant Director positions involved obtaining location filming permits. At times I did this on my own and other times were with the aid of a Location Manager. With or without a Location Manager, I was the person ultimately responsible for obtaining the filming permits. This occurred in many different cities and towns in California, numerous other states, and in other countries. The following paragraphs will give a brief description of my involvement with those productions and whether or not firearms were used in them. The dates in parentheses were when the pictures were released.

8. Position or Credit Definitions: **The** duties **of the positions mentioned in the above paragraph are briefly described below. For a more comprehensive list of duties, see the sources listed.**

a. **Producer:** "Subject to the control of the Owner, the individual receiving Produced By credit shall have final responsibility for all business and creative aspects of the production of the motion picture, with direct participation in making decisions concerning a major portion of the producing functions (see Producers Code of Credits Section 1 for comprehensive list)." Source: Producers Guild of America Code of Credits (https://www.producersguild.org/page/coc_tmp_2)

- 3 -

b. **Co-Producer / Line Producer: "**The Co-Producer / Line Producer is the single individual who has the primary responsibility for the logistics of the production, from pre-production through completion of production; all Department Heads report to the Co-Producer / Line Producer." Source: Producers Guild of America Code of Credits (https://www.producersguild.org/page/coc_tmp_2)

c. **Production Manager / Unit Production Manager: "**The UPM, under the supervision of the Employer, is required to coordinate, facilitate and oversee the preparation of the production unit or units (to the extent herein provided) assigned to him or her, all off-set logistics, day-to-day production decisions, locations, budget, schedules and personnel." Source: The Directors Guild of America Basic Agreement, pp. 14-5, sec. 1-302, (https://www.dga.org/Contracts/~/link.aspx?_id=CC4363E3-BC29-443C-9E34-88F7A534F982&_z=z)

d. **Assistant Director: "**The First Assistant Director, alone or in conjunction with the UPM, organizes pre-production, including organizing the crew, securing equipment, breaking down the script, preparing the stripboard and a shooting schedule. During production, he assists the Director with respect to on-set production details, coordinates and supervises crew and cast activities and facilitates an organized flow of production activity." Source: The Directors Guild of America Basic Agreement, p. 16, sec. 1-303, (https://www.dga.org/Contracts/~/link.aspx?_id=CC4363E3-BC29-443C-9E34-88F7A534F982&_z=z)

9. **Multiple Television and Feature Film Productions (1976-1979):** Credits – First Assistant Director, Second Assistant Director. After completing the AMPTP/DGA Training Program, I worked on multiple television and feature film productions. My duties on these productions generally did not include obtaining film permits.

10. **The Big Fix (1978):** Credit - Second Assistant Director. When the production department at Universal Studios realized the Unit Production Manager (UPM) was having difficulty keeping up with the pace of the production, they offered me a raise in pay to stick close to the UPM

- 4 -

EXPERT DECLARATION
**ER-298**

and make sure nothing slipped through the cracks. At the time, Universal did not assign Location Managers to feature productions, so it was left up to me to obtain all the film permits.

11.     **The Concorde: Airport 79 (1979):** Credit – Unit Production Manager. This was my first job as a UPM. The film was shot in Paris, France; Washington, DC; Alta, UT; and Los Angeles. As the 2nd UPM, I was responsible for the Washington, DC and Alta, UT locations. In Washington, permits were obtained from the National Park Service for the scenes shot at the Lincoln Memorial and the National Mall. In Utah, our filming was confined to the areas above the Alta ski runs, simulating the Alps where the Concorde crash lands in the story.

12.     **The Nude Bomb (1980):** Credit – Unit Production Manager. This was my first picture as the sole UPM. The film was shot entirely in Los Angeles on local locations and on stages at Universal Studios. It simulated locations in and around Washington, DC. Some weapons were used which mainly involved .38 caliber revolvers.

13.     **The Blues Brothers (1980):** Credit – Unit Production Manager. This picture was shot mostly in Chicago, IL and surrounding suburbs, with some stage work done at Universal Studios in Los Angeles. Although I did have the assistance of a Location Manager, I handled most of the interaction with Mayor Jane Byrne. There were scenes with a lot of weapons firing, mostly police .38 caliber revolvers. The weapons were all handled by the Prop Master, Michael Milgrom.

14.     **All Night Long (1981):** Credit – Unit Production Manager. This picture was shot in and around the Los Angeles area including locations in Pasadena and Valencia. No weapons were involved. There was no Location Manager.

15.     **Bustin' Loose (1981):** Credit – Unit Production Manager. I was brought on to oversee the shooting of additional scenes after Richard Pryor had recovered from an accident in which his face was badly burned. These scenes were shot on stage at Universal and no permits were required.

16.     **Ghost Story (1981):** Credit – Unit Production Manager. This picture was shot in Saratoga, NY; Woodstock, VT; Philadelphia, PA; and New York, NY. No weapons were involved.

17.     **The Thing (1981):** Credit – Unit Production Manager. This picture was shot on stage at Universal Studios with locations outside Juneau, AK and Stewart, BC. I acquired all the location

- 5 -

1   permissions required. On an ice field outside of Juneau, we shot a scene involving an actor firing a
2   rifle from a hovering helicopter. We also used pistols and rifles in Stewart, BC and on stage at
3   Universal Studios in California. The Prop Master, John Zemansky, handled them.

4       18.   **Star Wars: Episode VI – Return of the Jedi (1983):** Credit – Production Executive.
5   I was unable to accept a UPM credit because Lucasfilm Ltd. was not a signatory to the Directors
6   Guild of America (DGA) Basic Agreement, so I was not able to perform DGA covered work. I
7   supervised two unit managers who were not members of the DGA. Although the majority of the film
8   was largely shot in England and Tunisia, my responsibilities covered the shoots at the Kerner
9   Facility in San Rafael, CA; the Jedediah Smith Redwoods State Park outside Crescent City, CA; and
10  Buttercup Valley, outside Yuma, AZ. Buttercup Valley is actually in California, but Yuma is the
11  nearest town with motels. All weapons were futuristic inventions of the prop department. No actual
12  weapons were used.

13      19.   **Iceman (1984):** Credit – Unit Production Manager. This picture was shot in
14  Vancouver, BC and Stewart, BC. I don't recall any weapons being used. If they had been the
15  Canadian UPM, Justis Greene, would have sought the appropriate permits if needed.

16      20.   **Indiana Jones and the Temple of Doom ((1984):** Credit – Production Manager. My
17  responsibilities on this picture were the shoots on the Tuolomne River east of Modesto, CA;
18  Mammoth Mountain, CA; and Marin County, CA. No weapons were used.

19      21.   **Best Defense (1984):** Credit – Unit Production Manager. This picture was shot in Los
20  Angeles, CA and the area around Jericho, Israel. All weapons use took place in Israel.

21      22.   **The Goonies (1985):** Credit – Unit Production Manager. I was brought in to manage
22  additional scenes during postproduction, so I am not listed in the credit crawl. These were shot in
23  Los Angeles, CA, both on stage and on local location. No weapons were used.

24      23.   **Warning Sign (1985):** Credit – Associate Producer / Unit Production Manager. The
25  film was shot on location in La Crescenta, CA and Payson, UT. Semi-automatic pistols and a
26  revolver were used. These were handled by the Prop Master, Larry Byrd.

27
28

- 6 -

EXPERT DECLARATION
**ER-300**

24.     **Blue City (1986):** Credit – Unit Production Manager. This picture was shot in and around Los Angeles, CA. Revolvers and semi-automatic pistols were used in filming. All the weapons were controlled by the Prop Master, Jack Marino.

25.     **Howard the Duck (1986):** Credit – Co-Producer / Unit Production Manager. This picture was shot in Northern California consisting of locations in San Francisco, Petaluma, Napa, San Rafael, Black Point, Modesto, Nicasio, Oakland, Herald, Rio Vista, and Sacramento. No firearms were used.

26.     **One Crazy Summer (1986):** Credit – Unit Production Manager. This picture was shot in Cape Cod and Nantucket, MA. There were rifles present in a scene, but they were never fired. The Prop Master, Art Lipschultz handled the weapons.

27.     **Spaceballs (1987):** Credit – Production Manager. This picture did shoot on location in Buttercup Valley, CA but was mostly shot on stage at what is now Sony Studios in Culver City, CA. At that time, it was still MGM Studios. I was assisted by a Location Manager, Michael Meehan. All weapons were products of the prop department.

28.     **Clean and Sober (1988):** Credit – Unit Production Manager. This picture was shot in Pennsylvania, Delaware, and New Jersey, with stage work being done at Burbank, CA. No weapons were used.

29.     **Elvira: Mistress of the Dark (1988):** Credit – Production Manager. I was brought in to do additional scenes in post-production. Most of our filming took place on stage at the Burbank Studios except for a 2nd unit in Las Vegas, NV which I directed. No firearms were used.

30.     **Child's Play (1988):** Credit – Unit Production Manager. The portion of picture I was involved with was filmed in and around Los Angeles. I replaced the original UPM who had left the film. Handguns were used in some scenes. These were under the supervision of the Prop Master, Art Shippee. I was assisted in obtaining film permits by a Location Manager, Michael Malone.

31.     **The War of the Roses (1989):** Credit – Unit Production Manager. This picture was mostly shot on stage and local locations in Los Angeles, with a few scenes being shot at Whidbey Island, WA. No firearms were used.

- 7 -

EXPERT DECLARATION
**ER-301**

32.     **Child's Play 2 (1990):** Credit – Executive Producer. This picture was shot mostly in Pasadena, Long Beach, and Los Angeles, CA. There were police officers portrayed who were wearing holstered side arms. These were probably rubber props.

33.     **Child's Play 3 (1991):** Credit – Producer / 2nd Unit Director. This picture was shot mostly in Southern California with the military academy exteriors shot at Kemper Military School in Boonville, MO. Handguns and M1 rifles were used in both California and Missouri. The weapons were all under the custody and supervision of the Prop Master, Jack Marino. Location filming permits were obtained by a Location Manager, William Bowling. No special permits were required for the use of the weapons.

34.     **Babylon 5: The Gathering (1993):** Credit – Producer / Unit Production Manager. This was the pilot episode for a television episodic series. It was shot on stage in Santa Clarita, CA at the Santa Clarita Studios. No actual firearms were used.

35.     **Robin Hood: Men in Tights (1993):** Credit – Executive in Charge of Production / Production Manager. This picture was shot in and around Los Angeles, CA. All weapons were medieval. No firearms were involved. William Bowling was the Location Manager.

36.     **Showgirls (1995):** Credit – Unit Production Manager. This picture was shot in Los Angeles, CA; Lake Tahoe, NV; and Las Vegas, NV. No firearms were used.

37.     **Dracula: Dead and Loving It (1995):** Credit – Associate Producer / Production Manager. This picture was shot in and around Los Angeles, CA. No firearms were used.

38.     **Starship Troopers (1997):** Credit – Production Manager. This picture was shot in Southern California; Hell's Half Acre outside of Casper, WY; and Kadoka, SD. William Bowling was the Location Manager. During the shoot in Hell's Half Acre, we used futuristic prop weapons built on real automatic rifles, plus real Browning .50 caliber machine guns, all of which were fired using blank cartridges. Since the Federal Firearms Act of 1938, automatic weapons have been strictly controlled. These prohibitions were renewed in the Gun Control Act of 1968. I hired Robert "Rock" Galotti as our Weapons Coordinator/Armorer. Mr. Galotti is a Federal Firearms Licensee (FFL) and he was legally authorized to be in possession of such weapons and to arrange their transportation. He maintained strict control over the weapons. At the end of each shooting day, Mr.

- 8 -

EXPERT DECLARATION
**ER-302**

1    Galotti caused the weapons to be secured at the Casper, WY Police Department. No permits were

2    required for our use of these weapons because Mr. Galotti had control of them.

3        39.    **The Parent Trap (1998):** Credit – Production Manager. My involvement with this

4    picture was for the shooting sequences in the western United States. This included locations in

5    California such as San Francisco, Camp Seely in Crestline, Lake Gregory, Long Beach Airport,

6    Napa Valley, RMS Queen Mary Long Beach, Santa Clarita, and Los Angeles. No weapons were

7    used.

8        40.    **Hollow Man (2000):** Credit – Production Manager. This picture was shot in

9    Washington, DC and Los Angeles, CA. There were handguns used but I believe they were non-

10   functional replicas.

11       41.    **Ali (2001):** Credit – Production Manager. I am not listed in the credit crawl since I

12   was only involved in prepping the picture to shoot after which I handed the picture over to another

13   UPM. My work included scheduling the shoot, budgeting the picture, hiring the crew, arranging to

14   transport the crew and equipment to Uganda, and tracking costs during the prep period.

15       42.    **Spider-Man (2002):** Credit – Production Manager. I am not listed in the credit crawl

16   since I was brought in to oversee the shooting of additional scenes and to manage the postproduction

17   period. No firearms were used for these additional scenes.

18       43.    **The Anarchist Cookbook (2002):** Credit – Producer. This was a low budget

19   production shot in and around Plano, TX with a day at the Fort Worth Stockyards. There was a

20   handgun used which was obtained by the Prop Master, Jason Hammond.

21       44.    **Vampires: Los Muertos (2002):** Credit – Line Producer / Unit Production Manager.

22   I am not listed in the credit crawl since I was brought in to manage a few added scenes. The picture

23   was filmed entirely in Mexico except for the added scenes which I supervised. These were shot in

24   Los Angeles. There were handguns and a shotgun used. These were obtained by the Prop Master,

25   Richard Blake Wester. No special permits were required.

26       45.    **The Santa Clause 2 (2002):** Credit – Production Manager. This picture was shot

27   entirely in Canada. I was on the film only for the prep period during which I scheduled and budgeted

28   the movie.

EXPERT DECLARATION

**ER-303**

46. **Charlie's Angels: Full Throttle (2003):** Credit – Unit Production Manager. I was brought in to manage the additional scenes, so I am not listed in the credit crawl. No firearms were used.

47. **S.W.A.T. (2003):** Credit – Unit Production Manager. This picture was shot in and around Los Angeles and at Mojave Airport. Many firearms were used including automatic weapons. There were large shoot-outs staged in Burbank and downtown Los Angeles. All weapons were under the control of our Armorer, Michael Papac who is an FFL. Our main concern was how the noise would affect residents and businesses in the surrounding areas.

48. **A Lot Like Love (2005):** Credit – Unit Production Manager. This picture was shot in and around Los Angeles and in New York, NY. No firearms were used.

49. **Lords of Dogtown (2005):** Credit – Unit Production Manager. I was brought in to manage the additional scenes, so I am not listed in the credit crawl. It was shot mostly in Venice, CA and other Los Angeles areas. No firearms were used.

50. **Local Color (2006):** Credit – Co-Producer / Unit Production Manager. This was a low budget picture shot in New Orleans and Covington, LA. No firearms were used.

51. **The Holiday (2006):** Credit – Unit Production Manager. I was brought in to supervise additional scenes, so I am not listed in the credit crawl. These were shot in and around Los Angeles.

52. **Hard Breakers (2010):** Credit – Producer / Production Manager. This was a low budget independent feature shot in and around Los Angeles. No firearms were used.

53. **1982 (2013):** Credit – Co-Producer. This was a low budget short film. It was shot in Los Angeles. No firearms were used.

54. **Love is Not Love (2019):** Credit – Line Producer. This was a low budget independent feature shot in and around Los Angeles. No firearms were used.

55. **Current Productions:** Credit – Producer. I am currently involved in the development of four films, two of which will involve firearms.

- 10 -

56. **Planning for the use of firearms in a scene:** When I am employed as a Co-Producer, Line Producer, or Unit Production Manager, there are discrete steps that I follow when planning a film shoot in which firearms are used. These are outlined in the following paragraphs.

57. **Read the script.** The first step is to read the script and note any scenes in which firearms are used.

58. **Create the breakdown sheets.** A breakdown sheet is created for each scene in the script. In the top half of this sheet are listed the scene numbers, whether the scene is exterior, interior, or both, the set name, the time of day, how long the scene is in terms of pages and eighths of a page, a brief but unique synopsis of the scene, the page of the script the scene starts on, the story day of the scene, what filming unit will be shooting the scene, and the locations of the shoot.

    a. **Filling in the breakdown sheet:** The bottom half of the breakdown sheet is where all the specific elements that are needed to shoot the scene are listed. These would include cast members; background actors (extras); stunt players; picture cars or other vehicles appearing in front of camera; props; camera equipment; special effects that occur in the scene such as fire, rain, or explosions; costume notes; makeup and hair notes; animals; animal wranglers; music notes; sound notes; art department notes; set dressing; greenery; special equipment; security; additional labor; visual effects notes and personnel; and miscellaneous notes.

    b. **Props.** Props are any objects which are handled by the actors or extras. Jewelry, eyeglasses, and watches are also included in props, as are weapons of various sorts. These can be replicas of weapons, for example they may be an airsoft or plastic gun, or they can be real weapons such as knives, swords, or firearms.

    c. **Firearms.** Motion pictures and television productions usually use Title 1 firearms. These are firearms that are available to the general public, such as rifles from bolt action to semi-automatic, revolvers, and semi-automatic handguns. On occasion, we also use firearms that are prohibited to the general public in so far as they require a special federal permit and license to possess them. For more complex or higher

- 11 -

volume of firearms or other weapons, we employ an Armorer who has a federal firearms license.

    d.   **Title 1 Firearms.** In California, absent a statutory exemption, if a Prop Master or Armorer wanted to rent a Title 1 firearm to use in a motion picture or television production, the Prop Master or Armorer would need to undergo a background check every time he or she rented a firearm. Then when the Prop Master or Armorer wanted to turn the firearm over to an actor to use in a scene, the actor would have to go through a background check as well. Legislated waiting periods would also apply in each of these transfers. This would be unworkable in the making of a motion picture or television production and would severely impact the filmmakers.

    e.   **The California Entertainment Firearms Permit.** The California Legislature passed amendments to California's firearms restrictions creating the Entertainment Firearms Permit ("EFP"). This is a California specific permit that a Prop Master or any other nonprohibited person can register for and can be used in place of the repeated background checks. It also allows an EFP holder to give the firearm to an actor or other Authorized Participant and take it back after the scene is over, without doing background checks or requiring a waiting period. For purposes of California's ban on the open carry of weapons, the actor or participant to whom the firearm is loaned is an "Authorized Participant" as that term is used in California Penal Code Sections 26375 and 25510.

    f.   **Federal Firearm License.** In order to possess, transport, rent, or transfer firearms that are prohibited by the Federal Firearms Act and succeeding laws, a Prop Master or Armorer must have a Federal Firearms License ("FFL").

59.    **Create the shooting schedule.** Once the breakdown sheets are completed, the database of breakdown sheets is viewed in the form of a strip board, where each scene is individually displayed on a strip. These strips can be rearranged and sorted on the board with day markers to create a shooting schedule. It's at this point that I would consult with a Prop Master or Armorer if the motion picture or television production requires operational firearms.

- 12 -

60. **Prop Master or Armorer.** The decision whether to hire a Prop Master or an Armorer rests on the type and the number of weapons needed. On a movie such as STARSHIP TROOPERS, I had a complete department headed by an Armorer to handle all weapons. In that film, we were using many prohibited weapons including two Browning .50 caliber machine guns. Once the Prop Master or Armorer is hired, I would discuss with him or her the weapons we needed and solicit his/her recommendations. At that time, we would not know the names of all the people who might be handling the firearms in any given scene. This is because we would not necessarily have the motion picture or television production completely cast and would not yet have hired the stunt players. Any extras who would be given firearms in the scenes might not be hired until the day of shooting. In addition, on any shooting day, the Director may change his or her mind as to who will be firing the weapons. In my experience, neither a Prop Master nor an Armorer are concerned with or request the names or identities of the specific actors and extras who will be Authorized Participants. With respect to the Authorized Participants, the only concern a Prop Master or Armorer has is to make sure that the Authorized Participants are not legally prohibited from possessing a firearm and are capable of safely handling the firearm. The Prop Master or Armorer will then arrange for the procurement of the prop weapons and are responsible for the transport, storage, and safe use of the firearms.

61. **Film permits.** One to two weeks prior to the filming of a scene, the production company's designee will apply for the location filming permits. The application asks for information related to the logistics of the shoot, including for example; what will take place in the scene, how long we expect to be at the location, whether we will be firing weapons, the approximate size of the crew, whether we will be using pyrotechnics, where we will be parking our equipment, and whether we will need traffic control on public streets. It's not that different from applying for a permit to perform street maintenance. At no time during the permitting process, have I ever been asked to provide the names or identities of the actors, stunt players, and extras who will be using the firearms in any specific scene, and I have never volunteered that information. In fact, often at this stage of the process, that information is not yet known or finalized.

- 13 -

62.    The film permit will be issued with certain restrictions such as how many policemen we must hire and whether we need a fire safety officer with us during the shoot. We will also be required to notify residents and businesses within a 500-foot radius of our location about the upcoming shoot. If it's a residential area, we will be restricted to certain hours of the day (e.g. we can't arrive before 7:00 am and must be gone by 10:00 pm). The film permit does not identify or reference the names or the identities of the Authorized Participants in the shoot. Obviously, any notification to residents or businesses likewise does not include the names or identities of the Authorized Participants.

63.    **On the day of filming.** The call sheet for that day will have a notice that there will be gunfire on the set. We do the same if there will be explosions or if there will be anything similar the crew should be aware of. During the set up of the shot, a mandatory safety meeting will be held by the First Assistant Director in conjunction with the Prop Master and/or Armorer attended by the Director, actors, stunt players, extras, and crew. Hearing protection is issued to the crew. Cast members, stunt players, and extras will be issued foam ear plugs that won't be visible to the camera.

64.    Before each take, the weapons are checked, loaded with blank cartridges, and handed to the Authorized Participants (the actors, stunt players, and extras) by the Prop Master/Armorer. After each take, the weapons are secured by the Prop Master/Armorer, cleared, and reloaded with blank cartridges if there is to be another take.

65.    The use of firearms in motion pictures and television productions is highly regulated, especially in California. It would be more so if not for the special exemptions from the state firearm laws that are granted to the motion picture and television industry. Without those exemptions, it would be impossible to make certain types of productions in California.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed October 9, 2020 at Westlake Village, California

Robert Latham Brown
Declarant

- 14 -

EXPERT DECLARATION

**ER-308**

# Exhibit 12

1  David W. Affeld, State Bar No. 123922
   Brian R. England, State Bar No. 211355
2  Damion Robinson, State Bar No. 262573
   Affeld Grivakes LLP
3  2049 Century Park East, Ste. 2460
   Los Angeles, CA 90067
4  Telephone:     (310) 979-8700

5  Attorneys for Plaintiff
   Michael Zeleny
6

7

8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11  MICHAEL ZELENY,                Case No. CV 17-7357 RS

12         Plaintiff,              Assigned to:
                                   The Honorable Richard G. Seeborg
13             vs.
                                   **EXPERT DECLARATION OF**
14  GAVIN NEWSOM, *et al.*,        **MICHAEL TRISTANO**

15         Defendants.
                                   Action Filed:  December 28, 2017
16                                 Trial Date:    None Set

17

18

19

20

21

22

23

24

25

26

27

28

- 1 -

EXPERT DECLARATION

I, Michael Tristano, declare as follows:

1.     I have been retained by Affeld Grivakes LLP on behalf of Michael Zeleny, as an expert in the above-referenced litigation.

2.     As an independent expert, I have been asked to give my opinion on the issue of permitting for film, television, and other video projects, and, specifically, the permitting and use of firearms on such projects.

3.     For my work on this case, I am being compensated at a rate of $500 per hour, plus expenses.  I have not received and will not receive any other compensation related to this case.  No part of my compensation depends on the outcome of this case.

**PROFESSIONAL BACKGROUND AND EXPERIENCE**

4.     I have been a professional Armorer and Special Effects Technician for more than 30 years.  I have worked on more than 500 feature films, television shows and video projects, most of which are listed on the Internet Movie Database (imdb.com).  These projects include: 3:10 to Yuma, The Purge, Medal of Honor, I Am Still Here, and Enron: The Smartest Guys in the Room.

5.     Most of my work is done in the State of California, and my licenses and permits to do this work include:

    1)     A California DOJ Entertainment Firearms Permit;

    2)     A Federal Firearms License (FFL);

    3)     The four California Dangerous Weapon Permits, which include permits for assault weapons and .50 caliber weapons, machine guns, short-barrel rifles and shotguns, and destructive devices; and

    4)     The California Certificate of Eligibility.

6.     Besides providing on-set armorer services and training of actors, actresses, extras, and stunt people (collectively "Authorized Persons") for proper and safe use of blank-firing firearms on set, my company also rents and provides non-firing replica and rubber guns.

7.     I have also been an on-camera weapons expert on shows for The History Channel, The Discovery Channel and A&E.

EXPERT DECLARATION

8.      When I am involved in any project using firearms on the set of a motion picture, TV show or video project, I advise the production on what firearms I think they should use in their show and what permitting we will require regarding the use of firearms during the project.

9.      Based on my extensive career as a professional, licensed motion picture and television Armorer, I believe that I am qualified to address the questions presented to me.

**INFORMATION CONSIDERED**

10.      In preparing this expert report, I have reviewed the relevant applications and standards regarding permitting for film, television and video projects in the State of California, and the use of firearms on set.

11.      My analysis of the information relevant to this case is ongoing, and I expect to continue receiving information and questions as they are presented to me, and it is possible that new information may affect certain conclusions in this report. I therefore reserve the right to supplement it.

**OPINIONS**

12.      If called upon to testify, I would explain the following facts and opinions regarding permitting for film, television and video productions, and the inclusion of proper permitting for the use of firearms on these productions.

13.      When I am contacted by a production to provide their show with Armorer services and the rental of blank-firing guns, non-firing replicas and rubber guns, I am involved with the production company in the process of obtaining the necessary permits.  I always insist that productions get the proper permitting and cover all of the requirements in the specific area and jurisdiction they are filming in.

14.      In the State of California, although rules and regulations may vary somewhat from county to county and city to city, the general state policies are the same:

1)      The production must apply for a permit for all of the days and at each location where the filming will be taking place through the offices in

- 3 -

charge of filming in the respective jurisdictions. In Los Angeles, for example, permits are applied for and obtained from FilmLA.

2) If there is going to be blank-firing weapons used and blanks fired, both the permit application and the permit must include this information, with a description of the type of gunfire (such as single shot, semiautomatic, fully automatic, or black powder blanks) and the load size of the blanks (1/4 load, 1/2 load, or full load) so the proper notifications can be made to the surrounding area.

3) Is the blank gunfire to take place in the interior or exterior of the location? If there is gunfire in the exterior of the location, or in any area open to the public view, at least one Police Officer is usually required to be assigned to the location by the permitting office. A Fire Marshall or FSO (Fire Safety Officer) may also be assigned by the permitting office if the location is located in a fire zone, or if there are possible flammable elements at the location.

4) If there is no blank gunfire, but replica or rubber guns are brandished in an exterior part of the location, or an area open to view by the public, this must also be on the permit application and the permit and a Police Officer will still be assigned to the location to deal with civilians to make sure everyone knows this is not an active shooter situation.

5) Whenever any real or blank-firing firearms are present on a set, a licensed Armorer must be present to handle blank-firing weapons and a licensed Prop Master for non-firing replica guns and rubbers. This is so proper safety protocols are always followed.

6) Permitting offices do not inquire about the names or identities of the Authorized Participants using the weapons, as such information is neither necessary nor relevant for the permitting process. In fact, when the permit applications are being prepared, submitted, and considered, often times the

- 4 -

specific names and identities of the Authorized Participants are not known or finalized. In particular, the names and identities of extras serving as Authorized Participants may well not be known until the actual day of the shoot and can change throughout the day in the director's discretion. In my experience, during the permitting process, I have never been asked to provide, and have not provided, the names and identities of the anticipated Authorized Participants to any permitting office or agency.

7) In contrast to the permitting offices and agencies, licensed Armorers are required to ensure that none of the Authorized Participants using the real and/or blank-firing weapons is a felon or a person prohibited from possessing a firearm. Such "prohibited persons" may use replica or rubber weapons only.

8) While any blank-firing, replica or rubber weapons are on set, they remain in the charge of the Armorer and/or Prop Master, until they are needed to be placed in the hands of the Authorized Participants and/or on the set. After the shots are completed, the firearms are taken back and remain in the charge of the Armorer and/or Prop Master.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed October 9, 2020 at Los Angeles, California.

Michael Tristano
Declarant

- 5 -

EXPERT DECLARATION